IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

JOSH HICKS,

Plaintiff,

v.

Civil Action No.
9:10-CV-1177 (LEK/DEP)

OFFICER STERMER, OFFICER DAVIS, and SUPERINTENDENT, WILLARD CORRECTIONAL FACILITY*,*

Defendants.

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

JOSH HICKS, *pro se*
08-B-2899
Great Meadow Correctional Facility
P.O. Box 51
Comstock, NY 12821

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
Attorney General of the
State of New York
The Capitol
Albany, NY 12224-0341

KRISTA A. ROCK, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Josh Hicks, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against three employees of the New York State Department of Corrections and Community Services ("DOCCS") (formerly the New York State Department of Correctional Services, or "DOCS"), alleging that they violated his constitutional rights while he was confined to the Willard Correctional Facility ("Willard"), located in Willard, New York.[1] Plaintiff's complaint, which contains only minimal factual allegations, asserts that one defendant corrections officer verbally harassed and then assaulted him while the other stood idly by. As relief, plaintiff seeks recovery of punitive damages in the amount of five hundred thousand dollars as against those two officers as well as the superintendent at Willard, whose role in the relevant events is not

[1] Since all of the events giving rise to plaintiff's claims occurred at either Willard or the Five Points Correctional Facility, both of which are located in the Western District of New York, were this case to proceed forward I would recommend that it be transferred to that court. *See Rescuecom Corp. v. Chumley*, 522 F. Supp.2d 429, 448 (N.D.N.Y. 2007) ("Motions to transfer venue are governed by a two-part test: (1) whether the action to be transferred 'might have been brought' in the transferee venue; and (2) whether the balance of convenience and justice favors transfer.") Considering that all of the events relevant to plaintiff's claim took place in the Western District, it seems clear that the action could have been brought there and that the justice and convenience would be served by a transfer.

disclosed in plaintiff's complaint.

Currently pending before the court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint based principally upon the contention that Hicks failed to exhaust administrative remedies before commencing suit. Defendants additionally argue that, in any event, plaintiff's claims of harassment are not actionable, and further that those against the superintendent of Willard must be dismissed for lack of personal involvement. Having carefully reviewed the record in light of defendants' motion, without the benefit of a response from the plaintiff as to why dismissal is not warranted, I recommend that defendants' motion for summary judgment be granted in part, but otherwise denied in light of the existence of triable issues of material fact surrounding defendants' exhaustion defense. As an alternative basis for dismissal, however, I find that plaintiff's failure to provide the court with his current address is tantamount to a failure to prosecute and warrants *sua sponte* dismissal of his complaint on this independent ground.

## I. BACKGROUND[2]

[2] In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Burtnieks v. City of New York,* 716 F.2d 982, 985-86 (2d Cir. 1983) (citations omitted).

At the times relevant to his claims, plaintiff was a New York State prison inmate entrusted to the custody of the DOCCS.[3]  *See* Complaint (Dkt. No. 1) ¶ 2.  Plaintiff was confined at Willard until November 16, 2009, when he was transferred to Five Points Correctional Facility ("Five Points"), where he remained until February 22, 2010.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 18-3) ¶ 4.[4]

In his complaint plaintiff alleges that on October 20, 2009 he became engaged in a verbal altercation with Corrections Officer Stermer, and was assaulted by that officer, while Corrections Officer Davis, who observed the assault, failed to intervene on Hicks' behalf.  Complaint (Dkt. No. 1) at ¶¶ 14-15.  Plaintiff claims to have suffered severe pain and embarrassment as a result of the incident.  *Id.* at ¶ 14.  According to the plaintiff, the incident was witnessed by three fellow inmates.  *Id.* at ¶ 16.

Prior to commencing suit, plaintiff lodged complaints regarding the incident forming the basis of his claims in this action through two avenues.  The first of those was in the form of a complaint filed with the Office of the

---

[3]    As will be seen, plaintiff has apparently been released from DOCCS custody.  *See* p. 7 n.8, *post.*

[4]    By virtue of his failure to respond to defendants' motion, plaintiff is deemed to have admitted the facts recited in Defendants' Local Rule 7.1(a)(3) Statement.  *See* pp. 9 - 12, *post.*

New York State DOCCS Inspector General ("IG"). Complaint (Dkt. No. 1) at ¶ 17. Records maintained by the DOCCS IG reflect that an investigation of plaintiff's complaint was conducted, and the matter was ultimately closed as "unsubstantiated" on April 12, 2010. Ferro Aff. (Dkt. No. 18-6) ¶ 6.

Plaintiff also attempted to avail himself of the internal grievance process established by the DOCCS following his transfer into Five Points in November 2009. There the plaintiff filed Grievance No. FPT-22062-09, dated November 18, 2009, complaining of an assault occurring on October 29, 2009 while he was eating in the messhall at Willard. O'Neill Aff. (Dkt. No. 18-7) ¶ 11 and Exh. C. In that grievance, plaintiff asserted that he was kicked in the back by Corrections Officer Stermer.[5] *Id.* Plaintiff's grievance was denied on December 21, 2009 based upon the pendency of the IG's investigation. *Id.* There is no record of any appeal of that denial by the plaintiff to the DOCCS Central Office Review Committee ("CORC"). Hale Aff. (Dkt. No. 18-4) ¶ 10 and Exh. A.

## II. PROCEDURAL HISTORY

---

[5] Plaintiff's grievance makes no mention of involvement on the part of defendant Corrections Officer Davis, nor does it mention the superintendent at Willard. *See* O'Neill Aff. (Dkt. No. 18-7) Exh. C.

Plaintiff commenced this action on October 1, 2010. Dkt. No. 1. Following service of the summons and complaint on Willard Superintendent Bartlett and Corrections Officer Stermer, defendants requested and were granted an extension of time to respond to the complaint to January 15, 2011. Dkt. No. 8. On December 20, 2010, prior to the expiration of that deadline, instead of answering plaintiff's complaint defendants filed the instant motion for summary judgment.[6,7] Dkt. No. 18. Defendants' motion is premised upon their contention that 1) plaintiff's claims are procedurally barred based on his failure to exhaust available administrative remedies before filing suit, 2) he has failed to state a cognizable claim under the Eighth Amendment for verbal harassment, and

---

[6] Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering a plaintiff's complaint. *Compare* Fed.R.Civ.P. 12(b)(6) *with* Fed.R.Civ.P. 56. Despite the lack of a specific rule recognizing such a stay, some courts have deemed the interposition of a pre-answer summary judgment motion as an act of defending in the case, negating a finding of default, while others have not. *Compare Rashidi v. Albright*, 818 F. Supp. 1354, 1355-56 (D.Nev.1993) *with Poe v. Christina Copper Mines, Inc.*, 15 F.R.D. 85, 87 (D.Del.1953). In this instance, defendants requested and were granted an extension of time to file an answer to the complaint until thirty days after a final determination is issued with respect to defendants' motion, in the event that the action survives summary judgment. Dkt. No. 15.

[7] At the time the motion was filed only the superintendent and defendant Stermer had been served. Following service of the summons and complaint on defendant Davis, defendants requested that the court consider that defendant to be a party to the motion for summary judgment as well. Dkt. No. 21. That request was promptly granted. *See* Text Order of January 10, 2011.

3) he has failed to allege the personal involvement of the superintendent of Willard in the misconduct alleged. *Id.* Despite having been served with the requisite notification of the consequences of failing to respond, *see* Dkt. No. 18, plaintiff has failed to file any opposition to defendants' motion.[8]

Notwithstanding plaintiff's failure to respond, his deadline to do so having long since passed, defendants' motion is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on

---

[8] The court's records indicate that mail sent by the clerk of the court to the plaintiff at Great Meadow Correctional Facility on March 28, 2011 was returned as undeliverable. Research of records publicly available on the DOCS "Inmate Lookup" indicates that plaintiff was discharged from Great Meadow Correctional Facility on or about March 17, 2011. *See* http://nysdocslookup.docs.state.ny.us. It thus appears that plaintiff has failed to fulfill his obligation under the court's local rules to keep the court apprised of his current address.

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A moving party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").

B. Legal Significance of Plaintiff's Failure to Respond

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.)). Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion. *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. &

Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).[9] As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp. 2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to

---

[9] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

properly respond to that statement.[10]  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

C.      Failure to Exhaust Remedies

In their motion, defendants assert that plaintiff's Eighth Amendment claims are procedurally barred based upon his failure to exhaust available administrative remedies with regard to that cause of action.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]"  *Porter v. Nussle*, 534 U.S. 516, 524, 122 S. Ct. 983, 988 (2002), Congress altered the inmate litigation landscape

---

[10]      Local Rule 7.1(a)(3) provides that, "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  *See* N.D.N.Y.L.R. 7.1(a)(3).

considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S. Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532, 122 S. Ct. at 992 (citation omitted).

In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[11]  7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to CORC, which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.

---

[11]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

It is uncontroverted that while plaintiff filed a grievance concerning the incident giving rise to his claims, he failed to pursue that grievance through to completion including, significantly, to take an appeal of the adverse determination at the local level to the CORC. This circumstance tends to support defendants' contention that plaintiff's complaint is subject to dismissal for failure to exhaust available administrative remedies.

Despite the PLRA's exhaustion requirement, there are circumstances under which an inmate's failure to file a proper grievance before commencing suit may be overlooked and not relied upon as a basis for dismissal of his or her federal claims. An inmate may, for example, be excused from the requirement of exhaustion upon a finding that by their own actions defendants prevented the exhaustion of plaintiff's administrative remedies and should therefore be estopped from asserting failure to exhaust as a defense. *Macias v. Zenk*, 495 F.3d 37, 41 (2d Cir. 2007); *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004). In a series of decisions issued in 2004, led by *Hemphill*, the Second Circuit also identified a category of "special circumstances" which could justify

excusing a plaintiff's failure to exhaust administrative remedies.[12]

*Hemphill*, 380 F.3d at 689; see also *Giano v. Goord*, 380 F.3d 670, 676-77 (2d Cir. 2004).

In this instance, plaintiff clearly did not pursue the specified administrative remedy to completion.  Though plaintiff filed a grievance, he did not pursue the alternative expedited procedure for complaining of staff misconduct set forth in the applicable regulations, and he did not appeal the denial of his grievance to the CORC.  Additionally, plaintiff lodged a complaint with the IG's office, resulting in what could be viewed as the functional equivalent of a grievance investigation.  Indeed, the response to plaintiff's grievance filed at Five Points referred to that investigation and advised Hicks that "Five Points cannot conduct an investigation into the complaint as it is under IG Investigation[,]" thereby denying plaintiff's grievance.  Some court's have held that an inmate's filing of a complaint with the IG, and the IG's commencement of an investigation is insufficient

---

[12]    Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford* has been a matter of some speculation.  *See, e.g., Newman v. Dunkin*, No. 04-CV-395, 2007 WL 2847304, at *2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).  As one court in this district recently observed, "While recognizing that the Supreme Court's decision in *Woodford* may cast some doubt on the continued viability of the *Hemphill* analysis, the Second Circuit has continued to scrutinize failure to exhaust claims with reference to these three prongs."  *Hooks v. Howard*, No. 907-CV-0724, 2010 WL 1235236, at *4 (N.D.N.Y. Mar. 30, 2010) (McAvoy, S.J.) (citing *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir.2006)).

to excuse the failure to adhere to the PLRA exhaustion requirements.

*Grey v. Sparhawk*, No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. Jun. 23, 2000) (finding IG complaint do not excuse inmate's complete failure to file grievance); *but see Jacoby v. Phelix*, No. 9:07-CV-872, 2010 WL 1839299, at * 8 (N.D.N.Y. Mar. 31, 2010) (Baxter, M.J.) (noting that generally an IG complaint will not suffice to exhaust administrative remedies, but finding questions of fact precluding summary judgment based upon inmate's allegations that he was threatened into dropping his grievance) (citing *Grey*), *report and recommendation adopted*, 2010 WL 1839264 (N.D.N.Y. May 6, 2010) (Hurd, J.).

Under the circumstances presented, however, it is conceivable that the IG investigation and the denial of plaintiff's grievance on that basis constitutes special circumstances. *Morris v. Rabsatt*, No. 9:10-CV-0041, 2010 WL 4668440, at *4 (N.D.N.Y. Oct. 18, 2010) (Lowe, M.J.), *report and recommendation adopted*, 2010 WL 4668328 (N.D.N.Y. Nov. 9, 2010) (Kahn, J.). Accordingly, it cannot be definitively said at this point that there exists no sufficient basis to excuse the exhaustion requirement. See *Franklin v. Oneida Correctional Facility,* No. 9:03-CV-1452 (LEK/DEP), 2008 WL 2690243, at *7 (N.D.N.Y. July 1, 2008); *Heath v. Saddlemire*,

No. 9:96-CV-1998 (FJS/RF), 2002 WL 31242204, at *5 (N.D.N.Y. Oct. 7, 2002). I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's complaint on this procedural basis be denied.

D. Verbal Harassment

As an independent basis for dismissal of certain of plaintiff's claims, defendants argue that his assertions that he experienced verbal harassment do not give rise to a cognizable cause of action.

Plaintiff's claims are brought under the Eighth Amendment, which prohibits cruel and unusual punishment. Verbal conduct by prison officials toward an inmate, however offensive it may be, does not constitute cruel and unusual punishment in the constitutional sense. *Smith v. Goord*, No. 9:08 Civ. 1364, 2010 WL 3488148, at *6 (N.D.N.Y. Aug. 9, 2010) (Treece, M.J.), *report and recommendation adopted*, 2010 WL 3488139 (N.D.N.Y. Aug. 30, 2010) (Mordue, C.J.); *Carpio v. Walker*, No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J.). It is well established that 42 U.S.C. § 1983 is not intended to represent a code of professional conduct for federal, state and local prison officials. *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996)

(citations omitted); *Williams v. United States*, No. 07 Civ. 3018, 2010 WL 963474, at * 16 (S.D.N.Y. Feb. 25, 2010), *report and recommendation adopted*, 2010 WL 963465 (Mar. 16, 2010); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998).  Federal courts are neither equipped nor in the business of overseeing prison operations and performing human resource functions within such settings; rather, the function of the courts in a case such as this is to safeguard the right of prison inmates to be free of cruel and unusual punishment running afoul to the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 291 (1976).

A portion of plaintiff's cruel and unusual punishment claim is addressed to a "verbal altercation" involving Hicks and Corrections Officer Stermer.   Standing alone, the allegation that such a verbal altercation occurred does not rise to the level of constitutional significance, and is not cognizable under 42 U.S.C. § 1983.  *See Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio*, 1997 WL 642543, at *6 ("verbal

harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").  Nor do threats amount to a constitutional violation.  *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995).

Accordingly, to the extent that plaintiff has attempted to fashion an Eighth Amendment claim based upon defendant Stermer's alleged verbal harassment of him, he has failed to state a claim that is cognizable under section 1983, and that portion of his complaint is subject to dismissal.

E.    Personal Involvement

As a separate basis for dismissal of the claims against the superintendent of Willard, defendants assert that plaintiff has failed to allege that defendant's personal involvement in the constitutional deprivations at issue.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct.

1282 (1978)). As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983.[13] *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1952 (2009). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

There is nothing in the plaintiff's complaint or the record before the court to suggest that there is any basis for holding the superintendent of Willard responsible for the alleged misconduct, other than the fact that he has responsibility for overseeing that facility. Since his supervisory

---

[13] The Second Circuit has yet to address the impact of *Iqbal* upon the categories of supervisory liability under *Colon*. Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States*, 674 F. Supp. 2d 531, 542-544 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

position alone is insufficient to impose liability under section 1983, plaintiff's claims against the superintendent of Willard should also be dismissed for lack of personal involvement. *Richardson*, 347 F.3d at 435.

F. Failure to Provide the Court With a Current Address

As was noted above, plaintiff apparently has been released from prison, yet has failed to provide the court with his current address. Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute an action or comply with any order of the court. *Link v. Wabash R.R. County Independent Sch. Dist.*, 370 U.S. 626, 629-30, 82 S. Ct. 1386, 1388 (1962). This power to dismiss may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Freeman v. Lundrigan*, No. 95-CV-1190, 1996 WL 481534, at *1 (N.D.N.Y. Aug. 22, 1996) (Pooler, J.) (citing *Rodriguez v. Walsh*, No. 92-Civ-3398, 1994 WL 9688, at *1 (S.D.N.Y. Jan. 14, 1994) (other citations omitted)). The power of a court to dismiss an action for failure to prosecute is inherent and may be exercised *sua sponte*. *Lindsey v. Loughlin*, 616 F. Supp. 449, 453 (E.D.N.Y Aug. 13, 1985) (citing *Link*, 370 U.S. at 630-31, 82 S. Ct. at 1388-89 ("The authority of a court to dismiss *sua sponte* for

lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.")).

The appropriateness of a Rule 41(b) dismissal for failure to comply with an order of the court and/or for failure to prosecute is determined in light of five factors, including:

> (1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.

*See Shannon v. Gen. Elect. Co.*, 186 F.3d 186, 193 (2d Cir. 1999) (failure to prosecute action) (citation and internal quotation marks omitted); *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996) (failure to comply with order of court) (citations omitted).

Under this court's rules, an unrepresented litigant is under a duty to inform the court of any changes in his or her address. *See* N.D.N.Y.L.R. 10.1(c)(2). The import of this requirement cannot be understated; without

the benefit of an address for use in contacting a litigant the court is unable to communicate effectively regarding the case and to notify the party of scheduled hearings and other court requirements. As then-District Judge Pooler noted with respect to this important requirement,

> [i]t is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany County Corr. Facility Staff*, No. 95-CV-1525, 1996 WL 172699, at *1 (N.D.N.Y. Apr. 10, 1996) (quoting *Perkins v. King*, No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see generally* N.D.N.Y.L.R. 41.2(b).

Plaintiff commenced this action on October 1, 2010. Through language prominently appearing in the initial order granting plaintiff's application to proceed *in forma pauperis*, plaintiff was informed of the requirement to provide the court with notice of any change in address:

> **Plaintiff is also required to promptly notify the**

> **Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action[.]**

Order (Dkt. No. 4) p. 4 (emphasis in original).

Defendants filed and served this motion for summary judgment upon the plaintiff on December 20, 2010. Research of records publicly available on the DOCS "Inmate Lookup" indicates that plaintiff was discharged from Great Meadow Correctional Facility on or about March 17, 2011, well after the filing of defendants' motion. *See* http://nysdocslookup.docs.state.ny.us. Despite his presumptive awareness of the pendency of defendants' motion and the passage of more than five months since defendants served plaintiff with their motion, plaintiff has failed to respond. Moreover, four months have elapsed since plaintiff was apparently discharged from prison, yet he has failed to apprise the court of his current address. The court's independent efforts to locate plaintiff through the DOCS Inmate Lookup have been unsuccessful, showing only that he has been released from DOCS custody.

Given the present circumstances, I have considered whether a sanction less severe than dismissal is appropriate, and have concluded

that under the circumstances presented, it is not since any further effort to communicate with plaintiff would be futile. Additionally, I find that the court's need to manage its docket weighs in favor of dismissal. For these reasons, I recommend that plaintiff's complaint in this action be dismissed for failure to prosecute.

IV. SUMMARY AND RECOMMENDATION

Plaintiff asserts that he was harassed and assaulted by defendant Stermer and that defendant Davis failed to intervene, thus violating his right to be free from cruel and unusual punishment afforded by the Eighth Amendment. While issues of material fact preclude resolution of defendants' exhaustion of remedies defense at this early procedural juncture, Hicks' claims arising from alleged verbal harassment and all claims against the superintendent at Willard are subject to dismissal for failure to state a cause of action. Additionally, plaintiff's failure to comply with the local rules of the court and maintain a current address on file with the clerk's office should result in dismissal of his complaint on the separate and independent basis of failure to prosecute.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 18) be GRANTED in part, and that plaintiff's claims of verbal harassment, and all claims against the superintendent at Willard, be DISMISSED, but that the motion otherwise be DENIED; and it is further

RECOMMENDED, that plaintiff's complaint be DISMISSED *sua sponte* for failure to prosecute.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 26, 2011
Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

***1** Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

***2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))


N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)


END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

C
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

***1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

***2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

***1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

***2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. [FN2] The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

***3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; FN3 as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

***4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were “some key areas of concern,” but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

***5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See* *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see* *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See* *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U .S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See* *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord* *Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See, e.g.,* *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

***6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

***7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *SeeOsier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

***8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *SeeDavis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord*[*Davis,* 119 S.Ct. at 1671](#) ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See*[*Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000)](#); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

***9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

***10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional Facility, et al; Nassau County University Medical Staff and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

***1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff") brings this *pro se* action pursuant to 42 U.S.C. § 1983 against the Nassau County Sheriff, Nassau County Correctional Facility ("NCCF") and NCCF's medical staff, (collectively, "defendants"), seeking damages for injuries allegedly caused by defendants while he was incarcerated at NCCF. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that Hargrove's claims should be dismissed because he failed to exhaust administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e. For the following reasons, defendants' motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint, alleging that defendants violated his civil rights when they forcibly administered purified protein derivative skin tests ("PPD test") to test for latent tuberculosis ("TB") in April 2002, 2003 and 2004 while he was incarcerated at NCCF. Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove named Nassau County Sheriff Edward Reilly ("Reilly"), NCCF and Nassau County University Medical Staff [FN2] as defendants.[FN3] On November 22, 2004, after discovery, County Defendants and NHCC Defendants filed separate motions for summary judgment pursuant to Fed.R.Civ.P. 56. Both defendants properly filed a Local Rule 56.1 Statement and served Hargrove a Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment, pursuant to Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27, 2004. The *pro se* clerk's office received and filed the complaint on September 20, 2004. Under the prison mail-box rule, a *pro se* prisoner's complaint is deemed filed when it is delivered to prison authorities. *See, e.g., Walker v. Jastremski,* 430 F.3d 560, 562 (2d Cir.2005)(deeming *pro* se prisoner's § 1983 action filed on date complaint was handed to prison officials). There is no evidence in the record as to when Hargrove handed the complaint to prison officials. However, it is clear the operative date is between August 27, 2004 and September 20, 2004. As discussed, *infra,* both of these dates occur before Hargrove properly exhausted the administrative remedies available to him at NCCF.

FN2. The Nassau County University Medical Staff are employed by the Nassau Health Care Corporation ("NHCC"). Pursuant to the Correctional Center Health Services Agreement between the County of Nassau and NHCC, dated September 24, 1999, NHCC provides medical services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, http://www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

***2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

***3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶ ¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

***4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

***5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g.,* *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g.,* *Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also* *Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See* *Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

> ***6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also* *Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see* *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see* *Williams,* 418 F.Supp.2d at 101. *See also* *Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

***7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

***8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also* *Hemphill,* 380 F.3d. at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

***9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g.,* *Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g.,* *Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf.* *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See* *Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

***10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See* *Sloane,* 2006 WL 3096031, at *8;*Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also* *Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

***11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

***12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan, Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney General, The Capitol Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

**I. FACTS**[FN1]

FN1. The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [FN2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On May 3, 2004, after Plaintiff filed the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

***2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

**Civil Rights 78 1395(7)**

78 Civil Rights
78III Federal Remedies in General
78k1392 Pleading
78k1395 Particular Causes of Action
78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases

Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

***1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

***2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also* *Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom.* *Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See,* *McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See,* *Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

***3** Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

***4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10 th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

***5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr. Fac., Doctor Halko & P.A. Williams of Sing Sing Corr. Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY, Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of New York, New York, NY, By: S. Kenneth Jones, Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

***1** Defendants Charles Greiner ("Greiner"), past Superintendent of Sing Sing Correctional Facility ("Sing Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams ("Williams"), and Dr. Lofton ("Lofton"), all of the Sing Sing Medical Department, (collectively, the "Defendants"), have moved to dismiss the amended complaint of *pro se* inmate Roger Sulton ("Sulton"), pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure to exhaust administrative remedies. For the reasons set forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2, 2000, asserting a claim against the Defendants under Section 1983 for alleged violation of his constitutional rights under the Eighth Amendment for acting with deliberate indifference to his serious medical needs. Sulton filed an amended complaint on May 3, 2000, to identify additional defendants to his suit. Additionally, Sulton alleges negligent malpractice by the Sing Sing medical staff. Sulton seeks monetary damages. The instant motion was filed on August 9, 2000, and was marked fully submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). However, both the Defendants and Sulton have submitted materials outside the pleadings. Where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court has determined to treat the instant motion as a motion for summary judgment. Therefore, the following facts are gleaned from the parties' submissions, with all inferences drawn in favor of the non-movant as required on a motion for summary judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing Sing at the time of the incidents in question. Greiner was Superintendent of Sing Sing at that time. Halko was and is a doctor on medical staff at Sing Sing. Williams and Lofton are alleged to be affiliated with the Sing Sing Medical Department.

According to Sulton, on October 8, 1998, he slipped on a flight of wet stairs, where there was no "wet floor" sign posted, and injured his left knee. The next day his knee was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

***2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December 17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

> No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

***3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at *2- *3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq*.). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at *2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at *4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

***4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at *3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants' motion will be granted and the amended complaint will be dismissed without prejudice to the action being renewed once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow Correctional Facility; David Carpenter, Deputy Superintendent; Patrick Vanguilder, Deputy Superintendent of Security; William Mazzuca, Superintendent of Fishkill Correctional Facility; R. Ercole, Deputy Superintendent of Security; J. Conklin, Corrections Sergeant; and John Doe, Corrections Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Charles J. Quackenbush, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge.

**I. INTRODUCTION**

***1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David R. Homer, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated September 6, 2007 have been filed. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket No. 36) is **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all defendants and all claims.

**IT IS SO ORDERED**

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven DOCS employees, violated his constitutional rights under the Eighth and Fourteenth Amendments. [FN2] *See* Compl. (Docket No. 1). Presently pending is defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

**I. Background**

The facts are presented in the light most favorable to Newman as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").[FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

**II. Discussion**

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

**A. Standard**

***2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**B. Exhaustion**

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also* *Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement: [FN4]

FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See* *Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 952054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See* *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

***3** when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004))

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003); [FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See* *Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

***4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also* *Hemphill,* 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See* *Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

***5** Therefore, it is recommended that defendants' motion on this ground be granted.

**C. Eighth Amendment**[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should have know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See* *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See* *Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See* *Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also* *Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also* *Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

***6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
William E. HOOKS, Plaintiff,
v.
T. HOWARD, Correctional Officer, Upstate Correctional Facility; Mr. Mcgaw, Correctional Officer, Upstate Correctional Facility; Galiger, Correctional Officer, Upstate Correctional Facility; Mr. Green, Correctional Officer, Upstate Correctional Facility; Mr. Willette, Defendants.
No. 907-CV-0724 (TJM/RFT).

March 30, 2010.
William E. Hooks, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Christopher W. Hall, Esq., of Counsel, Albany, NY, for Defendants.

***MEMORANDUM-DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** *Pro se* Plaintiff William E. Hooks brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his constitutional rights during his confinement at Upstate Correctional Facility ("Upstate"). Dkt. No. 1. Defendants have filed a motion for summary judgment under Federal Rule of Civil Procedure 56 dismissing the complaint in its entirety. Dkt. No. 49. Plaintiff has submitted papers in opposition. Dkt. No. 51. For the reasons set forth herein, defendants' motion for summary judgment is granted in part and denied in part. With the exception of plaintiff's claims against defendants McGaw, Willette, Galiger and Green arising out of the alleged use of excessive force against plaintiff on August 7, 2006, all of plaintiff's claims are dismissed. In light of the foregoing, defendant C.O. Howard is dismissed as a defendant in this action.

**I. BACKGROUND**

At all relevant times concerning this action, plaintiff was an inmate at Upstate in the custody of the New York State Department of Correctional Services ("DOCS"). Plaintiff filed his complaint on July 12, 2007. Dkt. No. 1. Plaintiff alleges that defendants, Correction Officers Howard, McGaw, Galiger, Green and Willette, engaged in misconduct in violation of his constitutional rights on eleven separate occasions during the period 2005-2007, each of which is addressed in defendants' summary judgment motion.

Defendants argue that plaintiff's claims with respect to eight of the eleven incidents complained of are subject to dismissal because plaintiff failed to exhaust his administrative remedies as required under law. Dkt. No. 49. In support of their motion, defendants rely upon the supporting affidavits of Christine Gregory, Inmate Grievance Program ("IGP") Supervisor at Upstate ("Gregory Aff." and "Gregory Supp. Aff."), and Karen R. Bellamy, Director of DOCS IGP ("Bellamy Aff."). Bellamy is the custodian of records maintained by the Central Office Review Committee ("CORC"). Bellamy Aff. ¶ 2. As to the three exhausted claims, defendants argue that those claims must be dismissed because the facts alleged by plaintiff are not sufficient to state claims for the violation of his constitutional rights upon which relief may be granted by this Court. Defendants have submitted a statement of material facts as required by Local Rule 7.1 ("Defs.Stmt."), and a supporting memorandum of law ("Defs.MOL").

Plaintiff has responded in opposition to defendants' motion. Dkt. No. 51. In that response, plaintiff admits that five of his claims are unexhausted, but argues that he properly exhausted his administrative remedies with respect to three of the claims on which defendants seek summary judgment. Plaintiff has not responded to defendants' arguments in support of the requested dismissal of plaintiff's three exhausted claims. Plaintiff has submitted a statement of material facts as required by Local Rule 7.1 ("Pl.Stmt ."), and a supporting memorandum of law ("Pl.MOL").

**II. DISCUSSION**

**A. Summary Judgment Standard**

***2** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

entry of summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that there is no genuine issue of material fact to be decided with respect to any essential element of the claim in issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In meeting this burden, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323 (quoting Fed.R.Civ.P. 56(c)).

In the event this initial burden is met, the nonmoving party must produce evidence demonstrating that genuine issues of material fact exist. *Celotex,* 477 U.S. at 324; *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, the opposing party must proffer admissible evidence that "set[s] out specific facts" showing a genuinely disputed factual issue that is material under the applicable legal principles. Fed.R.Civ.P. 56(e); *see, e.g., Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all justifiable factual inferences in favor of the nonmoving party. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008); *Jeffreys,* 426 F.3d at 553. The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B. Exhaustion of Administrative Remedies**

***3** The Prisoner Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). The Supreme Court explained in *Woodford* that the PLRA requires "proper exhaustion," which " 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Woodford* 548 U.S. at 90 (quoting *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.2002)). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense," an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the established grievance system in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2d Cir.2004)) (emphasis omitted).

The New York State Department of Correctional Services (DOCS) has created a three-step grievance process known as the Inmate Grievance Program (IGP). *See* *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).[FN1] First, the inmate must file a grievance complaint with the facility's IGP Clerk within twenty-one (21) calendar days of the incident. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. The grievance complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC), which has sixteen (16) calendar days from receipt to informally resolve the issue or conduct a hearing.[FN2] The IGRC must issue a written decision within two (2) working days of the conclusion of the hearing. Second, the inmate may appeal the IGRC decision to the Superintendent within seven (7) calendar days of receipt of the IGRC's decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the appeal. Third, the inmate may appeal to CORC within seven (7) calendar days of receipt of the superintendent's written decision. CORC is to render a final administrative determination within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, in order to complete the grievance process. Upon the completion of all three steps, "a prisoner may seek relief pursuant to 42 U.S.C. § 1983 in federal court." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) *(citing Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001)).

FN1. The provisions of the grievance procedure established by DOCS are set forth in 7 N.Y.C.R.R. §§ 701.1 *et seq.*

FN2. Allegations of employee misconduct bypass the IGRC and go directly to the superintendent for review. If the superintendent determines that the grievance is "a bona fide harassment issue," the superintendent assumes responsibility for the matter. If not, the grievance is returned to the IGRC for normal processing.

***4** The Second Circuit has suggested a three-pronged inquiry when the inmate plaintiff opposes a defendant's assertion that the inmate failed to exhaust his or her available administrative remedies. In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit stated:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, [667-68 (2d. Cir.2004) ]. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, [695 (2d. Cir.2004) ], or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba* [v. *Wezner,* 366 F.3d 161, 163 (2d Cir.2004) ]. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, [675 (2d Cir.2004) ] (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003)[.]

*Hemphill,* 380 F.3d at 686. While recognizing that the Supreme Court's decision in *Woodford* may cast some doubt on the continued viability of the *Hemphill* analysis, the Second Circuit has continued to scrutinize failure to exhaust claims with reference to these three prongs. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect *Woodford* has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre-*Woodford* case law."); *Reynoso v. Swezey,* 238 Fed.Appx. 660, 662 (2d Cir.2007), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008) (noting that *Hemphill* recognized "nuances in the exhaustion requirement," the Court found that "[b]ecause we agree

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether *Woodford* has bearing on them."); *Macias,* 495 F.3d at 43 n. 1 (we need not decide what effect *Woodford* has on *Hemphill's* holding that where administrative procedures are confusing "a reasonable interpretation of prison grievance regulations may justify an inmate's failure to follow procedural rules to the letter."). As has the Second Circuit, as well as the other district courts in this Circuit, this Court will apply the *Hemphill* three-part inquiry to the exhaustion claims. *See e.g., Butler v. Martin,* 07-CV-521 (FJS/GHL), 2010 WL 980421, *1 (N.D.N.Y. Mar. 15, 2010) (the magistrate judge "correctly applied the Second Circuit's three-part inquiry" for analyzing claims of non-exhaustion); *Winston v. Woodward,* 05 Civ. 3385, 2008 WL 2263191, *6 (S.D.N.Y. May 30, 2008) (collecting cases).

***5** To be "available" for purposes of the PLRA, an administrative remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In addition, a court deciding this issue must apply an objective test and determine whether a similarly situated person of ordinary firmness would have deemed the administrative remedy available. *Hemphill,* 380 F.3d at 688.

"A plaintiff's failure to exhaust ... may be excused on the grounds of estoppel where the plaintiff was misled, threatened, or otherwise deterred from fulfilling the requisite procedures." *Winston,* 2008 WL 2263191 at *9 (citing *Hemphill,* 380 F.3d at 688-89) (other citation omitted). However, alleged intimidation will provide a basis to excuse the filing of a grievance only against the person alleged to have engaged in the intimidation. *Snyder v. Whittier,* 05-CV-1284 (TJM/DEP), 2009 WL 691940, *9 (N .D.N.Y. Mar. 12, 2009); *Larry v. Byno,* 01-CV-1574 (TJM), 2006 WL 1313344, ----3-4 (N.D.N.Y. May 11, 2006).[FN3]

FN3. Conclusory allegations of intimidation are not sufficient. In *Veloz v. New York,* the prisoner claimed that he placed his grievances in the mail, "but that his grievances were either misplaced or destroyed." 339 F.Supp.2d 505, 514 (S.D.N.Y.2004), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2006). The Court found it significant that plaintiff "offers no evidence that any particular officer thwarted his attempts to file [the grievances] ... His allegations 'stand alone and unsupported.' " *Id.* at 516 (quoting *Nunez v. Goord,* 172 F.Supp.2d 417, 429 (S.D.N.Y.2001)); *see also Winston,* 2008 WL 2263191, *10 (rejecting assertion that plaintiff failed to exhaust administrative remedies due to mail tampering because plaintiff failed "to put forth any corroborating evidence, either direct or circumstantial").

In addition, the Court must also consider whether "special circumstances" have been plausibly alleged, that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004). Justification "must be determined by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Id.* at 678. Special circumstances may be found to exist, for example, where prison officials "inhibit an inmate's ability to utilize administrative grievance procedures;" where the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming; and where all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676.

Here, it is undisputed that administrative remedies were available to plaintiff through the Upstate IGP, which plaintiff has acknowledged and, in fact, utilized by filing numerous grievances. *See Mingues v. Nelson,* 96 CV 5396, 2004 WL 324898, *4 (S.D.N.Y. Feb.20, 2004) (the record is unmistakably clear "that an appropriate administrative procedure was available" to plaintiff who did not deny knowledge of the IGP). It is also clear that defendants have not forfeited the administrative remedy defense in this action. Defendants asserted plaintiff's failure to exhaust in their answer to the complaint. Dkt.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 16 at 2.

Accordingly, the Court will consider whether plaintiff exhausted his administrative remedies with respect to the eight claims identified by defendants in their motion and, if not, whether defendants are estopped from asserting this defense or whether any "special circumstances" exist which might excuse plaintiff's failure to exhaust. These issues are addressed with respect to each of the eights claims, proceeding in chronological order by date of the underlying incident.[FN4]

FN4. For purposes of the pending summary judgment motion, the facts are related in a light most favorable to plaintiff, as the non-moving party, with all inferences drawn in his favor. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

***6 February 15, 2005:** Plaintiff claims that on this date C.O. Howard threw "hot coffee" at plaintiff's cell slot. Compl. (Facts) at 3.

Defendants maintain that this incident is unexhausted because plaintiff did not file a timely grievance. Defs. MOL at 7. The first grievance filed by plaintiff in 2005 and recorded by the Upstate IGP was Grievance UST 23622-05, which was dated May 19, 2005, more than one month later. Gregory Aff. ¶¶ 7-8 and exs. A and B.[FN5] There is no record in the CORC database "of such an incident ever being appealed as a grievance to CORC." Bellamy Aff. ¶ 10.

FN5. Exhibit A is a copy of the computer printout of plaintiff's grievance records at Upstate for the years 2005-2007. In Grievance UST 23622-05, plaintiff describes the hot coffee incident as follows: "[C.O. Howard] threw the contents at my cell mate's face (hot coffee)." Gregory Aff. ex. B. Plaintiff goes to state that "[m]y cell mate and I have both been advised that our complaints were never received, and time was allowed to expire!" *Id.*

According to plaintiff, he filed a complaint regarding the "hot coffee" incident on February 15, 2005, which "was held by staff" and "did not make it to the IGRC in time for processing at no fault of plaintiffs." Pl. Stmt. ¶¶ 2, 4. Plaintiff relies on a memorandum dated April 7, 2005 addressed to plaintiff from "L. Peary-Inmate Grievance Program." Pl. Stmt. ex. A. In this memorandum, Peary acknowledged that plaintiff submitted a complaint "dated 2/15/05" and advised plaintiff that the complaint was not processed as a grievance because it was received "outside the time frames for filing a grievance." *Id.* The memorandum goes on to state that if plaintiff provided "proof of mitigating circumstances within 7 days of the date of this correspondence," his complaint would be processed in accordance with the grievance procedures. *Id.* Plaintiff does not claim to have made a further submission as Peary advised. Rather, plaintiff states only that he "could not however appeal complaint due to being [an ongoing subject] of harassment." Pl. Stmt. ¶ 3.

Here, the record reflects that plaintiff did not file a timely grievance regarding the hot coffee incident and moreover, despite having been afforded an opportunity to mitigate his late filing, elected not do so. Plaintiff's unsupported assertion that he could not pursue his grievance remedies because he was being harassed by unidentified corrections personnel does not provide a basis for a finding of estoppel. *See* *Snyder,* 2009 WL 691940, *9. The record does not disclose a realistic fear of retribution on plaintiff's part sufficient to estop defendants from asserting the defense of non-exhaustion or otherwise justifying plaintiff's failure to exhaust.

Based upon the record before this Court, plaintiff did not file a timely grievance regarding the "hot coffee" incident, and there is no basis upon which to excuse that failure or to estop defendants from asserting that affirmative defense. This claim is dismissed.

**May 10, 2005:** Plaintiff claims that on this date C.O. Howard "took family photos, and magazines out of [Plaintiff's] cell." Compl. (Facts) at 3.

Defendants urge dismissal of this claim as unexhausted because the records maintained at Upstate do not reflect a grievance from plaintiff regarding this incident, and no grievance appeal appears in the CORC records corresponding to either the date or the nature of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the incident. Defs. MOL at 7; Gregory Aff. ¶ 8 and ex. A; Bellamy Aff. ex. A.[FN6]

> FN6. Exhibit A to the Bellamy Affidavit is a copy of the computer printout of plaintiff's grievance records at CORC for the years 2005-2008.

***7** Plaintiff admits that he did not file a grievance (or a grievance appeal) regarding this incident. Pl. Stmt. ¶¶ 5-7. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances exist which justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**May 19, 2005:** Plaintiff claims that on this date C.O. Howard engaged in "harassment, threats and misconduct." Compl. (Facts) at 3. Plaintiff filed Grievance UST 23622-05 dated May 19, 2005. Gregory Aff ex. B. In that grievance, plaintiff complained that C.O. Howard "badgered" him and, after first letting the juice containers fall off of the flap, "stacked the juice containers up 3 high so they could not fit [sic] throw cell slot." *Id.* Grievance UST-23622-05 was denied by the Superintendent on June 6, 2005. Gregory Aff. ¶ 9 and ex. B.

Defendants maintain that this claim is unexhausted because plaintiff did not appeal the denial of his grievance to CORC. Defs. MOL at 8; Bellamy Aff. ¶¶ 8-9 and ex. A.

Plaintiff admits that he did not appeal the denial of grievance UST 23622-05 to CORC. Pl. Stmt. ¶¶ 8-10. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the affirmative defense of non-exhaustion or that his failure to exhaust his administrative remedies is justified by special circumstances.

This claim is unexhausted and is dismissed.

**April 7, 2006:** Plaintiff claims that on this date C.O. Howard was verbally abusive to him during a pat frisk and denied him a telephone call concerning the death of a family member. Compl. (Facts) at 3. Plaintiff states that he "notified the Inspector General's Office" about this incident. *Id.*

Defendants seek dismissal of this claim on the ground that plaintiff did not exhaust his administrative remedies regarding this incident. Defs. MOL at 8. The grievance records at Upstate do not include a grievance from plaintiff regarding this incident. Gregory Aff. ¶ 11 and ex. A. There is no record in the CORC data base "of such an incident ever being appealed as a grievance to CORC." Bellamy Aff. ¶ 11 and ex. A.

Plaintiff opposes summary judgment, relying on a letter of complaint regarding the April 7, 2006 incident which he sent to DOCS Commissioner Goord on April 7, 2006. Pl. Stmt. ¶¶ 11-12 and ex. C. In that letter, plaintiff complained about this incident and stated that C.O. Howard had been engaged in ongoing harassment of plaintiff. The letter was assigned # 083650. Pl. Stmt. ex. C. Plaintiff does not claim to have received a response to this letter. Plaintiff does not claim to have taken any further actions to exhaust his administrative remedies, nor does he claim that C.O. Howard "misled, threatened, or otherwise deterred" him from utilizing the IGP. *See* *Winston,* 2008 WL 2263191, at *9. Plaintiff admits that there was no appeal to CORC. Pl. Stmt. ¶ 13.

***8** Upon review, the Court finds that this claim is unexhausted. After *Woodford,* notice alone of an inmate's complaint is insufficient because "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance" and "[t]he prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; see *Snyder,* 2009 WL 691940, * 10 (plaintiff's complaints which led to investigation by DOCS Inspector General, "while perhaps constituting substantive exhaustion, does not satisfy the PLRA's procedural exhaustion requirement."). Under *Woodford,* plaintiff cannot satisfy the PLRA's exhaustion requirement by filing a complaint with the superintendent. *Macias,* 495 F.3d at 44.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Because plaintiff did not comply with the established grievance protocol of the IGP, and in the absence of evidence demonstrating that defendants should be estopped from asserting non-exhaustion or that special circumstances exists which justify the failure, this claims is unexhausted and is hereby dismissed.

**August 7, 2006:** Plaintiff claims that on this date C.O. McGaw and C.O. Willette used excessive force against him during a strip search, causing serious injury. Plaintiff claims that C.O. Galiger and C.O. Green failed to intervene and protect him from the assault. Compl. (Facts) at 4-5. Plaintiff filed Grievance UST 27819-06 regarding this incident. *Id.* Grievance UST 27819-06 was denied by the Superintendent on September 13, 2006. Gregory Aff. ¶ 12 and ex. C.

Defendants seek summary judgment dismissing this claim as unexhausted. Defs. MOL at 8. There is no record that plaintiff appealed the denial of this grievance to CORC. Bellamy Aff. ¶¶ 8-9 and ex. A.

In response, plaintiff claims that he timely appealed the denial of his grievance to CORC on September 18, 2006. Pl. Stmt. ¶¶ 14-16; Pl. MOL at 5, 12-13. Plaintiff relies on a copy of the Superintendent's response to Grievance UST 27819-06 which includes plaintiff's "Appeal Statement" dated September 18, 2006. Pl. Stmt. ex. B. Hand-written on that document (presumably by plaintiff) is the following: "Received on 9/18/06 filed on 9/18/06 CORC." *Id.* Plaintiff states that he could not place his appeal in "the designated grievance mail box" because at that time inmates at Upstate (a Special Housing facility) had no direct access to a grievance "mail box" but, rather, had to hand their grievance documents to a correction officer and rely on that person to physically place the documents in the box, which is what plaintiff did. Pl. Stmt. ¶ 16; Pl. MOL at 5. Plaintiff has also submitted a copy of a letter dated August 6, 2007 addressed to IGP Director "Tomas G. Baben," regarding his appeal of Grievance UST 27819-06. Pl. Stmt. ex. B. Plaintiff stated in that letter that he had not received confirmation that his appeal of Grievance UST 27819-06 was received by CORC and expressed concern that the appeal might have been "intercepted by staff and never processed." *Id.* On the basis of these documents, plaintiff argues summary judgment dismissing this claim as unexhausted is unwarranted. Pl. MOL at 9-10.

***9** Defendants have not replied.

In *Finch v. Servello,* 06-CV-1448 (TJM/DRH), 2008 WL 4527758 (N.D.N.Y. Sept. 29, 2008), this Court denied the defendants' motion for summary judgment dismissing the plaintiff's claim on the ground of non-exhaustion, in light of the plaintiff's sworn statement that he requested his housing officer to send a letter to his superiors attesting to plaintiff's repeated efforts to file a grievance. This Court adopted the Report-Recommendation issued by Magistrate JudgeDavid R. Homer, which included the following analysis of the issue presented by the defendants' summary judgment motion:

> Nevertheless, although implausible, Finch's testimony on this issue requires a determination of credibility, a determination that cannot be made on a motion for summary judgment. *See Dillon v. Morano,* 497 F.3d 247, 254 (2d Cir.2007); *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 157 (2d Cir.1998) ("To the extent that these inconsistencies can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury."); *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.").

*Finch,* 2008 WL 4527758 at ----7-8; *see also, Ross v. Wood,* 05-CV-1112 (FJS/GHL), 2009 WL 3199539, *11 (N.D.N.Y. Sep. 30, 2009) (issues of fact raised by plaintiff in opposition to summary judgment, to which defendants did not reply, preclude summary judgment on issue of exhaustion).

Here, plaintiff has submitted evidence regarding his appeal of the grievance to CORC sufficient to demonstrate that genuine issues of material fact exist such that summary judgment on this claim must be denied.

**September 14, 2006:** Plaintiff alleges that on this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

date C.O. Howard used excessive force against him, twisting the handcuffs on plaintiff's wrists in a way that caused him "to scream out in pain." Compl. (Facts) p. 7. Plaintiff submitted Grievance UST 28206-06. *Id.* This grievance was denied by the Superintendent on November 2, 2006. Gregory Aff. ¶ 13 and ex. D.

Defendants maintain that this claim is unexhausted because plaintiff did not appeal the denial of Grievance UST 28206-06 to CORC. Defs. MOL at 8; Gregory Aff. ¶ 13; Bellamy Aff. ¶ 9.

Plaintiff admits that he did not appeal the denial of Grievance UST 28206-06 to CORC. Pl. Stmt. ¶¶ 17-19. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising this issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

In light of the foregoing, this claim is unexhausted and is therefore dismissed.

**December 20, 2006:** Plaintiff alleges that on this date C.O. McGaw and C.O. Willette allegedly harassed plaintiff, and "denied meals, and or supplies." Compl. (Summary of Facts). Plaintiff filed Grievance UST 29243-06 regarding this incident. *Id.*

***10** Defendants argue that plaintiff's claims regarding this incident are unexhausted because Grievance UST 29243-06 does not relate to the incident described in the complaint but, rather, relates to an entirely different incident which allegedly occurred on December 14, 2006 and which involved alleged verbal abuse by Officer "Waults and a refusal to provide Plaintiff with a broom for cell clean up." Defs. MOL at 9; *see* Gregory Aff. ¶ 16 and ex. E. Grievance UST 29243-06 was denied by the Superintendent on January 16, 2007. *Id.* There is no record that plaintiff appealed the denial of Grievance UST 29243-06 to CORC. Bellamy Aff. ¶¶ 8-9 and ex. A.

Plaintiff admits the facts as outlined above. Pl. Stmt. at ¶¶ 23-26. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**March 15, 2007:** Plaintiff claims that on this day C.O. McGaw denied plaintiff his "diet tray" at the evening meal. Compl. (Summary of Facts). Plaintiff filed Grievance UST-30148-07. *Id.*

Defendants seek summary judgment dismissing this claim as unexhausted. Defs. MOL at 10. Defendants note that Grievance UST-30148-07 is dated February 7, 2007, and complains that C.O. McGaw denied plaintiff his evening meal on February 5, 2007-not March 15, 2007. *Id.; see* Gregory Aff. ¶ 17 and ex. F. Grievance UST-30148-07 was denied by the Superintendent on March 29, 2007. Gregory Aff. ¶ 17 and ex. F. There is no record that plaintiff appealed the denial of this grievance to CORC. Bellamy Aff. ¶ 9 and ex. A. Defendants argue that summary judgment is appropriate because claims arising out of the March 15, 2007 incident were not exhausted and, moreover, because even if plaintiff intended to refer in his complaint to an incident which occurred on February 5, 2007, that claim is also unexhausted because plaintiff did not appeal the denial of Grievance UST-30148-07 to CORC. Defs. MOL at 10.

In response, plaintiff admits the facts outlined above. Pl. Stmt. ¶¶ 27-30. Plaintiff does not contend in his motion opposition papers that defendants should be estopped from raising the issue of exhaustion or that special circumstances justify his failure to exhaust his administrative remedies.

Based upon the foregoing, this claim is unexhausted and is dismissed.

**(C) Merits of Plaintiff's Exhausted Claims**

In addition to the matters discussed above, the complaint asserts claims arising out of three additional incidents. Complaint (Facts) at 3, 8; (Summary of Facts). Defendants acknowledge that plaintiff exhausted his administrative remedies with respect to these three claims. Defs. MOL at 9. Defendants nevertheless seek summary

judgment dismissing these claims for failure to state a claim upon which relief may be granted for the violation of plaintiff's constitutional rights. *Id.* at 9-12.

***11** Plaintiff's remaining claims arise out of the following three incidents.[FN7]

FN7. Plaintiff admits the relevant facts regarding these three incidents as set forth herein. Pl. Stmt. ¶¶ 32-43. Plaintiff has not set forth legal arguments in opposition to this aspect of defendants' motion for summary judgment.

**October 26, 2005:** Plaintiff claims that on this date C.O. Howard harassed and threatened him. Compl. (Facts) at 3. Plaintiff filed Grievance UST-25150-05 complaining that C.O. Howard intentionally “shoved” 2 containers of juice and 4 containers of milk through the feed slot of Plaintiff's cell, followed by a feed up tray, “purposely knocking them to the floor inside the cell.” Gregory Supp. Aff. ex. G. The grievance also accused C.O. Howard of stating to plaintiff: “I bet you wont beat my next ticket.” *Id.* Plaintiff complained that C.O. Howard's behavior was “unprofessional” and asked that he not be “harassed, set up, or verbally abused nor threaten by Officer Howard.” *Id.* at 4, 6.

**August 16, 2006:** Plaintiff claims that on this date “Mr Willette have harassed, denied MEALS, and or supplies to the plaintiff.” Compl. (Summary of Facts). Plaintiff filed Grievance UST-27855-06 complaining that a corrections officer identified as “Waults” (but said to be the officer who allegedly assaulted plaintiff on August 7, 2006; *i.e.* C.O. Willette) “refused to issue requested claims forms and grievances forms per his duty. ... I was also denied the morning meal during feed up by this Officer and Officer Allen.” Gregory Supp. Aff. ex. H. Plaintiff asked in the grievance to be “assured of his safety” and to have the officer “reprimanded and told not to spit in peoples food.” *Id.*

October 14, 2006: Plaintiff claims that on this date, during an escort to the visitor area, C.O. Howard “boasted” about his involvement in the alleged assault on plaintiff on August 7, 2006, and attempted to provoke plaintiff to violence by making racially offensive remarks. Compl. (Facts) at 8.[FN8] Plaintiff filed Grievance UST-28590-06 complaining that C.O. Howard “crossed the line yet again.” Gregory Supp. Aff. ex. I. Plaintiff asked for an “order of protection” and for C.O. Howard to be fired or reassigned. *Id.*

FN8. According to plaintiff. C.O. Howard made statements such as “go ahead take a shot,” “we've got a boy coming through,” and “come on bitch take a swing.” *Id.*

Defendants characterize plaintiff's claims as arising under the Eighth Amendment, and argue that summary judgment should be granted dismissing these claims because they fail to state claims upon which relief may be granted. Defs. MOL at 10-12.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the “unnecessary and wanton infliction of pain” and are incompatible with “the evolving standards of decency that mark the progress of a maturing society.” *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also* *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment “imposes duties on these [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must ‘take reasonable measures to guarantee the safety of the inmates.’ “ *Farmer,* 511 U.S. at 832 (citation omitted).

***12** A claim alleging that the plaintiff's conditions of confinement violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be “sufficiently serious” from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with “deliberate indifference.” *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.Ct. 2321, 115 L.Ed.2d 271 (1991).

It is well-settled that words alone, however violent, are not held to amount to an assault, or to constitute cruel and unusual punishment under the Eighth Amendment. *Johnson v. Glick,* 481 F.2d 1028, 1033 n. 7 (2d Cir.1973), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). In other words, § 1983 is "not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)). Accordingly, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 97-CV-253 (NAM/DRH), 2000 WL 949457, *3 (N.D.N.Y. Jun. 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)); *see also* *Cossey v. Killacky,* 04-CV-6305CJS(P), 2004 WL 1960163, *2 (W.D.N.Y. Aug.16, 2004) (citing cases).[FN9]

FN9. A prisoner can state a claim under the Eighth Amendment against a corrections officer who spreads malicious rumors about him if the rumors "incited other inmates to assault [the plaintiff] ..., thereby placing him at grave risk of physical harm." *Young v. Coughlin,* 93 Civ. 262, 1998 WL 32518, *7 (S.D.N.Y. Jan.29, 1998). However, if the plaintiff fails to allege-with concrete facts, not conclusory assertions-that he has suffered an objectively "sufficiently serious" injury or that the corrections officer acted with a "sufficiently culpable state of mind," the claim must be dismissed. *Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (references to prisoner as "informant" or a "rat" in conversations with other inmate not sufficient to give rise to an inference that plaintiff actually faced a substantial risk of serious harm from other inmate); *see* *Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, *4 (S.D.N.Y. Apr.6, 2009) (where plaintiff has not alleged any facts that, if proven, would establish that he ever faced actual or imminent harm, court will not assume that a serious risk existed merely because corrections officer spread rumors about him). Plaintiff makes no such claim in this action.

Actions which may reasonably be understood to been taken for purposes of harassment and abuse, but which did not pose a substantial risk of serious harm to the inmate, may also fall short of the requirement for a viable Eighth Amendment claim that the harm be, objectively "sufficiently serious." *See, e.g.,* *Benitez v. Locastro,* 04-CV-423 (NAM/RFT), 2008 WL 4767439, *5 (N.D.N.Y. Oct. 29, 2008) (allegation that officers threw dirty mop water into plaintiff's cell and overflowed his toilet, even if true, constitute no more than *de minimis* actions best described as harassment, not cruel and unusual punishment); *McFadden v. Solfaro,* 95 Civ. 1148, 1998 WL 199923, ----2, 13 (S.D.N.Y. Apr.23, 1998) (prisoner's claim that a corrections officer regularly threw coffee, juice, and water into his cell and placed hair in his food tray was not a triable cause of action under the Eighth Amendment); *see also* *Samuels v. Hawkins,* 157 F.3d 557, 558 (8th Cir.1998) (prison guard's actions of throwing a liquid at plaintiff that did not harm him in any way were *de minimis* ).[FN10]

FN10. Similarly, a *de minimis* use of force will rarely suffice to state a constitutional claim. *See* *Hudson,* 503 U.S. at 9-10; *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

In this case, plaintiff claims that on two occasions, separated in time by nearly one year, C.O. Howard was verbally abusive to him.[FN11] Plaintiff also claims that on one of those occasions, C.O. Howard needlessly shoved his food through the feed up slot so that it fell to the floor of his cell. Plaintiff does not allege, nor are there any facts in the record which even suggest, that C.O. Howard's actions actually harmed plaintiff or posed a substantial risk of serious harm. Rather, the undisputed facts show that C.O. Howard engaged in conduct which, if true, was inappropriate and unprofessional, but which did not violate plaintiff's constitutional rights. Accordingly, the Court finds that plaintiff's claims against C.O. Howard

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

arising out of the incidents on October 26, 2005 and October 14, 2006, do not state a claim upon which relief may be granted pursuant to § 1983 and are, therefore, dismissed.

> FN11. Plaintiff also alleges in his complaint that C.O. Willette "harassed" him on August 16, 2006. This claim is without factual support of any kind in either in the complaint or in Grievance UST-27855-06. Moreover, as noted above, plaintiff has not addressed the sufficiency of this claim in response to defendants' motion for summary judgment and it is, therefore, dismissed.

***13** Plaintiff claims that on August 16, 2006, C.O. Willette denied him meals and supplies. Compl. (Summary of Fact). In Grievance UST-27855-06, plaintiff complained that he was "denied the morning meal," and was refused "claims forms and grievances forms." Gregory Supp. Aff. ex. H. Such deprivations, alleged by plaintiff to have occurred only on one occasion, while not to be condoned, are nonetheless *de minimis* and do not rise to a level of constitutional significance. *See* *Parker v. Peek-Co,* 06-CV-1268 (GLS/DEP), 2009 WL 211371, *4 (N.D.N.Y. Jan. 27, 2009) (plaintiff's claim that he was "deprived of two meals on that date is *de minimis* and does not rise to a level of constitutional significance."); *Cagle v. Perry,* 04-CV-1151 (TJM/GHL), 2007 WL 3124806, * 14 (N.D.N.Y. Oct. 24, 2007) (deprivation of two meals is "not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation."); *see also* *Cruz v. Church,* 05-CV-1067 (GTS/DEP), 2008 WL 4891165, ----2, 12 (N.D.N.Y. Nov. 10, 2008) (summary judgment granted where plaintiff failed to allege food deprivation of sufficient proportions to support an Eighth Amendment claim).

Mindful of its obligation to construe the allegations of the *pro se* complaint broadly to detect the strongest claim which, based upon the circumstances alleged, could be asserted by the plaintiff, *Diaz v. United States,* 517 F.3d 608, 613 (2d Cir.2008), the Court has considered whether the allegations of plaintiff's complaint that C.O. Willette denied him grievance forms and claim forms are sufficient to state a claim for the violation of plaintiff's First Amendment right to petition government for the redress of grievances.

It is well-established that a prison inmate has no constitutional right of access to an internal prison grievance process. *See* *Harnett v. Barr,* 538 F.Supp.2d 511, 522 (N.D.N.Y.2008); *Chadwick v. Mondoux,* 05-CV-975 (GLS/GJD), 2007 WL 2891655, *6 (N .D.N.Y. Sep. 28, 2007); *Rhodes v. Hoy,* No. 05-CV-836, 2007 WL 1343649, *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"). Accordingly, plaintiff's allegations that C.O. Willette refused to provide him with grievance and/or claim forms on August 16, 2006, even if true, do not state a cognizable claim for the violation of plaintiff's First Amendment rights and this claim is dismissed. *See* *Graham v. Coughlin,* 86 CIV. 163, 2000 WL 1473723, *7 (S.D.N.Y. Sep.29, 2000) (the "occasional failure of prison personnel to provide plaintiff with grievance forms does not constitute a cognizable claim under § 1983"); *Harnett,* 538 F.Supp.2d at 522 (the refusal to process a grievance or the improper handling of a grievance does not rise to the level of a constitutional violation).

## III. CONCLUSION

For the reasons stated herein, defendants' motion for summary judgment is granted in part and denied in part. All of plaintiff's claims are dismissed with the exception of his claims against defendants McGaw, Willette, Galiger, and Green arising out of the alleged use of excessive force against plaintiff on August 7, 2006 (the "excessive force claims"). Defendants' motion for summary judgment dismissing the excessive force claims is denied because plaintiff has adduced evidence sufficient to show that a reasonable trier of fact could conclude that plaintiff exhausted his administrative remedies with respect thereto. Accordingly, it is hereby

***14** ORDERED that defendants' motion for summary judgment (Dkt. No. 49) is **granted in part and denied in part** as set forth above; and it is further

ORDERED that defendant C.O. Howard is dismissed as a defendant in this action; and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)

(Cite as: 2010 WL 1235236 (N.D.N.Y.))

ORDERED that this matter is remanded to the assigned magistrate judge for a final pretrial conference on the excessive force claims, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Decision and Order on the parties.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Hooks v. Howard
Not Reported in F.Supp.2d, 2010 WL 1235236 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodolfho GREY, Plaintiff,
v.
Jared SPARHAWK, William Kelly, Jerry Surber, David Kaufman, Raymond T. Meyer, Richard Ward, and Donald E. Premo, Defendants.
No. 99 CIV. 9871 HB.

June 23, 2000.
DECISION & ORDER

BAER, District J.

***1** Plaintiff Rodolfho Grey, proceeding *pro se,* brings this action against defendants, alleging that he was subjected to "uncontrolled force" at the Green Haven Correction Facility in violation of 42 U.S.C. § 1983. All of the defendants are correctional officers at that facility. Defendants move to dismiss plaintiff's complaint for his failure to exhaust administrative remedies. For the reasons set forth below, defendants' motion to dismiss is GRANTED.

*Discussion*

*A. Failure to Exhaust Administrative Remedies*

As a matter of law, a prisoner cannot file a lawsuit under 42 U.S .C. § 1983 until he or she has exhausted all available administrative remedies. [FN1] "No action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until* such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a), the Prison Litigation Reform Act ("PLRA") (emphasis added); *see Diezcabeza v. Lynch,* 75 F.Supp.2d 250, 255 (S.D.N.Y.1999)(the PLRA requires inmates to exhaust grievance procedures in § 1983 actions based on claims of excessive force). Even in cases where a plaintiff seeks monetary damages only and the administrative agency cannot provide such a remedy, the plaintiff must still exhaust the grievance procedures.[FN2] *See e.g., Williams v. Muller,* 2000 WL 487954 (S.D.N.Y.2000); *Castillo v. Buday,* 85 F.Supp.2d 309, 312 (S.D.N.Y.2000); *see also Perez v. Wisconsin Department of Corrections,* 182 F.3d 532, 537 (7th Cir.1999).

FN1. The State of New York has implemented grievance procedures in each of its correctional facilities. *See* N.Y. Correction Law § 139; 7 N.Y. C.R.R. § 701.

FN2. In *Davis v. Frazier,* 98 Civ. 2658, 1999 WL 385414, *4 (S.D.N.Y. June 15, 1999), while it was not the express holding of the case, I recognized that some courts in this district had held that a prisoner's exhaustion of administrative remedies is not required when monetary damages are sought. Since then, numerous courts in this district and other jurisdictions have held as I do here: that even where a prisoner seeks monetary damages, the prisoner must still exhaust his administrative remedies. *See, e.g., Williams v. Muller,* 98 Civ. 5204, 2000 WL 487954 (S.D.N.Y.2000); *Castillo v. Buday,* 85 F.Supp.2d 309, 312 (S.D.N.Y.2000); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 439 (S.D.N.Y.2000); *Cruz v. Jordan,* 80 F.Supp.2d 109 (S.D.N.Y.1999); *Edney v. Karrigan,* 69 F.Supp.2d 540, 544 (S.D.N.Y.1999); *see also Nyhuis v. Reno,* 204 F.3d 65, 68-70 (3d Cir.2000); *Perez v. Wisconsin Department of Corrections,* 182 F.3d 532, 537 (7th Cir.1999). This Court finds persuasive those decisions which hold that exhaustion is applicable even where the requested relief cannot be awarded by the prison grievance system, given the plain language and intent of § 1997e. Thus, "the requirement of exhaustion applies to whatever administrative remedies are available in a correctional facility, regardless whether they may be different from the remedies that are available in a subsequent judicial proceeding. In short, if there is a remedy available at the administrative level, it must be pursued by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

inmate and exhausted before filing suit in this Court ." *Cruz v. Jordan,* 80 F.Supp.2d 109 (S.D.N.Y.1999). To hold otherwise would frustrate congressional intent as the exhaustion requirement could be easily bypassed by inmates simply by adding a claim for monetary relief. *See Santiago v. Meinsen,* 89 F.Supp.2d at 440 (citing *Cruz,* 80 F.Supp.2d at 120-21).

Plaintiff concedes in his complaint that he did not file a formal grievance at his place of confinement prior to filing this action. (Amended Complaint, ¶ II D.) According to plaintiff, he did not do so because "the highest executive officer, [the] superintendent, signed a report stating that the 'use of force are (sic) justified." ' (*Id.* at D.) FN3 Plaintiff contends that because the prison's superintendent had cast a "predetermined" decision against him, any formal complaints would be "futile." In support of this argument, plaintiff relies on *McCarthy v. Madigan,* 503 U .S. 140, 148 (1992), which held that an exhaustion of grievance procedures may be unnecessary when an administrator has already predetermined the issue. The Court's decision in *McCarthy,* however, is inapplicable. It did not involve a statute like the PLRA and, moreover, predated its enactment. Indeed, the Supreme Court explicitly stated that "[w]here Congress specifically mandates, exhaustion is required." *Id.* at 144. Further, numerous courts have held that the PLRA eliminated the futility exception and necessitates exhaustion of administrative grievance procedures. *See, e.g., Beeson v. Fishkill Correctional Facility,* 28 F.Supp.2d 884 (S.D.N.Y.1998). Thus, the superintendent's initial documentation and evaluation of an incident does not in this instance provide plaintiff an exemption to the PLRA's exhaustion requirement.

FN3. The Court notes that plaintiff bases his argument on a notation made by the prison's superintendent on a "Use of Force" report filed. This "Use of Force" report was not a report or a complaint filed by plaintiff; rather, it appears to be a departmental report filed by a prison officer(s) subsequent to an incident between plaintiff and certain guards at the facility.

***2** Plaintiff asserts that he complained directly to the Inspector General's office "where grievances are dealt with on the highest level." (*Id.* at E-F.) In broadly construing plaintiff's complaint, he appears to argue that this action serves to exhaust the grievance procedure FN4, because the Inspector General is the "ultimate arbiter" of prison grievances, citing Directive 4040, § VIII of the N.Y. Department of Correctional Services (as authorized by N.Y. Correction Law § 139). Thus, plaintiff argues that the Inspector General's investigation, if any, into the matter exhausts the administrative procedures. This argument, too, lacks merit. As an initial matter, when filing an administrative complaint, a prisoner must file the complaint with the grievance committee established at his correctional facility-which plaintiff concedes he did not do. (*See* Directive 4040.) FN5 Any complaint he may have made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures. To allow plaintiff to bypass those procedures would obviate the purpose for which the procedures were enacted.

FN4. It should also be noted that plaintiff failed to provide any documentation or affidavit to support his claim that a complaint was sent directly to the Inspector General's office.

FN5. Moreover, as Directive 4040 expressly provides: "the Inspector General is one of three possible avenues of final administrative resolution."

*B. Application for the Appointment of Counsel*

Plaintiff also requests this Court to appoint counsel. In determining whether to appoint counsel, a court should first consider the apparent merit of plaintiff's claim and, if this threshold requirement is met, the court should consider the ability of the indigent plaintiff to deal with the legal and factual issues involved without the assistance of counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 60-61 (2d Cir.1986). The Court carefully reviewed the pleadings and has taken all of these factors into consideration. Here, the issue presented was a straightforward legal issue, i.e. whether plaintiff had exhausted his administrative remedies. No hearing was necessary to resolve the issue presented and plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2000 WL 815916 (S.D.N.Y.)

(Cite as: 2000 WL 815916 (S.D.N.Y.))

response was well-drafted. Accordingly, petitioner's application for appointment of counsel is denied. However, in the event plaintiff refiles this action after he has exhausted his administrative remedies, plaintiff may renew his request for counsel at that time.

*Conclusion* [FN6]

FN6. Craig Lanza, a second-year student at Duke University School of Law, assisted in the research and preparation of this decision.

Accordingly, because plaintiff has failed to exhaust his administrative remedies-a fact to which he readily admits-defendants' motion to dismiss is granted, and plaintiff's complaint is dismissed without prejudice. Further, plaintiff's request for the appointment of counsel is denied without prejudice. The Clerk of the Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2000.

Grey v. Sparhawk
Not Reported in F.Supp.2d, 2000 WL 815916 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2010 WL 1839299 (N.D.N.Y.)

(Cite as: 2010 WL 1839299 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Brent JACOBY, Plaintiff,
v.
D. PHELIX, Captain, Franklin Correctional Facility; R. Gates, Sergeant, Franklin Correctional Facility; E. Coupal, Correctional Officer, Franklin Correctional Facility,[FN1] Defendants.

FN1. Plaintiff's original complaint included L. Sears, D. Artus, and D. Selsky as defendants. Pursuant to the order entered by Judge Hurd on August 19, 2008, (Dkt. No. 23) the complaint was dismissed without prejudice as to defendants Sears, Artus, and Selsky.

No. 9:07-CV-872 (DNH/ATB).

March 31, 2010.
Brent Jacoby, pro se.

Adrienne J. Kerwin, for Defendants.

**REPORT AND RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

***1** This matter was referred by United States District Judge David N. Hurd for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). The case was transferred to me on January 4, 2010, following the retirement of U.S. Magistrate Judge Gustave J. Di Bianco. (Dkt. No. 46).

While an inmate in the custody of the Department of Correctional Services ("DOCS") at Clinton Correctional Facility, plaintiff filed his complaint, pursuant to 42 U.S.C. § 1983, regarding events that occurred during his incarceration at Franklin Correctional Facility ("Franklin"). Plaintiff's complaint lists three causes of action. He alleges that defendants Coupal and Phelix retaliated against plaintiff for filing grievances ("Count 1"). (Compl. at 19).[FN2] He claims that defendant Coupal violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment ("Count 2"). (*Id.*). Finally, plaintiff alleges that defendants Phelix and Gates violated his Fourteenth Amendment right to due process ("Count 3"). (Compl. at 19-20). Plaintiff seeks monetary damages. (Compl. at 20).

FN2. Plaintiff's complaint is confusingly numbered, with the first six pages, which appear to be a form, numbered 3-8 and the next fourteen pages numbered 1-14. Plaintiff has numbered some of the paragraphs, but not all of them. Consequently, for the sake of clarity, the court will cite to information in the complaint by page number, beginning with the first page of the complaint as page 1 and continuing through page 20.

Presently before this court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 37). Plaintiff has responded in opposition to the motion. (Dkt. No. 45). For the following reasons, this court recommends that defendants' motion be granted in part and denied in part.

**DISCUSSION**

**I. *Facts***

On September 30, 2006, plaintiff was issued a misbehavior report for "cheeking" pills. (Defs.' Ex. B). A Tier III [FN3] hearing was held on October 4, 2006, and plaintiff was found guilty of creating a disturbance, smuggling, interference with an employee, and refusing a direct order. (Defs.' Ex. C). Plaintiff was sentenced to one month in the Special Housing Unit ("SHU"), which time began on October 4, 2006. (*Id.*). Plaintiff had his first interaction with defendant Coupal, a corrections officer in the Alcohol and Substance Abuse Treatment ("ASAT") dorm, on October 3, 2006-the day before his Tier III

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

hearing. (Compl. p. 1, Pl.'s Dep. at 22, 27). At his deposition [FN4] in this case, plaintiff testified that he had arrived in the ASAT dorm about four days before his encounter with defendant Coupal. (Pl.'s Dep. at 22). This statement is consistent with the location indicated on the misbehavior report dated September 30, 2006. (Defs.' Ex. B).

FN3. New York prison inmates are subject to three levels of disciplinary hearings for violations of prison rules. *Porter v. Coughlin,* 421 F.3d 141, 142 n. 1 (2d Cir.2005) (citing *inter alia* N.Y. COMP.CODES R. & REGS. tit. 7 §§ 270.2 (Standards of Inmate Behavior), 270.3 (Tiers of Disciplinary Hearings), 252.5 (Tier I dispositions), 253.7 (Tier II dispositions), and 254.7 (Tier III dispositions)). Tier III hearings are reserved for the more serious violations.

FN4. Plaintiff was deposed on February 9, 2009, and the transcript of the deposition has been filed as Defendants' Ex. A.

Plaintiff alleges that, when he first arrived at the ASAT dorm, he put up a "collage," consisting of girls' pictures. (Pl.'s Dep. at 27; Pl.'s Resp. Ex. 1, at 60 [FN5]). Some of the other inmates in the ASAT dorm told plaintiff that he would be told to take down the pictures and that defendant Coupal "would flip out as soon as he came in." (Pl.'s Dep. at 28). Plaintiff wrote a grievance about the picture policy on October 2, 2006, the day before defendant Coupal's shift. (Pl.'s Dep. at 28; Pl.'s Resp. Ex. 1, at 60). Plaintiff alleges that, after inmate representatives from the grievance committee came to discuss the grievance with him on October 3, 2006, defendant Coupal confronted plaintiff about the grievance and told plaintiff to take down the pictures. (Compl. ¶ 1; Pl.'s Dep. at 30). Plaintiff alleges that defendant Coupal also asked numerous questions plaintiff considered "personal," which plaintiff refused to answer. (Compl.¶ 4).

FN5. Plaintiff filed 66 pages of documents as an "exhibit" to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (Dkt. No. 45-1). For ease of reference, the court will refer material contained in "exhibit" by page number beginning with the first page of the exhibit and cite it as "Pl.'s Resp. Ex."

***2** Plaintiff then alleges that defendant Coupal took him to an area between two sets of doors at the entrance to the ASAT dorm, where defendant Coupal was "in [plaintiff's] face intimidating [him] and acting like [Coupal] was gonna assault [plaintiff] with his fists because he put on some thick gloves." (Compl.¶ 5). Plaintiff alleges that after this intimidation, he and Coupal went back to defendant Coupal's desk, where plaintiff again refused to answer questions. (Compl.¶ 7). He also told defendant Coupal that plaintiff "wasn't signing off [FN6] on my grievance about the pictures." (Compl. ¶ 7; Pl.'s Dep. at 36).

FN6. "Signing off" on a grievance is a procedure by which an inmate acknowledges that the problem complained of in the grievance has been informally resolved.

Plaintiff alleges that defendant Coupal then took him between the two sets of doors again, where defendant Coupal

> kicked my feet from up [sic] under me with his boots. I fell to the floor and balled up to protect myself. [Coupal] then started kicking me and slinging me around by my shirt and arms into the wall and he stomped on my feet with his boots causing my big toenail to fall off.

(Compl. ¶ 8; *see also* Pl.'s Dep. at 38-40). Plaintiff alleges that defendant Coupal then told him to go back to his "cube ." (Compl.¶ 9).

Plaintiff wrote a grievance dated October 3, 2006, about the alleged assault. (Compl. ¶ 11; Pl.'s Resp. Ex. at 48-51; *see also* Pl.'s Dep. at 45-46).[FN7] After plaintiff's Tier III hearing [FN8] on October 4, 2006-the day after the alleged assault incident with defendant Coupal-he was sentenced to 30 days in the SHU. (Def.'s Ex. C; Pl.'s Dep. at 40). After serving 30 days in the SHU, plaintiff did not return to the ASAT dorm, but was released back into the general prison population. (Pl.'s Dep. at 65-66).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. This grievance was appealed to the superintendent and found to be without merit, as indicated on the report consisting of the last two pages of Defs.' Ex. R. The report indicates the grievance was filed November 14, 2006, and signed by the superintendent on December 7, 2006.

FN8. This hearing was for the "pill cheeking" misbehavior report.

Plaintiff was not checked by medical personnel for injuries related to the alleged October 3, 2006, assault until December 1, 2006, at which time, no injuries were noted. (Compl. ¶¶ 15-16; Pl.'s Dep. at 63-64; Pl.'s Resp. Ex. at 54, 56; Defs.' Ex. V). The examination was the result of plaintiff's grievance, complaining of the assault. Although the grievance is dated October 3, 2006, it is stamped received by the Guidance Unit on November 8, 2006, and was given Grievance No. FKN 7373-06 on November 14, 2006. (Pl.Ex. at 48-51). Superintendent Sears ordered an investigation of the grievance on November 14, 2006. (*Id.* at 52). Sergeant B. Buchanan conducted the investigation, including ordering plaintiff to be "checked by medical," as well as interviewing plaintiff and defendant Coupal. (*Id.* at 54). Sergeant Buchanan issued a report on December 1, 2006.[FN9] (*Id.*). Sergeant Buchanan's report states that plaintiff wished to " 'drop the whole thing.' " (*Id.*).

FN9. Defendant Coupal wrote a memorandum to Sergeant Buchanan, dated December 2, 2006, reflecting what he told Sergeant Buchanan during the interview. (Pl.'s Resp. Ex. at 53).

The plaintiff's Ambulatory Health Record for December 1, 2006, states "viewed for security ... no injuries claimed or seen." (Defs.' Ex. V). However, the Inmate Injury Report indicates that plaintiff initially stated "nothing happened" and refused to answer the place or time of injury, but then "alleges that he was injured by an officer-recanted this 'nothing happened.' Refused to answer any further questions." (Defs.' Ex. V). Plaintiff also signed a paper dated December 1, 2006, which states, "I wish to withdraw all allegations detailed in [the October 3, 2006 grievance]. I am not being coerced in any way, shape or form."[FN10] (Pl.'s Resp. Ex. at 55). Plaintiff now alleges he was threatened by corrections officers to drop the allegations "or they would kick [plaintiff's] ass and put him in the Box[FN11] with his other 2 witnesses that he mentioned in his grievance." (Compl. ¶ 13; *see also* Pl.'s Dep. at 63-64).

FN10. The court notes that, although plaintiff signed the document, the handwriting appears to be Sergeant Buchanan's. *Compare* (Pl.'s Resp. Ex. at 54) *with* (Pl.'s Resp. Ex. at 55).

FN11. "Box" is a slang term for the SHU.

***3** By late December 2006 or early January 2007, plaintiff had been re-admitted to the ASAT program and was housed in an ASAT dorm where defendant Coupal worked. (Compl. ¶ 18; Pl.'s Dep. at 68-69). Around this same time, an investigator from the Inspector General's office met with plaintiff. (Compl. ¶ 20; Pl.Ex. at 57). Soon thereafter, plaintiff claims that he and defendant Coupal started having conflicts again. (Compl.¶¶ 22, 23).

On February 26, 2007, defendant Coupal prepared a misbehavior report for what appeared to be a fresh tattoo on plaintiff's left forearm. (Defs.' Ex. D). Plaintiff was examined by medical staff, who poured peroxide on the tattoos.[FN12] (Compl.¶¶ 29-30). Plaintiff's ambulatory health record dated February 26, 2007, states, "Tattoos on arm, chest-All tatoos[sic] are not bubbling, but one on L wrist, Dice, on arm appears recent." (Defs.' Ex. V). The Inmate Injury Report dated February 26, 2007, includes the following: "Inmate's Statement: States about 4 months ago-tattoos." (Defs.' Ex. V). Plaintiff then wrote a grievance dated February 27, 2007, stating that defendant Coupal threatened and harassed him. (Defs.' Ex. R).[FN13]

FN12. Fresh tattoos would cause the peroxide to "bubble."

FN13. This grievance was filed on March 1, 2007, and signed by the superintendent on March 12, 2007, finding that plaintiff was "unable to substantiate his allegations," and affirmed by the Central Office Review Committee on April 11,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007. (Defs.' Ex. R).

A Tier II hearing was held on March 1, 2007, and plaintiff pled guilty to "tattooing" and an "unhygienic act." (Defs.' Ex. E, F). Defendant alleges that he pled guilty because the lieutenant "said he was gonna find me guilty so just plead guilty and he would go easy on me and not send me to segregation. So I did because I didn't want to lose my ASAT program and vocational classes." (Compl.¶ 32).

On March 16, 2007, plaintiff alleges he dropped some dishes, and when he went out of his cube to retrieve them, he received a misbehavior report from defendant Coupal for being out of his cubicle and refusing a direct order. (Compl. ¶ 37; Defs.' Ex. G). After a Tier II hearing held on March 19, 2007, and continued on March 24, 2007, plaintiff was found guilty of refusing a direct order, being out of place, and noncompliance with hearing disposition.[FN14] (Defs.' Ex. H). Plaintiff wrote a grievance dated March 20, 2007, stating that defendant Coupal had threatened and harassed him.[FN15] (Defs.' Ex. S). During the investigation of the March 20, 2007 grievance, plaintiff mentioned that he had already accused Coupal of assaulting him, referring to the alleged October 3, 2006 incident. *Id.*

> FN14. Plaintiff was on "non-program hours," meaning he was restricted to his cubicle when he was not participating in prison programming.

> FN15. This grievance was filed on March 22, 2007, and signed by the superintendent on April 13, 2007, with the following findings: "The Grievant has not provided any evidence to support any of his allegations. It appears the Grievant is using the [Inmate Grievance Program] to retaliate against the officer for him writing misbehavior reports." (Defs.' Ex. S). These findings were affirmed by the Central Office Review Committee, which mentioned in its report that the Inspector General's investigation of the October 3, 2006, assault incident found the allegations to be unsubstantiated. *Id.*

On March 23, 2007, plaintiff was issued a misbehavior report by defendant Coupal for possessing a set of headphones and an AC adapter, both without plaintiff's inmate number on them. (Defs.' Ex. J). Plaintiff alleges these items were actually taken from him about three weeks prior to March 23, 2007. (Compl.¶¶ 35, 39-40). At a Tier II hearing held on March 27, 2007, plaintiff was found guilty of possessing an altered item, unauthorized exchange, and contraband. (Defs.' Ex. K). He was then sentenced to 30 days in the SHU. *Id.*

On April 1, 2007, plaintiff was issued a misbehavior report by defendant Gates as a result of a continuing investigation into a fire set in another inmate's cube on March 1, 2007, and the discovery of homemade alcohol ("hooch") in another inmate's cube on March 22, 2007. (Defs.' Ex. M; Compl. ¶¶ 42-47). Defendant Gates conducted the investigation and prepared a report for defendant Phelix, his superior officer. (Defs.' Ex. P; Gates Decl. ¶¶ 3, 8; Phelix Decl. ¶ 13). The material in the report is practically identical to that written in the misbehavior report issued to the plaintiff. (Defs.' Ex. M, P; Phelix Decl. ¶ 14). Defendant Phelix conducted the Tier III hearing on April 5, 10, and 16, 2007, where plaintiff was found guilty of making "alcohol or intoxicant" and not guilty of "arson, flammable materials and property damage or loss." (Defs.' Ex. N).

***4** On appeal, the ruling was reversed and expunged because defendant Phelix should have recused himself due to his receipt of defendant Gates' report in Phelix's capacity as Gates' supervisor. (Phelix Decl. ¶ 13). In April 2007, plaintiff had a Time Allowance Committee (TAC) review at Franklin, which recommended that plaintiff not lose any good time. (Compl. ¶ 64; Defs.' Ex. U). On June 29, 2007, the TAC at Clinton met and recommended plaintiff lose all his good time credit. (Compl. ¶¶ 65-66; *see also* Defs.' Ex. U).

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "All reasonable inferences and any ambiguities are drawn in favor of the nonmoving party."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2010 WL 1839299 (N.D.N.Y.)

(Cite as: 2010 WL 1839299 (N.D.N.Y.))

*Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See* *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Additionally, while a court "is not required to consider what the parties fail to point out," the court "may in its discretion opt to conduct an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations and internal quotation marks omitted).

**III. *Retaliation***

***5** In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also* *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds,* *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds,* *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

**A. Defendant Phelix**

Defendant Phelix argues that there is no causal connection between his actions and plaintiff's grievances, because his "only involvement with the plaintiff relevant to the complaint was when I served as the hearing officer in connection with a disciplinary charge against the plaintiff." (Phelix Decl. ¶ 3). Phelix further argues that "there is no evidence that [defendant] Phelix knew of the grievances or complaints made by the plaintiff." (Defs .'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 3). These statements are not supported by the documentation included with defendants' motion for summary judgment.

Defendants submitted an "Interdepartmental Communication," associated with plaintiff's grievance filed on March 1, 2007, indicating that defendant Phelix was involved with the review of that grievance. (Defs.' Ex. R). Defendants also filed another "Interdepartmental Communication" dated April 5, 2007, indicating that defendant Phelix was also involved with the review of plaintiff's grievance filed on March 22, 2007. (Defs.' Ex. S). Another "Interdepartmental Communication," dated March 23, 2007, was filed by the defendants, but the document only indicates that it is connected with the plaintiff, not a specific grievance. (*Id.*). This document is not initialed by defendant Phelix, although the heading indicates the document is from him. (*Id.*).

***6** Plaintiff, while pointing out the temporal proximity between the grievances he filed in March and the Tier III hearing held in April, simply concludes that defendant Phelix "was out to get me out of the facility and to a SHU as retaliatory treatment for all the grievances and letters I wrote .... " (Compl.¶ 56). Even though defendant Phelix incorrectly asserts that he had no involvement with plaintiff, other than presiding over the Tier III hearing held in April, it is clear that any actions taken by defendant Phelix would have been taken regardless of plaintiff's grievances and letters.

Defendant Phelix's role in investigating plaintiff's grievances appears to have been merely supervisory, and not determinative, since many other prison officials were also involved in plaintiff's grievances, and the initial findings were eventually reviewed and upheld by Central Office Review Committee ("CORC"). *See* notes 7 & 9, *supra.* As to the findings made in the Tier III hearing in April, defendant Phelix found plaintiff guilty of only one out of four offenses, that of making alcohol.[FN16] (Defs.' Ex. N; Phelix Decl. ¶ 9). In making his finding, defendant Phelix relied on the testimony of another inmate, Timothy Parry, who specifically testified that plaintiff made the "hooch." [FN17] (Defs.' Ex. O). Because defendant Phelix likely would have found plaintiff guilty even in the absence of plaintiff's grievances, this court recommends that plaintiff's cause of action based on retaliation as to defendant Phelix be dismissed.

FN16. It is also questionable that defendant Phelix subjected plaintiff to any "adverse action." He was assigned to preside over plaintiff's hearing; thus, the only thing he did that was arguably adverse to plaintiff was to find him guilty of one of the charges. As stated above, "adverse action" is that which would deter an individual of ordinary firmness from asserting his rights. Clearly, finding someone guilty of only one of four charges undermines the inference that defendant Phelix was being unfair to plaintiff. There is nothing in defendant Phelix's actions that would deter an inmate from asserting his rights.

FN17. As defendant Phelix stated at the disciplinary hearing, plaintiff's improper misbehavior was exacerbated by the fact that he was being housed in an ASAT dormitory in a program targeting Alcohol and Substance Abuse. (Defs. Ex. O at 56).

**B. Defendant Coupal**

The misbehavior reports prepared by defendant Coupal are also based on plaintiff's actions violating prison rules. Defendant Coupal prepared a misbehavior report dated February 26, 2007, because plaintiff appeared to have a fresh tattoo. (Defs.' Ex. D). Defendant Coupal's suspicion was confirmed, as indicated on the Ambulatory Health Record dated February 26, 2007, which states that medical staff examined the tattoo and concluded it was "recent." (Defs.' Ex. V). Defendant Coupal prepared the misbehavior report dated March 16, 2007, because plaintiff was on cube restriction and did not remain in his cube, which plaintiff admits. (Defs.' Ex. H; Compl. ¶ 37). Defendant Coupal prepared the misbehavior report on March 23, 2007, because plaintiff possessed unauthorized altered headphones, which are considered contraband at Franklin, which plaintiff also admits.[FN18] (Defs.' Ex. J; *see also* Compl. ¶¶ 35, 40). Thus, plaintiff would have been found guilty of the misbehavior reports filed by defendant Coupal, and any First Amendment retaliation claims against defendant Coupal regarding the misbehavior report may be dismissed. *See, e.g., Lowrance v. Achtyl,* 20 F.3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

529, 535 (2d Cir.1994) (holding that the defendants met their burden to show they would have filed disciplinary charges absent any retaliatory motive when "it was undisputed that [the plaintiff] had in fact committed the prohibited conduct"); *Chavis v. Kienert,* 9:03-CV-39 (FJS/RFT), 2005 U.S. Dist. LEXIS 41920, at *53-59, 2005 WL 2452150, at *17-19 (N.D.N.Y. Sept. 30, 2005).

> FN18. The court notes that plaintiff tries to explain these incidents by accusing defendant Coupal of conducting searches to harass plaintiff, but the facts that plaintiff had a recent tattoo, was out of place, and possessed contraband remain the same. Plaintiff's arguments based on the technicalities of when he should or should not be written up are not persuasive. (Compl.¶¶ 39, 40).

***7** Plaintiff does claim that defendant Coupal's alleged assault was "in retaliation" for plaintiff's grievance regarding the pictures hanging in his cube. Plaintiff includes a copy of this grievance, and it is dated October 2, 2006. (Pl.'s Resp. Ex. at 60-63). When inferences are resolved against the movant, given the temporal proximity of the grievance and the alleged assault, there are questions of fact as to whether defendant Coupal was aware of plaintiff's grievance about the picture policy in his cube and whether he retaliated against plaintiff by the alleged assault. Thus, plaintiff's First Amendment claim regarding defendant Coupal may not be dismissed as related to the alleged assault.

**IV. *Excessive Force***

**A. Exhaustion of Administrative Remedies**

Defendants first argue that plaintiff has failed to properly exhaust the excessive force claim as against defendant Coupal. The PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). In *Woodford v. Ngo,* 548 U.S. 81 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 92-93. "Proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 89-94. An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

However, the Second Circuit has held that certain exceptions to exhaustion apply. The proper inquiry is to determine "whether: (1) administrative remedies were in fact available to the prisoner; (2) the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Chavis v. Goord,* 333 Fed. Appx. 641, 643 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. COMP.CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the CORC. *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

***8** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a). The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b). Under the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2010 WL 1839299 (N.D.N.Y.)

(Cite as: 2010 WL 1839299 (N.D.N.Y.))

regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h).

Here, defendants argue that plaintiff did not properly exhaust his claim because he did not appeal his grievance related to the alleged assault on October 3, 2006, to the CORC. (*See* Defs.' Ex. T). The superintendent reviewed the alleged assault grievance on December 7, 2006, and there is no question that plaintiff did not appeal the superintendent's decision to the CORC. (Defs.' Ex. R). This is apparently due to the paper signed by plaintiff and dated December 1, 2006, which stated, "I wish to withdraw all allegations detailed in [the alleged assault grievance]. I am not being coerced in any way, shape or form." (Pl.'s Resp. Ex. at 55).

Plaintiff concedes that he did not appeal the assault grievance to the CORC, but claims that the reason he did not pursue the grievance is because he was threatened by Sgt. Buchanan and others, and because he apparently believed that the Inspector General's investigation would be sufficient. (Compl. ¶ 13; Pl.'s Resp. Mem. at 4). When asked during his deposition why he "signed off" on the grievance, plaintiff responded, "Because ... Albany was already involved in it and [the inspector general] ... the grievance was already wrote [sic] and put in, and I knew they were investigating, so it really didn't matter, and I was scared, honestly .... it's like, the heck with it, you know." (Pl.'s Dep. at 63; *see also* Compl. ¶ 14).

The comment plaintiff made at his deposition suggests that he was frightened into dropping his grievance and that he thought the Inspector General's investigation would take care of the matter. If, in fact, plaintiff was threatened into dropping his grievance, the defendants would be estopped from asserting the defense of non-exhaustion. There are questions of fact remaining regarding these alleged threats.

Plaintiff also claims that he "signed off" on the grievance because the Inspector General was already investigating the incident, and therefore it was unnecessary to continue the grievance procedure. (Pl.'s Dep. at 63). Generally, an inmate's attempt to exhaust by simply writing a letter, either to supervisory officials or directly to the Inspector General, will ***not*** suffice to exhaust administrative remedies. *See Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS 8656, at, *5, 2000 WL 815916 (S.D.N .Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse the plaintiff "from adhering to the available administrative procedures").

***9** It has been held that "a grievance through informal channels will satisfy the exhaustion requirement ***if the prisoner thereby obtained a favorable resolution of his grievance."*** *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (citations omitted). The exhaustion requirement will be satisfied because the inmate would not have any reason to appeal a favorable resolution. *Andrews v. Cruz,* 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, *16, 2010 WL 1141182 (S.D.N.Y. March 24, 2010) (citations omitted).

In *Andrews,* the court held that the plaintiff could have believed that he obtained a "favorable resolution" because of the Inspector General's investigation since an investigation by the Inspector General was the only relief available under the regulations governing "harassment" grievances. *Id.; See* N.Y.C .R.R. § 701.8. However, the plaintiff in *Andrews* followed the "harassment grievance" procedure, and the Superintendent sent the grievance to the Inspector General for investigation. This case presents a different situation, in which it appears that plaintiff wrote directly to the Inspector General, but his grievance also prompted a DOCS investigation of the incident.

Plaintiff's claim that he had been threatened by defendants leaves questions of fact regarding whether he exhausted his administrative remedies, and this court will not recommend granting summary judgment on this basis.

**B. Eighth Amendment Standard**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Eighth Amendment prohibits the " 'unnecessary and wanton infliction of pain.' " *Baker v. Willett,* 42 F.Supp.2d 192, 196 (N.D.N.Y.1999) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). When the use of excessive force is alleged, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers,* 475 U.S. 312, 320-21 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033 (1973)). In order to meet the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327.

Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992). However, the court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321. Not every push or shove, even if it seems unnecessary, amounts to a violation of the constitution. *Hudson,* 503 U.S. at 9-10 (*de minimis* force); *Johnson v. Glick,* 481 F.2d at 1033.

***10** Here, defendant Coupal argues that he never assaulted plaintiff. However, resolving inferences against defendant Coupal leaves an issue of fact both as to the nature of the interaction between defendant Coupal and plaintiff on October 3, 2006, and its severity. While there is no direct proof of violence due to the lack of evidence of physical injury, the alleged inmate witnesses' refusal to testify and length of time between the medical examination and the alleged incident at least raises the possibility of threats and a cover-up. If the incident occurred as plaintiff alleges, there appears to be little to no provocation for the alleged physical force used by defendant Coupal. Resolving inferences against the movants results in an issue of fact to be determined by a jury.

Because issues of fact exist as to plaintiff's retaliation claims as well as plaintiff's excessive force claims against defendant Coupal, defendants' motion for summary judgment as to defendant Coupal fails. Accordingly, their motion for summary judgment as to plaintiff's cause of action for retaliation as to defendant Coupal should be denied. In addition, defendants' motion for summary judgment as to plaintiff's cause of action for excessive force as to defendant Coupal should be denied.

**V. *Due Process***

To establish a claim based on a violation of due process, a plaintiff must first establish a constitutionally protected liberty or property interest that a plaintiff was denied without due process. *See Perry v. McDonald,* 380 F.3d 159, 173 (2d Cir.2001) (citations omitted). Prison discipline implicates a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). The Second Circuit has interpreted the Supreme Court's decision in *Sandin* to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose [ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin,* 515 U.S. at 484). Atypicality in a *Sandin* inquiry is normally a question of law. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey,* 197 F.3d at 585.[FN19] When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). *See also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

FN19. In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***11** The duration of a disciplinary confinement, while not the only factor to be considered, remains significant under *Sandin. Colon,* 215 F.3d at 23 1. [FN20] While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32.[FN21]

FN20. Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485-86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.* at 485.

FN21. In *Colon,* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

In this case, plaintiff alleges that his due process rights were violated by defendants Gates and Phelix based on their involvement in the investigations of the homemade alcohol and dorm fire incidents. Defendant Gates' involvement was limited to his April 1, 2007, misbehavior report. Even if the misbehavior report was false, it would not rise to a violation of substantive due process. *See* *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (a prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process). Additionally, the penalty imposed by defendant Phelix as a result of the Tier III hearing in April included three months in the SHU, with one month suspended and six months deferred. (Phelix Decl. ¶ 10; Defs.' Ex. N). This penalty does not implicate a liberty interest protected by the due process clause. *See* *Alvarado v. Kerrigan,* 152 F.Supp.2d 350, 355 (S.D.N.Y.2001) (101 days or less in the SHU without more, does not trigger a liberty interest).

Because plaintiff has failed to establish a liberty interest, no due process violation occurred. Therefore, plaintiff's due process claims as to defendants Gates and Phelix must fail. Accordingly, this court recommends that defendants' motion for summary judgment be granted as to plaintiff's cause of action based on a deprivation of due process as to defendants Gates and Phelix. Plaintiff also appears to allege a violation of due process for the revocation of good time credit. (Comp. Count 3). However, plaintiff's claim for damages relating to the loss of good time credits was dismissed on October 4, 2007. (Dkt. No. 6).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 37) be **GRANTED IN PART,** and the complaint **DISMISSED IN ITS ENTIRETY AS TO DEFENDANTS PHELIX and GATES,** and it is further

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to plaintiff's claims based on retaliation and excessive force as to defendant Coupal, as discussed above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Jacoby v. Phelix
Slip Copy, 2010 WL 1839299 (N.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Slip Copy, 2010 WL 1839299 (N.D.N.Y.)

(Cite as: 2010 WL 1839299 (N.D.N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Brent JACOBY, Plaintiff,
v.
Cpt. PHELIX; Gates, Sgt.; and Eric Coupal, Defendants.
No. 9:07-CV-872.

May 6, 2010.
Brent Jacoby, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Adrienne J. Kerwin, Esq., Asst. Attorney General, Albany, NY, for Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Brent Jacoby, commenced this civil rights action in August 2007, pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 31, 2010, the Honorable Andrew T. Baxter, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted in part and the complaint dismissed in its entirety as to defendants Phelix and Gates; and further recommended that defendants' summary judgment motion be denied in part as to plaintiff's claims based on retaliation and excessive force as to defendant Coupal. No objections to the Report-Recommendation have been filed.

Based upon a careful review of the file, and the recommendations of Magistrate Judge Baxter, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket No. 37) is GRANTED in part and DENIED in part;

2. Plaintiff's claims based on retaliation and excessive force as to defendant Coupal are DENIED.

3. The complaint is DISMISSED in its entirety as to defendants Phelix and Gates;

4. The Clerk is directed to return the file to the Magistrate Judge for any further pretrial proceedings in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Jacoby v. Phelix
Slip Copy, 2010 WL 1839264 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Allen MORRIS, Plaintiff,

v.

Calvin RABSATT, P. Barr, Sgt. McLear, J. Rupert, Defendants.

No. 9:10-CV-0041 (LEK/GHL).

Oct. 18, 2010.

Allen Morris, Rome, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Christina L. Roberts-Ryba, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT-RECOMMENDATION and ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Allen Morris alleges that Defendants falsely accused him of having a weapon in his cell to retaliate against him for filing a lawsuit. Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 20.) For the reasons that follow, I recommend that Defendants' motion be denied.

**I. BACKGROUND**

Plaintiff was, at the time of the events relevant to this action, an inmate at Riverview Correctional Facility. (Dkt. No. 9 ¶ 6.) Plaintiff alleges that on November 25, 2009, Defendant Correction Officer P. Barr framed Plaintiff by pretending to find a weapon in Plaintiff's cubicle. *Id.* Plaintiff alleges that Defendant Barr's actions were "clearly a set-up" because Defendant Correction Officer P. Rupert had "the misbehavior report on his desk prepared to write ... before the cube search was even conducted." *Id.* Plaintiff protested that the weapon did not belong to him. *Id.* at 6. Shortly thereafter, Defendant Sgt. McLear escorted Plaintiff to the Special Housing Unit ("SHU"). *Id.* When Plaintiff told Defendant McLear that he had been set up, Defendant McLear told him to shut up or he would come to the hearing and testify against Plaintiff. *Id.*

While housed in the SHU, Plaintiff wrote to Defendant Calvin Rabsatt, the superintendent of Riverview, explaining that he had been set up. *Id.* Defendant Rabsatt did not respond. *Id.*

When Plaintiff had been in the SHU for seven days, he was released into the facility's general population and the misbehavior report was expunged from his record. *Id.*

Plaintiff alleges that Defendants retaliated against him because he had previously filed a complaint against the Superintendent of Cape Vincent Correctional Facility and the Jefferson County Public Defender's Office. *Id.* Plaintiff requests ten million dollars in damages. *Id.* ¶ 9.

Plaintiff states in the complaint that he did not file a grievance regarding these events "because the issue is ungrievable." *Id.* ¶ 4(b).

Defendants now move to dismiss the complaint, arguing that it is barred because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Dkt. No. 20.) Plaintiff has opposed the motion. (Dkt. No. 21.) Defendants have filed a reply. (Dkt. No. 22.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2010 WL 4668440 (N.D.N.Y.)

(Cite as: 2010 WL 4668440 (N.D.N.Y.))

can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

***2** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

A prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable claim under 42 U.S.C. § 1983. *Jones v. Bock,* 549 U.S.199, 211-17 (2007). "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. *Id.* at 215-16.

**III. ANALYSIS**

Defendants argue that this action must be dismissed with prejudice because the face of the complaint shows that Plaintiff failed to exhaust his administrative remedies and it is now too late for him to do so. (Dkt. No. 20-2.) Although this is a close question, I find that the record currently before the Court does not support dismissal for failure to exhaust.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

In New York state prisons, the Department of Correctional Services ("DOCS") has a well-established three-step inmate grievance program ("IGP"), which is the proper procedure for exhausting most, but not all, claims. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2010). First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at (b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, and issues a written decision within two working days of the conclusion of the hearing. *Id.* at (b)(2). At the second step, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at (c). At the third step, a grievant may appeal to the Central Office Review Committee ("the CORC") within seven working days of receipt of the superintendent's written decision. *Id.* at (d). "To properly exhaust administrative remedies, an inmate must file an appeal with the CORC ." *Torres v. Carry,* 672

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2010 WL 4668440 (N.D.N.Y.)

(Cite as: 2010 WL 4668440 (N.D.N.Y.))

F.Supp.2d 338, 343 (S.D.N.Y.2009).

***3** DOCS also has an expedited procedure for inmates who wish to file a grievance alleging harassment.[FN1] N.Y. Comp.Codes R. & Regs. tit. 7, § 701.8 (2010). Under this procedure, the inmate is required to file a grievance with the facility's IGP clerk as under the normal program. *Id.* (a). Rather than being reviewed under the normal guidelines, however, the grievance "must be forwarded to the superintendent by close of business that day." *Id.* (b). The superintendent "shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment ... If not, then it shall be returned to the IGRC for normal processing." *Id.* (c). If the superintendent determines that the grievance presents a "bona fide harassment issue," he must either initiate an in-house investigation, request an investigation by the Inspector General's office, or request an investigation by the New York State Police, Bureau of Criminal Investigation. *Id.* (d). If the inmate is dissatisfied with the superintendent's response or if the superintendent fails to respond to the grievance, the inmate may appeal to the CORC. *Id.* (g)-(h).

> FN1. The regulations define "harassment" as "employee misconduct meant to annoy, intimidate or harm an inmate." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.2(e) (2010).

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e) (1)-(2) (2010). Rather than "grieving" the result, an inmate who is dissatisfied with the result of a Tier II hearing must file an appeal with the facility superintendent within seventy-two hours of receiving the written disposition of the disciplinary hearing. N.Y. Comp.Codes R. & Regs. tit. 7, § 253.8 (2010). An inmate who is dissatisfied with the result of a Tier III hearing must file an appeal to the commissioner within thirty days of receiving the written disposition. N.Y. Comp.Codes R. & Regs. tit. 7, § 254.8 (2010). The filing of such an appeal constitutes exhaustion under the PLRA. *Davis v. Barrett,* 576 F.3d 129, 132 (2d Cir.2009).

DOCS' regulations note that if an inmate is unsure whether an issue is grievable or nongrievable, he should "file a grievance and the question will be decided through the grievance process." N.Y. Comp.Codes. R. & Regs. tit. 7, § 701.3(e).

Here, the face of the complaint shows that Plaintiff did not properly follow either the standard three-step procedure or the expedited procedure for allegations of harassment by staff. Both of those procedures require an inmate to file a grievance with the IGP clerk, which Plaintiff admits on the face of his complaint he did not do. (Dkt. No. 9 ¶ 4.)

The complaint states that Plaintiff was not required to file a grievance because the issues that concerned him were "non-grievable ." *Id.* However, the face of the complaint shows that Plaintiff did not follow the proper procedures for exhausting "non-grievable" disciplinary issues by appealing the results of a disciplinary hearing. Although a letter to the Superintendent would have been the proper method of appealing an unfavorable disciplinary disposition, it does not appear that Plaintiff ever received such a disposition. Plaintiff alleges that he was escorted to the SHU after the incident and that he remained there for seven days before "the ticket was expunged off his record" and he was "released and restored back to population status." (Dkt. No. 9 at 6.) This plausibly suggests two scenarios: (1) that Plaintiff successfully defended himself at a disciplinary hearing and was then released from the SHU, in which case there was no unfavorable disposition to appeal; or (2) the misbehavior report was withdrawn before a disciplinary hearing was conducted, in which case there also was no unfavorable disposition to appeal. Therefore, the letter Plaintiff wrote to Defendant Superintendent Rabsatt while he was in the SHU did not serve to properly exhaust his "non-grievable" issues.

***4** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2004). FN2 First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

FN2. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

Here, neither of the first two *Hemphill* inquiries save Plaintiff's complaint. As discussed above, administrative remedies were available to Plaintiff. Defendants have preserved the exhaustion defense by raising it in their motion to dismiss. Plaintiff has not indicated, either on the face of the complaint or in his opposition papers, that Defendants inhibited his exhaustion of administrative remedies in any way. Thus, the Court must consider whether special circumstances have been plausibly alleged that justify Plaintiff's failure to comply with the administrative procedural requirements.

Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Plaintiff argues that he could not exhaust his administrative remedies by filing a grievance because the results of disciplinary hearings and matters under investigation by the Inspector General are "non-grievable." FN3 (Dkt. No. 21 at 1.) As discussed above, DOCS regulations clearly state that if an inmate is unsure whether an issue is grievable or non-grievable, he should "file a grievance and the question will be decided through the grievance process." N.Y. Comp.Codes. R. & Regs. tit. 7, § 701.3(e). On the other hand, "a letter to the Superintendent who then commences an Inspector General investigation can constitute 'special circumstances' that satisfy the PLRA requirement that prison officials be afforded time and opportunity to address prisoner complaints internally." *Hairston v. LaMarche,* No. 05 Civ. 6642, 2006 U.S. Dist. LEXIS 55436, at * 32, 2006 WL 2309592, at *9 (S.D.N.Y. Aug. 10, 2006).FN4 Plaintiff's complaint and his opposition to the motion to dismiss plausibly suggest that Defendant Rabsatt forwarded Plaintiff's letter to the Inspector General for investigation. This suggestion may, of course, be refuted through evidence at a later stage in this litigation. However, given the state of the pleadings, the special solicitude that must be granted to *pro se* civil rights litigants, and the fact that failure to exhaust is an affirmative defense that generally cannot be determined on a motion to dismiss, I recommend that the Court deny Defendants' motion to dismiss.

FN3. Plaintiff asserts in his opposition that "at the time of filing, this matter was being investigated by the Inspector General's office." (Dkt. No. 21 at 1.) The complaint itself makes no reference to an Inspector General investigation. As discussed above, Plaintiff is not required to plead facts proving exhaustion because failure to exhaust is an affirmative defense rather than an element of Plaintiff's cause of action.

FN4. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***5 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 20) be ***DENIED;*** and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**ORDERED** that the Clerk provide Plaintiff with a copy of *Hairston v. LaMarche,* No. 05 Civ. 6642, 2006 U.S. Dist. LEXIS 55436, 2006 WL 2309592 (S.D.N.Y. Aug. 10, 2006) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Morris v. Rabsatt
Slip Copy, 2010 WL 4668440 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Allen MORRIS, Plaintiff,
v.
Calvin RABSATT, Defendant.
No. 9:10-CV-0041 (LEK/GHL).

Nov. 9, 2010.
Allen Morris, Rome, NY, pro se.

Christina L. Roberts-Ryba, New York State Attorney General, Albany, NY, for Defendant.

***ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report-Recommendation filed on October 18, 2010, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 23).

Within fourteen days after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b), in compliance with L.R. 72.1 of the Northern District of New York. No objections have been raised in the allotted time with respect to Magistrate Judge Lowe's Report-Recommendation. While the Court agrees with Magistrate Judge Lowe's assessment that the issue presented by Defendants' Motion to dismiss (Dkt. No. 20) involves a "close question," Report-Rec at 4, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 23) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 20) is **DENIED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Morris v. Rabsatt
Slip Copy, 2010 WL 4668328 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 1

Not Reported in F.Supp.2d, 2008 WL 2690243 (N.D.N.Y.)

(Cite as: 2008 WL 2690243 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Benjamin FRANKLIN, Plaintiff,
v.
ONEIDA CORRECTIONAL FACILITY, et al., Defendants.
No. 9:03-CV-1452 (LEK/DEP).

July 1, 2008.
Benjamin Franklin, pro se.

Office of Attorney General, Risa L. Viglucci, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report-Recommendation filed on May 22, 2008, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 72).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge XX's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 72) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 64) is DENIED; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Benjamin Franklin, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 claiming deprivation of his constitutional rights during the course of his confinement. In his complaint, plaintiff alleges that as a result of the failure of prison officials to adequately protect him he was assaulted on several occasions by corrections officers and denied medical treatment for injuries suffered during the course of those incidents. Plaintiff asserts that defendants' actions constituted cruel and unusual punishment, in violation of the Eighth Amendment, and seeks relief of an unspecified nature.

Currently pending before the court is a motion by the defendants requesting the entry of summary judgment dismissing plaintiff's complaint, both procedurally based upon Franklin's alleged failure to satisfy his obligation to exhaust available internal administrative remedies before filing suit, and on the merits, arguing that as a matter of law plaintiff cannot establish the existence of a constitutional deprivation under the Eighth Amendment. Having carefully considered the record now before the court I am unable to conclude at this juncture that that plaintiff's claims are procedurally barred, in light of his contention that he chose not to file a grievance as a result of threats of retaliation by prison officials, and further based upon the fact that in response to a complaint registered by him with the Commissioner of the New York State Department of Correctional Services ("DOCS"), a full investigation was conducted into the plaintiff's allegations, thereby fulfilling the objective of the grievance requirement. Turning to the merits, I find that the facts surrounding plaintiff's excessive force claims are genuinely disputed, and recommend against dismissal of those claims.[FN1]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. Defendants' motion does not address the merits of plaintiff's failure to protect and medical indifference claims.

I. *BACKGROUND*[FN2]

FN2. In light of the procedural posture of the case, the record now before the court has been interpreted in a light most favorable to the plaintiff, as a non-moving party, with all inferences drawn, and ambiguities resolved, in his favor. *See* *Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

***2** At the times relevant to his claims plaintiff was a prison inmate entrusted to the custody of the DOCS. Prior to his temporary transfer into the Downstate Correctional Facility on May 16, 2003, plaintiff was assigned to a special housing unit ("SHU") cell within the Oneida County Correctional Facility ("Oneida"), located in Oneida, New York.[FN3] Plaintiff maintains that while in SHU confinement, he was regularly assaulted by corrections officers, including defendants Austin and Mullen, denied lunch, and refused medical attention both for the injuries suffered in the fight which led to his transfer into the unit and those resulting from the ensuing staff assaults. *Id.* ¶¶ 18-24. While maintaining that the assaults were continuous during the time of his SHU confinement, plaintiff's complaint makes specific reference to beatings by Austin and Mullen on March 21, 2003, and again on April 7, 2003. *Id.* ¶¶ 16-24, 26. Plaintiff also asserts that prior to the first such assault, he informed defendant Santos that he feared for his safety based upon threats made by those two officers. *Id.* ¶¶ 9-10.

FN3. Plaintiff's confinement in the SHU was apparently disciplinary in nature, stemming from his involvement in a fight with a fellow inmate. Fourth Amended Complaint (Dkt. No. 26) ¶¶ 8, 16.

In support of their motion, defendants Mullen and Austin have submitted affidavits in which they deny having assaulted the plaintiff. Mullen Aff. (Dkt. No. 64-11) ¶ 5; Austin Aff. (Dkt. No. 64-10) ¶ 5. In addition, Corrections Officer Mullen notes that he was not even present and working at Oneida on April 7, 2003, one of the two dates specifically mentioned in plaintiff's complaint. Mullen Aff. (Dkt. No. 64-11) ¶ 8.

Sometime prior to May 22, 2003, at which time he was designated to the Upstate Correctional Facility, Franklin sent a handwritten letter to the DOCS Commissioner complaining of various conditions including, *inter alia,* the assaults which are the subject of this action.[FN4] *See* Viglucci Aff. (Dkt. No. 64-6) Exh. A. That letter prompted an investigation into Franklin's allegations, consisting of interviews of the parties involved, including the plaintiff. *Id.* As a result of that investigation DOCS officials concluded that plaintiff's allegations were unfounded, and he was advised of that determination. *See generally* Fourth Amended Complaint (Dkt. No. 26); *see also generally* Franklin Aff. (Dkt. No. 70).

FN4. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See* *Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 5, 2003, and was thereafter granted leave to proceed *in forma pauperis.*[FN5] Dkt. Nos. 1, 3. Following the issuance of orders deeming plaintiff's earlier pleadings to be deficient, *see, e.g.,* Dkt. Nos. 5, 12, 15, 25, plaintiff submitted a fourth amended complaint which was ultimately approved for filing. Dkt. Nos. 26, 28. Named as defendants in plaintiff's fourth amended complaint are various DOCS employees, including Corrections Lieutenant Santos, Corrections Officers D.J. Mullen and Austin, and an additional corrections officer identified only as "John Doe". *See* Dkt. No. 26. Plaintiff's complaint, which is modest in terms of specifics, asserts claims of cruel and unusual punishment, based both upon the alleged use of excessive force by defendants Mullen and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Austin, the failure of defendant Santos to protect him from those officers, and the refusal of the defendants to provide him with required medical treatment. *Id.*

FN5. This action was originally commenced in the Western District of New York, but was subsequently transferred here by order issued by Senior District Judge John T. Elfin on December 5, 2003. Dkt. Nos. 1, 4.

***3** On June 27, 2007, following the close of pretrial discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 64. In their motion, defendants argue that plaintiff's claims are procedurally barred, based upon his failure to exhaust available administrative remedies before filing suit, and additionally assert that as a matter of law, the record fails to establish the existence of an Eighth Amendment violation. *Id.* Plaintiff has since filed papers in opposition to defendants' motion, Dkt. No. 70, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

***4** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Failure to Exhaust Administrative Remedies*

The record now before the court reflects that the plaintiff did not file a formal grievance, utilizing the available procedures within the DOCS system, concerning the matters raised in his complaint. Plaintiff attributes this failure to his belief that DOCS prison officials would not process any grievance from him concerning the matter, and additionally notes that he has been threatened by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

corrections officers with retribution for filing any grievances against them. *See, e.g.,* Plaintiff's Opposition (Dkt. No. 70) at p. 30, ¶¶ 6-8. In their motion, defendants argue that this omission provides a procedural basis for dismissal of plaintiff's claims, regardless of their relative merit.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

***5** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorythm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions, by preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN6] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

FN6. In practicality these three prongs of the

prescribed test, though intellectually distinct, plainly admit of significant overlap. *See Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *8 n .14 (E.D.N.Y. Jan. 31, 2007); *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

1. *Availability of Remedy*

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN7] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

FN7. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

***6** Certain of plaintiff's claims implicate misconduct on the part of corrections officials. In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address complaints of alleged staff harassment.[FN8] 7 N.Y.C.R.R. § 701.8; *see Perez v. Blott,* 195 F.Supp.2d 539, 543 (S.D.N.Y.2002) (describing expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R. § 701.11, which has since been re-codified). This expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or retaliation.[FN9] *See* 7 N.Y.C.R.R. § 701.8(a). An inmate claiming harassment by a DOCS worker must file a grievance, which is then assigned a grievance number and, in the event of allegations of staff harassment, forwarded to the superintendent of the facility. 7 N.Y.C.R.R. § 701.8(b). If, after reviewing the grievance, the superintendent finds it to be facially lacking in merit, the matter reverts back to the inmate grievance resolution committee ("IGRC") for review. 7 N.Y.C.R.R. § 701.8(c). If, on the other hand, the superintendent believes that an investigation is warranted, he or she may initiate an in-house investigation, or instead, request investigation by the inspector general's office. 7 N.Y.C.R.R. § 701.8(d). Once the grievance is determined, a matter which must occur within twenty-five business days of filing, *see* 7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step which is required in order to satisfy the exhaustion requirement. *See Singh v. Goord,* 520 F.Supp.2d 487, 495 (S.D.N.Y.2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *4 (S.D .N.Y. Dec. 11, 2000) (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

FN8. Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor. 7 N.Y.C.R.R. § 701.8(a).

FN9. The regulations pertaining to the grievance process describe harassment as any allegation involving "employee misconduct meant to annoy, intimidate, or harm an inmate ...." 7 N.Y.C.R.R. § 701.2(e); *see also* DOCS Directive No. 4040.

Despite this entitlement under most circumstances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

available to an inmate plaintiff. *See Hemphill,* 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at *8 (citations omitted) (noting, for example, that a defendant's failure to advance plaintiff's grievances or the issuance of threats against an inmate to deter the filing of a grievance may effectively render the administrative process unavailable). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Id.* at 688 (internal quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at *8.

***7** Based on the record now before the court, construed in a light most favorable to the plaintiff, it appears that a genuine triable issue of fact exists regarding the availability of the IGP to the plaintiff. As was previously noted, plaintiff asserts that he received specific threats of adverse action against him in the event of the filing of any grievances. Under the circumstances the court is unable to conclude at this stage in the proceedings, as a matter of law, that the grievance process was available to the plaintiff.

2. *Presentation of Defense/Estoppel*

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In their answer to plaintiff's fourth amended complaint, defendants have raised failure to exhaust as an affirmative defense. *See* Answer (Dkt. No. 37) ¶ 10. Because the defendants have properly raised exhaustion as a defense, and plaintiff does not assert any basis to estop them from pursuing it, I find that this prong of the exhaustion test does not come into play in this case.

3. *Special Circumstances*

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ). As the Supreme Court has noted, "[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388.

In this instance, prompted by plaintiff's letter complaining of the use of excessive force and other deprivations to the DOCS Commissioner, an investigation was conducted into plaintiff's allegations. While in this case the established IGP procedure or the alternative expedited procedure for complaining of staff misconduct was bypassed by the plaintiff, his complaint to the Commissioner resulted in what could be viewed as the functional equivalent of a grievance investigation. Since at trial a finding may be made that the filing of a grievance would have been redundant, and likely would ultimately have led to the same result, with deference undoubtedly being given to the investigation previously conducted, it cannot be definitively said at this point that there exists no sufficient basis to excuse the exhaustion requirement. Accordingly, I recommend denial of the portion of defendants' motion which asserts this procedural basis for dismissal of plaintiff's claims. *See Heath v. Saddlemire,* No. 96-CV-1998, 2002 WL 31242204, at *4-5 (N.D.N.Y. Oct. 7, 2002) (Scullin, C.J.).

C. *Merits Of Plaintiff's Excessive Force Claim*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***8** In their motion, defendants next assert that plaintiff's excessive force claim is subject to dismissal as a matter of law. While acknowledging that plaintiff claims to have been assaulted by prison officials, defendants argue that "[p]laintiff's allegations are so outrageous, that they can only be considered to have been fabricated." Defendants' Memorandum (Dkt. No. 64-3) at 7.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Eighth Amendment analysis requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91. The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element to prevail a plaintiff must establish that defendant acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> ***9** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.
>
> Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [FN10] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN10. It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

In his complaint, though unsworn, *see* Dkt. No. 26 ¶¶ 19-21, and as confirmed in affidavits provided in opposition to defendants' motion, *see* Dkt. No. 70 at pp. 10, 27, plaintiff claims to have been assaulted by defendants Austin and Mullen. In support of their motion, defendants assert that the allegations are fabricated and inherently incredible, and thus should be discounted as a matter of law. In support of that position, defendants offer the denial by those corrections officers of any wrongdoing, the results of an investigation by the DOCS in which the allegations were determined to be unfounded, and particulars regarding the procedures at Oneida which, they maintain, make it impossible for the actions to have occurred as described by the plaintiff, without detection.

As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted. Under these circumstances I recommend a finding that genuine, triable issues of material fact exist which must be resolved before plaintiff's excessive force claims can be adjudicated.

IV. *SUMMARY AND RECOMMENDATION*

While the record in this case firmly establishes that plaintiff did not pursue an internal claim under the IGP relating to the violations asserted in his complaint in this action, the record also discloses the existence of fact questions regarding whether he should be excused from that requirement, and additionally whether the claim should be deemed to be exhausted by virtue of his complaint to the DOCS Commissioner and a subsequent investigation into that complaint. Turning to the merits of the only portion of plaintiff's Eighth Amendment claim now challenged, I find the existence of triable issues of material fact surrounding plaintiff's excessive force claim against the defendants and therefore recommend the denial of summary judgment dismissing that claim as a matter of law.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 64) be DENIED in its entirety.

***10** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

The clerk is directed to promptly forward a copy of this order to the plaintiff by regular mail and defendant via electronic means.

N.D.N.Y.,2008.

Franklin v. Oneida Correctional Facility
Not Reported in F.Supp.2d, 2008 WL 2690243 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Corey HEATH, Plaintiff,
v.
C.O. SADDLEMIRE, Correctional Officer, Coxsackie C.F.; C.O. Premo, Correctional Officer, Coxsackie C.F.; C.O. Foley, Correctional Officer, Coxsackie C.F.; C.O. Reyes, Correctional Officer, Coxsackie C.F.; C.O. Pilatich, Correctional Officer, Coxsackie C.F.; C.O. Darling, Correctional Officer, Coxsackie C.F.; C.O. Messina, Correctional Officer, Coxsackie C.F.; C.O. Hotaling, Correctional Officer, Coxsackie C.F.; C.O. Hodges, Correctional Officer, Coxsackie C.F.; C.O. Supina, Correctional Officer, Coxsackie C.F.; C .O. Stroud, Correctional Officer, Coxsackie C.F.; C.O. Pampianchi, Correctional Officer, Coxsackie C.F.; C.O. Agerami, Correctional Officer, Coxsackie C.F.; C.O. Chewers, Correctional Officer, Coxsackie C.F.; John Doe # 1; John Doe # 2; C.O. Chase, Sergeant, Coxsackie C.F.; C.O. Crandell, Sergeant, Coxsackie C.F.; C.O. Palmer, Sergeant, Coxsackie C.F.; C.O. Christian, Sergeant, Wende C.F.; John Doe # 3; Deperio, Doctor, Wende C.F.; Bugler, Nurse, Wende C.F.; Sansbury, Nurse, Wende C.F.; Irvin, Superintendent, Wende C.F.; Czajka, Nurse Administrator, Wende C.F.; John Doe # 4; Punzal, Doctor, Wende C.F., Defendants.
No. 9:96-CV-1998 (FJS/RF.

Oct. 7, 2002.

Inmate brought §1983 action against state prison alleging violation of his Eighth Amendment rights. On parties' motions for summary judgment, the District Court, Scullin, J., held that: (1) inmate failed to show that personnel at state prison were deliberately indifferent to his medical needs or that he suffered serious injury, and (2) inmate exhausted his administrative remedies.

Motions granted in part and denied in part.

West Headnotes

[1] **Prisons 310 192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
(Formerly 310k17(2))

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment. Most Cited Cases

Inmate failed to show that personnel at state prison were deliberately indifferent to his medical needs or that he suffered serious injury, in his lawsuit under Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §1983.

[2] **Civil Rights 78 1319**

78 Civil Rights

78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal Law Enforcement; Prisons. Most Cited Cases
(Formerly 78k209)

**Estoppel 156 62.2(2)**

156 Estoppel

156III Equitable Estoppel
156III(A) Nature and Essentials in General
156k62 Estoppel Against Public, Government, or Public Officers

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

156k62.2 States and United States
156k62.2(2) k. Particular State Officers, Agencies or Proceedings. Most Cited Cases

Inmate Grievance Program (IGP) was not sole means for New York prisoner to satisfy Prison Litigation Reform Act (PLRA) requirement for exhaustion of administrative remedies prior to commencing §1983 action under Eighth Amendment; superintendent at facility and inspector general's office instituted investigations based on inmate's complaints, and defendants were estopped from asserting failure to exhaust because corrections commission replied to inmate's letters complaining about the incident, stating that "you have followed the correct procedure by notifying the Inspector General of your complaint." U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. § 701.7 et seq.

Corey Heath, Clinton Correctional Facility, Dannemora, Plaintiff Pro Se.

Office of the New York State Attorney General, Litigation Bureau, Albany, Attorneys for Defendants, Jeffrey P. Mans, AAG, of Counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

***1** Plaintiff Corey Heath brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging violations of his Constitutional rights under the Eighth Amendment. Specifically, Plaintiff alleges that on January 14, 1996, while he was incarcerated at Coxsackie Correctional Facility ("Coxsackie"), several corrections officers used excessive force against him and others failed to intervene and protect him. Plaintiff was subsequently hospitalized at Albany Medical Center Hospital ("AMCH") and treated for multiple injuries between January 14 and January 23, 1996. Upon release from AMCH, Plaintiff was transferred to Downstate Correctional Facility and then to Wende Correctional Facility ("Wende") on February 9, 1996. Plaintiff does not contend that his treatment at AMCH was deficient. Rather, Plaintiff alleges that Defendants were deliberately indifferent to his ongoing need for medical and dental treatment while incarcerated at Wende.

Named as Defendants are numerous corrections officers at Coxsackie and Wende and several medical staff at Wende.

Defendants moved for partial summary judgment with respect to Plaintiff's deliberate indifference claims and Defendant Saddlemire's counterclaim for battery. Plaintiff thereafter cross-moved for summary judgment on all claims and also moved for appointment of counsel. On March 11, 2002, Magistrate Judge Treece issued a Report-Recommendation in which he recommended that the Court (1) grant Defendants' motion for partial summary judgment with respect to Plaintiff's claim of deliberate indifference to serious medical needs, (2) deny as moot Defendants' motion for partial summary judgment with respect to Defendant Saddlemire's counterclaim for battery, (3) deny Plaintiff's cross-motion for summary judgment in its entirety, and (4) dismiss four unnamed "John Doe" Defendants from the case. The Report-Recommendation did not address Plaintiff's motion for appointment of counsel.

After Magistrate Judge Treece issued his Report-Recommendation, Defendants sought leave to file a supplemental motion for summary judgment with respect to the excessive force and failure to protect claims based upon an intervening change in law. *See* Dkt. No. 119. The Court granted Defendants' request by Order dated May 14, 2002. *See* Dkt. No. 120.

Presently before the Court are Plaintiff's objections to Magistrate Judge Treece's Report-Recommendation. *See* Dkt. No. 118. Also before the Court is Defendants' supplemental motion for summary judgment with respect to the excessive force and failure to protect claims. *See* Dkt. No. 126.

II. DISCUSSION

A. Standard of Review

The Court reviews *de novo* those findings and recommendations in a magistrate judge's report-recommendation to which a party has filed timely objections and for clear error those parts of the report-recommendation to which a party does not object. *See* 28 U .S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72; *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1990). The Court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b); *see* 28 U.S.C. § 636(b)(1).

B. Summary Judgment

***2** A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the non-moving party based on the evidence presented, the legitimate inferences drawn from that evidence in favor of the non-moving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The district court is admonished to liberally construe pleadings presented by a *pro se* plaintiff. *See Gittens v. Garlocks Sealing Techs.,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998) (citing *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam)) (other citations omitted). Nevertheless, proceeding *pro se* does not otherwise relieve a plaintiff from the usual requirements of summary judgment. *See id.; Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) ("a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (citation omitted)).

C. Deliberate Indifference Claims

To state a claim under the Eighth Amendment on the basis of the denial of medical care, Plaintiff must establish that Defendants acted with deliberate indifference to serious medical needs. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). Plaintiff must establish both an objectively serious condition and a subjectively culpable state of mind on the part of the relevant Defendants. *See id.* (citations omitted). Plaintiff must therefore establish the existence of a condition that is objectively "urgent," *i.e.,* "one that may produce death, degeneration, or extreme pain." *Id.* (citation omitted). In addition, Plaintiff must demonstrate that Defendants acted with a knowing disregard of an excessive risk to inmate health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates." *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992) (citation omitted). Moreover, an inmate does not have the right to the treatment of his choice. *See id.* at 44-45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)) (other citation omitted).

[1] Magistrate Judge Treece found that Plaintiff did not suffer a "serious injury" and, moreover, that Plaintiff's disagreement with the nature and character of the treatment that he received is insufficient to establish deliberate indifference on the part of Defendants. He therefore recommended that the Court grant Defendants' motion for partial summary judgment with respect to Plaintiff's deliberate indifference claims.

***3** Plaintiff's objections generally attempt to call into question minor factual details without providing any concrete evidence to controvert Magistrate Judge Treece's findings.[FN1] For example, Magistrate Judge Treece relied in part on an expert affidavit opining that discoloration of one of Plaintiff's teeth was caused by a 1995 dental procedure. Plaintiff objects on the ground that the discoloration was not noted until 1999. However, Plaintiff has offered no specific evidence linking the discoloration of the tooth to the January 14, 1996 incident. Moreover, even if the discoloration was linked to the January 14, 1996 incident, this fact alone does little to establish a "serious injury" or that Defendants were deliberately indifferent to Plaintiff's condition.

FN1. In addition to factual objections, Plaintiff asserts that Magistrate Judge Treece erred in failing to address an equal protection argument based on the alleged denial of dental treatment while Plaintiff was confined in the SHU. However, neither Plaintiff's complaint nor his motion papers raise an equal protection claim. Moreover, even if Plaintiff had raised an equal protection claim, he has not demonstrated that he was treated differently than other similarly situated inmates.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Upon a thorough review of relevant portions of the record, the Court finds that Plaintiff's objections do not call into question Magistrate Judge Treece's findings. Accordingly, the Court adopts Magistrate Judge Treece's recommendation and grants Defendants' motion for partial summary judgment on the deliberate indifference claims on the ground that Plaintiff has not established that he suffered a "serious injury" or that Defendants acted with deliberate indifference to Plaintiff's medical needs.

D. Defendant Saddlemire's Counterclaim for Battery

Defendants additionally moved for summary judgment with respect to Defendant Saddlemire's counterclaim for battery set forth in Defendants' amended answer. *See* Dkt. No. 74. Magistrate Judge Treece recommended that the Court deny the motion as moot based on the Court's prior Order striking defendants' amended answer. *See* Dkt. No. 87. Defendant Saddlemire has not objected to this portion of the Report-Recommendation. Finding no clear error, the Court accordingly adopts Magistrate Judge Treece's recommendation and denies as moot Defendant Saddlemire's motion for summary judgment.

E. Defendants' Supplemental Motion for Summary Judgment

[2] As noted above, Defendants obtained leave to file a supplemental motion for summary judgement based on Plaintiff's alleged failure to exhaust administrative remedies with respect to his excessive force and failure to protect claims. Since this is a jurisdictional issue, the Court will consider Defendants' supplemental motion before addressing Magistrate Judge Treece's recommendation with respect to Plaintiff's cross-motion for summary judgment on the merits of these claims.

Defendants correctly assert that the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to exhaust administrative remedies prior to commencing an action under 42 U.S.C. § 1983. The Supreme Court recently held that the PLRA's exhaustion requirement applies to excessive force claims, reversing prior practice in this Circuit. *See* *Porter v. Nussle,* 534 U.S. 516,-, 122 S.Ct. 983, 992 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life ....") (citation omitted). Defendants further point out that inmates are generally required to follow the three-step grievance process set forth in 7 N.Y.C.R.R. § 701.7 ("section 701.7") to resolve disputes. *See, e.g.,* *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347 (S.D.N.Y.2002) (inmates must follow three-step process set forth in section 701.7 to exhaust remedies as required by the PLRA). Defendants thus contend that Plaintiff is barred from asserting an excessive force claim in the present action because he failed to avail himself of the procedures set forth in section 701.7 following the January 14, 1996 incident.

***4** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under § 1983 ... until such administrative remedies as are available [to inmates] are exhausted." 42 U.S.C. § 1997e(a). New York has instituted a series of procedures known as the Inmate Grievance Program ("IGP") for resolving complaints about prison conditions. *See generally* 7 N.Y.C.R.R. § 701.1 *et seq.* (McKinney 2002). Section 701.1 states that the IGP "is intended to supplement, not replace, existing formal or informal channels of problem resolution." 7 N.Y.C.R.R. § 701.1(a). In addition, the IGP itself contains several methods for resolving inmate complaints. *Compare* 7 N.Y.C.R.R. § 701.7 (setting forth formal procedure for resolution of grievances) *with* 7 N.Y.C.R.R. § 701.11 (setting forth an informal expedited review process for allegations of harassment); *see also* *Gadson v. Goord,* No. 98-CV-1224, 2002 WL 982393, *2 (N.D.N.Y. May 10, 2002) (noting multiple dispute resolution schemes within the IGP). Several courts have nevertheless held that the process set forth in section 701.7 is the only remedial structure that satisfies the PLRA's exhaustion requirement. *See, e.g.,* *Rodriguez,* 209 F.Supp.2d at 347 (inmate who failed to comply with the three-step grievance process set forth in section 701 had not exhausted administrative remedies for purposes of the PLRA). However, the Second Circuit has noted that "[r]esolution of the matter through informal channels satisfies the [PLRA's] exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy." *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) (citation omitted). Notably, at least one court has entertained the possibility that informal complaints

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

leading to an investigation by the Inspector General satisfy the PLRA's exhaustion requirement. *See* *Perez v. Blot,* 195 F.Supp.2d 539, 545-46 (S.D.N.Y.2002) (granting additional discovery regarding plaintiff's efforts to pursue informal administrative remedies). In sum, prosecuting a grievance pursuant to section 701.7 is the usual, but not the only, administrative remedy available to aggrieved inmates.

Included with Plaintiff's response are several letters addressed to various prison officials complaining that several Corrections Officers used excessive force against Plaintiff while others failed to protect him during the January 14, 1996 incident. The first letter, dated March 15, 1996, and addressed to Superintendent Mantello of Coxsackie C.F., was prepared by counsel at the Legal Aid Society in response to Plaintiff's request. *See* Dkt. No. 129, Exhibit "B." Plaintiff prepared two additional letters on June 23, 2002, addressed to the Inspector General and Commissioner of the State Commission of Correction. *See id.* at Exhibit "A." Significantly, the Commission of Correction replied to Plaintiff's letters, stating "You have followed the correct procedure by notifying the Inspector General of your complaint." *Id.* at Exhibit "C." Moreover, it appears that both the Superintendent at Coxsackie Correctional Facility and the Inspector General's Office instituted investigations based on Plaintiff's complaints. *See id.* at Exhibits "B" and "C."

***5** It is clear that Plaintiff took several steps to seek redress for his grievances, including writing letters to prison officials, securing counsel, and, ultimately, instituting this lawsuit. Plaintiff's efforts resulted in an investigation by both the Superintendent of the Coxsackie Correctional Facility and the Inspector General of the Commission of Correction. Under these circumstances, it cannot fairly be said that Plaintiff has failed to avail himself of available administrative remedies, as required by the PLRA. That he did not avail himself of the section 701.7 grievance process is not dispositive. *Cf.* *Marvin,* 255 F.3d at 43 n. 3. Accordingly, the Court finds that Plaintiff has exhausted his administrative remedies within the meaning of the PLRA.

Even assuming that the procedures set forth in section 701.7 constitute the only satisfactory administrative remedy under the PLRA, Plaintiff contends that he is excused from failing to avail himself of that process. Specifically, Plaintiff alleges that he relied on the letter from the Commission of Correction stating that he was following the "correct procedure" for pursuing his grievance. *Cf.* *O'Connor v. Featherston,* 01 CIV. 3251, 2002 WL 818085, *2 (S.D.N.Y. Apr.29, 2002) (inmate may fulfill PLRA's exhaustion requirement where he (1) relies on prison officials' representations that correct procedure was followed or (2) makes a "reasonable attempt" to exhaust administrative remedies). Therefore, since Plaintiff relied on the representations of prison officials, the Court finds that Defendants are estopped from arguing that Plaintiff should have followed different procedures.

Accordingly, the Court denies Defendants' supplemental motion for summary judgment on the ground that Plaintiff has exhausted administrative remedies within the meaning of the PLRA and, in the alternative, that Plaintiff's failure to avail himself of the section 701.7 procedures is excused because he reasonably relied on the representations of prison officials.

F. Plaintiff's Cross-Motion for Summary Judgment on his Excessive Force and Failure to Protect Claims

Having denied Defendants' supplemental motion for summary judgment on the excessive force and failure to protect claims, the Court will now consider Plaintiff's original cross-motion for summary judgment on the merits of these claims. Magistrate Judge Treece found that disputes as to material facts exist with respect to the excessive force and failure to protect claims and thus recommended that the Court deny Plaintiff's cross-motion for summary judgment. Plaintiff has not objected to Magistrate Judge Treece's recommendation. Having reviewed the Report-Recommendation and having found no clear error, the Court accepts Magistrate Judge Treece's recommendation and denies Plaintiff's cross-motion for summary judgment.

G. "John Doe" Defendants

Magistrate Judge Treece recommended that four John Doe Defendants be dismissed from the case, noting *sua sponte* Plaintiff's unexcused delay in identifying these

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants and his failure to timely serve process. Plaintiff asserts that Defendants' lack of cooperation in the discovery process is to blame for his failure to identify and serve the four John Doe Defendants. While it appears from the Docket that discovery in this case did not proceed smoothly, it also appears that Plaintiff ultimately had ample discovery. Specifically, while several of Plaintiff's requests for additional time were ultimately denied, Defendants were nevertheless ordered to comply with Plaintiff's discovery requests. *See* Dkt. No. 68. Accordingly, the Court adopts Magistrate Judge Treece's recommendation and orders the four John Doe Defendants dismissed from the case.

H. Appointment of Counsel

***6** Magistrate Judge Treece did not address Plaintiff's motion for appointment of counsel appended to his cross-motion for summary judgment. The record reveals that Plaintiff has made numerous requests to have counsel appointed and each request has been denied. Notably, prior to filing his cross-motion for summary judgment, Plaintiff once more moved to have counsel appointed. *See* Dkt. 95. In denying that request, Magistrate Judge Treece ordered the Clerk to return to Plaintiff any further motions to appoint counsel unless and until a trial date was scheduled. *See* Dkt. No. 99. Accordingly, the Court will not address Plaintiff's attached motion requesting counsel and any further requests will not be considered until such time as a trial date is scheduled..

III. CONCLUSION

After carefully considering Magistrate Judge Treece's Report-Recommendation, Plaintiff's objections, Defendants' supplemental motion for summary judgment and Plaintiff's response thereto, relevant portions of the record, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Treece's Report-Recommendation, dated March 11, 2002, is ADOPTED in its entirety; and the Court further

ORDERS that Defendants' motion for partial summary judgment with respect to the deliberate indifference claims is GRANTED; and the Court further

ORDERS that Defendants' motion for partial summary judgment with respect to Defendant Saddlemire's counterclaim for battery is DENIED as moot; and the Court further

ORDERS that Defendants' supplemental motion for summary judgment is DENIED; and the Court further

ORDERS that Plaintiff's cross-motion for summary judgment is DENIED in its entirety; and the Court further

ORDERS that the four "John Doe" Defendants are dismissed from the case; and the Court further

ORDERS that the parties are to await instructions from the Court regarding the scheduling of a trial date.

IT IS SO ORDERED.

N.D.N.Y.,2002.

Heath v. Saddlemire
Not Reported in F.Supp.2d, 2002 WL 31242204 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Corey HEATH, Plaintiff,
v.
C.O. SADDLEMIRE, Correctional Officer, Coxsackie C.F.; C.O. Premo, Correctional Officer, Coxsackie C.F.; C.O. Foley, Correctional Officer, Coxsackie C.F.; C.O. Reyes, Correctional Officer, Coxsackie C.F.; C.O. Pilatich, Correctional Officer, Coxsackie C.F.; C.O. Darling, Correctional Officer, Coxsackie C.F.; C.O. Messina, Correctional Officer, Coxsackie C.F.; C.O. Hotaling, Correctional Officer, Coxsackie C.F.; C.O. Hodges, Correctional Officer, Coxsackie C.F.; C.O. Supina, Correctional Officer, Coxsackie C.F.; C .O. Stroud, Correctional Officer, Coxsackie C.F.; C.O. Pampianchi, Correctional Officer, Coxsackie C.F.; C.O. Agerami, Correctional Officer, Coxsackie C.F.; C.O. Chewers, Correctional Officer, Coxsackie C.F.; John Doe # 1; John Doe # 2; C.O. Chase, Sergeant, Coxsackie C.F.; C.O. Crandell, Sergeant, Coxsackie C.F.; C.O. Palmer, Sergeant, Coxsackie C.F.; C.O. Christian, Sergeant, Wende C.F.; John Doe # 3; Deperio, Doctor, Wende C.F.; Bugler, Nurse, Wende C.F.; Sansbury, Nurse, Wende C.F.; Irvin, Superintendent, Wende C.F.; Czajka, Nurse Administrator, Wende C.F.; John Doe # 4; Punzal, Doctor, Wende C.F., Defendants.
No. 9:96-CV-1998 (FJS/RF.

Oct. 7, 2002.

Inmate brought §1983 action against state prison alleging violation of his Eighth Amendment rights. On parties' motions for summary judgment, the District Court, Scullin, J., held that: (1) inmate failed to show that personnel at state prison were deliberately indifferent to his medical needs or that he suffered serious injury, and (2) inmate exhausted his administrative remedies.

Motions granted in part and denied in part.

West Headnotes

**[1] Prisons 310 192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
(Formerly 310k17(2))

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment. Most Cited Cases

Inmate failed to show that personnel at state prison were deliberately indifferent to his medical needs or that he suffered serious injury, in his lawsuit under Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §1983.

**[2] Civil Rights 78 1319**

78 Civil Rights

78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal Law Enforcement; Prisons. Most Cited Cases
(Formerly 78k209)

**Estoppel 156 62.2(2)**

156 Estoppel

156III Equitable Estoppel
156III(A) Nature and Essentials in General
156k62 Estoppel Against Public, Government, or Public Officers

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2002 WL 31242204 (N.D.N.Y.)

(Cite as: 2002 WL 31242204 (N.D.N.Y.))

156k62.2 States and United States
156k62.2(2) k. Particular State Officers, Agencies or Proceedings. Most Cited Cases

Inmate Grievance Program (IGP) was not sole means for New York prisoner to satisfy Prison Litigation Reform Act (PLRA) requirement for exhaustion of administrative remedies prior to commencing §1983 action under Eighth Amendment; superintendent at facility and inspector general's office instituted investigations based on inmate's complaints, and defendants were estopped from asserting failure to exhaust because corrections commission replied to inmate's letters complaining about the incident, stating that "you have followed the correct procedure by notifying the Inspector General of your complaint." U.S.C.A. Const.Amend. 8; 42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. § 701.7 et seq.

Corey Heath, Clinton Correctional Facility, Dannemora, Plaintiff Pro Se.

Office of the New York State Attorney General, Litigation Bureau, Albany, Attorneys for Defendants, Jeffrey P. Mans, AAG, of Counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

***1** Plaintiff Corey Heath brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging violations of his Constitutional rights under the Eighth Amendment. Specifically, Plaintiff alleges that on January 14, 1996, while he was incarcerated at Coxsackie Correctional Facility ("Coxsackie"), several corrections officers used excessive force against him and others failed to intervene and protect him. Plaintiff was subsequently hospitalized at Albany Medical Center Hospital ("AMCH") and treated for multiple injuries between January 14 and January 23, 1996. Upon release from AMCH, Plaintiff was transferred to Downstate Correctional Facility and then to Wende Correctional Facility ("Wende") on February 9, 1996. Plaintiff does not contend that his treatment at AMCH was deficient. Rather, Plaintiff alleges that Defendants were deliberately indifferent to his ongoing need for medical and dental treatment while incarcerated at Wende.

Named as Defendants are numerous corrections officers at Coxsackie and Wende and several medical staff at Wende.

Defendants moved for partial summary judgment with respect to Plaintiff's deliberate indifference claims and Defendant Saddlemire's counterclaim for battery. Plaintiff thereafter cross-moved for summary judgment on all claims and also moved for appointment of counsel. On March 11, 2002, Magistrate Judge Treece issued a Report-Recommendation in which he recommended that the Court (1) grant Defendants' motion for partial summary judgment with respect to Plaintiff's claim of deliberate indifference to serious medical needs, (2) deny as moot Defendants' motion for partial summary judgment with respect to Defendant Saddlemire's counterclaim for battery, (3) deny Plaintiff's cross-motion for summary judgment in its entirety, and (4) dismiss four unnamed "John Doe" Defendants from the case. The Report-Recommendation did not address Plaintiff's motion for appointment of counsel.

After Magistrate Judge Treece issued his Report-Recommendation, Defendants sought leave to file a supplemental motion for summary judgment with respect to the excessive force and failure to protect claims based upon an intervening change in law. *See* Dkt. No. 119. The Court granted Defendants' request by Order dated May 14, 2002. *See* Dkt. No. 120.

Presently before the Court are Plaintiff's objections to Magistrate Judge Treece's Report-Recommendation. *See* Dkt. No. 118. Also before the Court is Defendants' supplemental motion for summary judgment with respect to the excessive force and failure to protect claims. *See* Dkt. No. 126.

II. DISCUSSION

A. Standard of Review

The Court reviews *de novo* those findings and recommendations in a magistrate judge's report-recommendation to which a party has filed timely objections and for clear error those parts of the report-recommendation to which a party does not object. *See* 28 U .S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72; *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1990). The Court "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b); *see* 28 U.S.C. § 636(b)(1).

B. Summary Judgment

***2** A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the non-moving party based on the evidence presented, the legitimate inferences drawn from that evidence in favor of the non-moving party, and the applicable burden of proof. *See* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The district court is admonished to liberally construe pleadings presented by a *pro se* plaintiff. *See* *Gittens v. Garlocks Sealing Techs.,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998) (citing *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam)) (other citations omitted). Nevertheless, proceeding *pro se* does not otherwise relieve a plaintiff from the usual requirements of summary judgment. *See* *id.;* *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) ("a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (citation omitted)).

C. Deliberate Indifference Claims

To state a claim under the Eighth Amendment on the basis of the denial of medical care, Plaintiff must establish that Defendants acted with deliberate indifference to serious medical needs. *See* *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). Plaintiff must establish both an objectively serious condition and a subjectively culpable state of mind on the part of the relevant Defendants. *See id.* (citations omitted). Plaintiff must therefore establish the existence of a condition that is objectively "urgent," *i.e.,* "one that may produce death, degeneration, or extreme pain." *Id.* (citation omitted). In addition, Plaintiff must demonstrate that Defendants acted with a knowing disregard of an excessive risk to inmate health or safety. *See* *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates." *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992) (citation omitted). Moreover, an inmate does not have the right to the treatment of his choice. *See* *id.* at 44-45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)) (other citation omitted).

[1] Magistrate Judge Treece found that Plaintiff did not suffer a "serious injury" and, moreover, that Plaintiff's disagreement with the nature and character of the treatment that he received is insufficient to establish deliberate indifference on the part of Defendants. He therefore recommended that the Court grant Defendants' motion for partial summary judgment with respect to Plaintiff's deliberate indifference claims.

***3** Plaintiff's objections generally attempt to call into question minor factual details without providing any concrete evidence to controvert Magistrate Judge Treece's findings.[FN1] For example, Magistrate Judge Treece relied in part on an expert affidavit opining that discoloration of one of Plaintiff's teeth was caused by a 1995 dental procedure. Plaintiff objects on the ground that the discoloration was not noted until 1999. However, Plaintiff has offered no specific evidence linking the discoloration of the tooth to the January 14, 1996 incident. Moreover, even if the discoloration was linked to the January 14, 1996 incident, this fact alone does little to establish a "serious injury" or that Defendants were deliberately indifferent to Plaintiff's condition.

FN1. In addition to factual objections, Plaintiff asserts that Magistrate Judge Treece erred in failing to address an equal protection argument based on the alleged denial of dental treatment while Plaintiff was confined in the SHU. However, neither Plaintiff's complaint nor his motion papers raise an equal protection claim. Moreover, even if Plaintiff had raised an equal protection claim, he has not demonstrated that he was treated differently than other similarly situated inmates.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Upon a thorough review of relevant portions of the record, the Court finds that Plaintiff's objections do not call into question Magistrate Judge Treece's findings. Accordingly, the Court adopts Magistrate Judge Treece's recommendation and grants Defendants' motion for partial summary judgment on the deliberate indifference claims on the ground that Plaintiff has not established that he suffered a "serious injury" or that Defendants acted with deliberate indifference to Plaintiff's medical needs.

D. Defendant Saddlemire's Counterclaim for Battery

Defendants additionally moved for summary judgment with respect to Defendant Saddlemire's counterclaim for battery set forth in Defendants' amended answer. *See* Dkt. No. 74. Magistrate Judge Treece recommended that the Court deny the motion as moot based on the Court's prior Order striking defendants' amended answer. *See* Dkt. No. 87. Defendant Saddlemire has not objected to this portion of the Report-Recommendation. Finding no clear error, the Court accordingly adopts Magistrate Judge Treece's recommendation and denies as moot Defendant Saddlemire's motion for summary judgment.

E. Defendants' Supplemental Motion for Summary Judgment

[2] As noted above, Defendants obtained leave to file a supplemental motion for summary judgement based on Plaintiff's alleged failure to exhaust administrative remedies with respect to his excessive force and failure to protect claims. Since this is a jurisdictional issue, the Court will consider Defendants' supplemental motion before addressing Magistrate Judge Treece's recommendation with respect to Plaintiff's cross-motion for summary judgment on the merits of these claims.

Defendants correctly assert that the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), requires prisoners to exhaust administrative remedies prior to commencing an action under 42 U.S.C. § 1983. The Supreme Court recently held that the PLRA's exhaustion requirement applies to excessive force claims, reversing prior practice in this Circuit. *See* *Porter v. Nussle,* 534 U.S. 516,-, 122 S.Ct. 983, 992 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life ....") (citation omitted). Defendants further point out that inmates are generally required to follow the three-step grievance process set forth in 7 N.Y.C.R.R. § 701.7 ("section 701.7") to resolve disputes. *See, e.g., Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347 (S.D.N.Y.2002) (inmates must follow three-step process set forth in section 701.7 to exhaust remedies as required by the PLRA). Defendants thus contend that Plaintiff is barred from asserting an excessive force claim in the present action because he failed to avail himself of the procedures set forth in section 701.7 following the January 14, 1996 incident.

***4** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under § 1983 ... until such administrative remedies as are available [to inmates] are exhausted." 42 U.S.C. § 1997e(a). New York has instituted a series of procedures known as the Inmate Grievance Program ("IGP") for resolving complaints about prison conditions. *See generally* 7 N.Y.C.R.R. § 701.1 *et seq.* (McKinney 2002). Section 701.1 states that the IGP "is intended to supplement, not replace, existing formal or informal channels of problem resolution." 7 N.Y.C.R.R. § 701.1(a). In addition, the IGP itself contains several methods for resolving inmate complaints. *Compare* 7 N.Y.C.R.R. § 701.7 (setting forth formal procedure for resolution of grievances) *with* 7 N.Y.C.R.R. § 701.11 (setting forth an informal expedited review process for allegations of harassment); *see also* *Gadson v. Goord,* No. 98-CV-1224, 2002 WL 982393, *2 (N.D.N.Y. May 10, 2002) (noting multiple dispute resolution schemes within the IGP). Several courts have nevertheless held that the process set forth in section 701.7 is the only remedial structure that satisfies the PLRA's exhaustion requirement. *See, e.g., Rodriguez,* 209 F.Supp.2d at 347 (inmate who failed to comply with the three-step grievance process set forth in section 701 had not exhausted administrative remedies for purposes of the PLRA). However, the Second Circuit has noted that "[r]esolution of the matter through informal channels satisfies the [PLRA's] exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy." *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) (citation omitted). Notably, at least one court has entertained the possibility that informal complaints

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

leading to an investigation by the Inspector General satisfy the PLRA's exhaustion requirement. *See* *Perez v. Blot,* 195 F.Supp.2d 539, 545-46 (S.D.N.Y.2002) (granting additional discovery regarding plaintiff's efforts to pursue informal administrative remedies). In sum, prosecuting a grievance pursuant to section 701.7 is the usual, but not the only, administrative remedy available to aggrieved inmates.

Included with Plaintiff's response are several letters addressed to various prison officials complaining that several Corrections Officers used excessive force against Plaintiff while others failed to protect him during the January 14, 1996 incident. The first letter, dated March 15, 1996, and addressed to Superintendent Mantello of Coxsackie C.F., was prepared by counsel at the Legal Aid Society in response to Plaintiff's request. *See* Dkt. No. 129, Exhibit "B." Plaintiff prepared two additional letters on June 23, 2002, addressed to the Inspector General and Commissioner of the State Commission of Correction. *See id.* at Exhibit "A." Significantly, the Commission of Correction replied to Plaintiff's letters, stating "You have followed the correct procedure by notifying the Inspector General of your complaint." *Id.* at Exhibit "C." Moreover, it appears that both the Superintendent at Coxsackie Correctional Facility and the Inspector General's Office instituted investigations based on Plaintiff's complaints. *See id.* at Exhibits "B" and "C."

***5** It is clear that Plaintiff took several steps to seek redress for his grievances, including writing letters to prison officials, securing counsel, and, ultimately, instituting this lawsuit. Plaintiff's efforts resulted in an investigation by both the Superintendent of the Coxsackie Correctional Facility and the Inspector General of the Commission of Correction. Under these circumstances, it cannot fairly be said that Plaintiff has failed to avail himself of available administrative remedies, as required by the PLRA. That he did not avail himself of the section 701.7 grievance process is not dispositive. *Cf.* *Marvin,* 255 F.3d at 43 n. 3. Accordingly, the Court finds that Plaintiff has exhausted his administrative remedies within the meaning of the PLRA.

Even assuming that the procedures set forth in section 701.7 constitute the only satisfactory administrative remedy under the PLRA, Plaintiff contends that he is excused from failing to avail himself of that process. Specifically, Plaintiff alleges that he relied on the letter from the Commission of Correction stating that he was following the "correct procedure" for pursuing his grievance. *Cf.* *O'Connor v. Featherston,* 01 CIV. 3251, 2002 WL 818085, *2 (S.D.N.Y. Apr.29, 2002) (inmate may fulfill PLRA's exhaustion requirement where he (1) relies on prison officials' representations that correct procedure was followed or (2) makes a "reasonable attempt" to exhaust administrative remedies). Therefore, since Plaintiff relied on the representations of prison officials, the Court finds that Defendants are estopped from arguing that Plaintiff should have followed different procedures.

Accordingly, the Court denies Defendants' supplemental motion for summary judgment on the ground that Plaintiff has exhausted administrative remedies within the meaning of the PLRA and, in the alternative, that Plaintiff's failure to avail himself of the section 701.7 procedures is excused because he reasonably relied on the representations of prison officials.

F. Plaintiff's Cross-Motion for Summary Judgment on his Excessive Force and Failure to Protect Claims

Having denied Defendants' supplemental motion for summary judgment on the excessive force and failure to protect claims, the Court will now consider Plaintiff's original cross-motion for summary judgment on the merits of these claims. Magistrate Judge Treece found that disputes as to material facts exist with respect to the excessive force and failure to protect claims and thus recommended that the Court deny Plaintiff's cross-motion for summary judgment. Plaintiff has not objected to Magistrate Judge Treece's recommendation. Having reviewed the Report-Recommendation and having found no clear error, the Court accepts Magistrate Judge Treece's recommendation and denies Plaintiff's cross-motion for summary judgment.

G. "John Doe" Defendants

Magistrate Judge Treece recommended that four John Doe Defendants be dismissed from the case, noting *sua sponte* Plaintiff's unexcused delay in identifying these

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants and his failure to timely serve process. Plaintiff asserts that Defendants' lack of cooperation in the discovery process is to blame for his failure to identify and serve the four John Doe Defendants. While it appears from the Docket that discovery in this case did not proceed smoothly, it also appears that Plaintiff ultimately had ample discovery. Specifically, while several of Plaintiff's requests for additional time were ultimately denied, Defendants were nevertheless ordered to comply with Plaintiff's discovery requests. *See* Dkt. No. 68. Accordingly, the Court adopts Magistrate Judge Treece's recommendation and orders the four John Doe Defendants dismissed from the case.

H. Appointment of Counsel

***6** Magistrate Judge Treece did not address Plaintiff's motion for appointment of counsel appended to his cross-motion for summary judgment. The record reveals that Plaintiff has made numerous requests to have counsel appointed and each request has been denied. Notably, prior to filing his cross-motion for summary judgment, Plaintiff once more moved to have counsel appointed. *See* Dkt. 95. In denying that request, Magistrate Judge Treece ordered the Clerk to return to Plaintiff any further motions to appoint counsel unless and until a trial date was scheduled. *See* Dkt. No. 99. Accordingly, the Court will not address Plaintiff's attached motion requesting counsel and any further requests will not be considered until such time as a trial date is scheduled..

III. CONCLUSION

After carefully considering Magistrate Judge Treece's Report-Recommendation, Plaintiff's objections, Defendants' supplemental motion for summary judgment and Plaintiff's response thereto, relevant portions of the record, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge Treece's Report-Recommendation, dated March 11, 2002, is ADOPTED in its entirety; and the Court further

ORDERS that Defendants' motion for partial summary judgment with respect to the deliberate indifference claims is GRANTED; and the Court further

ORDERS that Defendants' motion for partial summary judgment with respect to Defendant Saddlemire's counterclaim for battery is DENIED as moot; and the Court further

ORDERS that Defendants' supplemental motion for summary judgment is DENIED; and the Court further

ORDERS that Plaintiff's cross-motion for summary judgment is DENIED in its entirety; and the Court further

ORDERS that the four “John Doe” Defendants are dismissed from the case; and the Court further

ORDERS that the parties are to await instructions from the Court regarding the scheduling of a trial date.

IT IS SO ORDERED.

N.D.N.Y.,2002.

Heath v. Saddlemire
Not Reported in F.Supp.2d, 2002 WL 31242204 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ismail N. SMITH, Plaintiff,
v.
Commissioner GOORD; C.O. Matrese, Correctional Officer, Coxsackie Correctional Facility; Ranze, Coxsackie Correctional Facility; Bogardus, Correctional Officer, Coxsackie Correctional Facility; Michaud, Correctional Officer, Coxsackie Correctional Facility; Noeth, Coxsackie Correctional Facility; John Doe, Keeplock C.O., Coxsackie Correctional Facility, from F-2 on 9/12/07; Sperry, Nurse, Coxsackie Correctional Facility; John Doe, Physical Therapist from 8/7/08, Coxsackie Correctional Facility; John Doe, Deputy Commissioner of Programs, DOCS; John Doe, Deputy Commissioner of Facilities; Murzda, Correctional Officer, Coxsackie Correctional Facility; McDermot, Lt., Coxsackie Correctional Facility; Rivera, Superintendent, Coxsackie Correctional Facility; Montusello,[FN1] Deputy Superintendent of Security; A. Mtambu, Nurse, Defendants.

FN1. The correct spelling of Defendant Montusello's name appears to be "Martuscello." *See* Dkt. No. 48, Acknowledgment of Serv., dated Aug. 4, 2009. We shall refer to him using the correct spelling of his name.

Civ. No. 9:08-CV-1364 (NAM/RFT).

Aug. 9, 2010.

Ismail N. Smith, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

***1** *Pro se* Plaintiff Ismail N. Smith brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights. On December 22, 2009, Defendants Goord, Rivera, and Martuscello filed a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6). Dkt. No. 67. By their Motion, the moving Defendants assert that Plaintiff's supervisory liability claims are not facially valid and that Plaintiff has failed to plead any personal involvement on their part. *Id.* Plaintiff was ordered to file a response to the Motion no later than January 8, 2010. *Id.* On January 6, 2010, Plaintiff filed a Letter-Motion seeking an extension to file a response, which the Court granted, extending his deadline to March 8, 2010. Dkt. No. 70; Text Order, dated Jan. 6, 2010. On March 26, 2010, Plaintiff filed a Motion to Amend his Complaint for a third time,[FN2] but did not otherwise address the pending Motion to Dismiss. Dkt. No. 74. By his Proposed Third Amended Complaint, Plaintiff, in large measure, reiterates the allegations in the Second Amended Complaint. *Compare* Dkt. No. 65, Second Am. Compl. *with* Dkt. No. 74, Proposed Third Am. Compl. In terms of substantive changes contained in the Proposed Third Amended Complaint, Plaintiff seeks to add claims against two new defendants, Correction Officers McKintyre and Stevenson, as well as new claims against Defendant Lieutenant ("Lt.") McDermott. Proposed Third Am. Compl. at ¶¶ 27-31 & 40. Defendants collectively filed a Partial Opposition to the Third Motion to Amend, arguing that Plaintiff's proposed claims against McKintyre are facially invalid and implausible, but otherwise registering no opposition to the remainder of that Motion. Dkt. No. 75. To date, Plaintiff has not responded to the Motion to Dismiss filed by Goord, Rivera, and Martuscello. *See generally* Case Dkt.

FN2. The original Complaint was filed on December 22, 2008. Dkt. No. 1. Plaintiff filed his First Motion to Amend on June 15, 2009, which, being unopposed by Defendants, was granted. Dkt. No. 41. On September 21, 2009, Plaintiff filed a Second Motion to Amend, which was again granted after Defendants offered no substantive opposition to the Motion. Dkt. No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

64. Plaintiff's Second Amended Complaint was docketed on November 24, 2009. Dkt. No. 65. Defendants Goord, Rivera, and Martuscello filed their Motion to Dismiss on December 22, 2009. Dkt. No. 67.

Because the Proposed Third Amended Complaint does not in any way add to or subtract from Plaintiff's claims against Defendants Goord, Rivera, and Martuscello, we shall begin by addressing their Motion to Dismiss and then proceed to Plaintiff's Third Motion to Amend.

## I. DEFENDANT'S MOTION TO DISMISS

### A. Summary of Plaintiff's Claims

As the Motion to Dismiss is limited to Plaintiff's claims against Goord, Rivera, and Martuscello, we need not recite the entirety of Plaintiff's allegations in order to put their Motion into context. Instead, a brief overview of Plaintiff's claims will suffice. Such overview is derived from the factual allegations in Plaintiff's Second Amended Complaint, which, in accordance with the applicable standard under FED. R. CIV. P. 12(b)(6), must be taken as true for the purposes of addressing the Motion to Dismiss. *See infra* Part I.B.

At all times relevant to this action Plaintiff was incarcerated at the Coxsackie Correctional Facility ("Coxsackie"). Dkt. No. 65, Second Am. Compl. at p. 7, Intro. Plaintiff claims that Defendants subjected him to a sustained serious of threats and harassment, Second Am. Compl. at ¶¶ 1-5, issued false misbehavior reports against him in retaliation for complaints he filed, Second Am. Compl. at ¶¶ 10-15, displayed deliberate indifference to his medical needs, Second Am. Compl. at ¶¶ 7-9 & 24-26, and finally, on September 12, 2007, he was beaten and subjected to excessive force by Defendants Ramsey, Bogardus, Noeth, Matrease, and Michaud, Second Am. Compl. at ¶¶ 17-20. Plaintiff also brings supervisory liability claims based on the above alleged constitutional violations against Defendants Goord, Rivera, Martuscello, and John Does Deputy Commissioner of Facilities and Deputy Commissioner of Programs. *Id.* at ¶¶ 37-41. We provide more detail regarding those supervisory claims in our discussion below. *See infra* Part I.C.

### B. Standard of Review

***2** On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950 (citing *Twombly* ). "A claim has facial plausibility when the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U . S. ---- 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950-51.

**C. Personal Involvement**

***3** The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. at 1948.

Nevertheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Defendants Goord, Rivera, and Martuscello assert that Plaintiff's allegations fail to state facially valid claims against them under § 1983. Plaintiff's supervisory liability claims against these Defendants are stated in the Second Amended Complaint [FN3] as follows:

> FN3. Plaintiff brings identical claims against these Defendants in his Proposed Third Amended Complaint. *See* Proposed Third Am. Compl. at ¶¶ 42-47.

37. Prior to plaintiff ISMAIL N SMITH's arrival at Coxsackie Correctional Facility, Commissioner Goord, Rivera, Montucello, Deputy Commissioner of Facilities, [and] Deputy Commissioner of Programs John Doe developed and maintained policies or customs/or upheld policies or customs exhibiting deliberate indifference to the constitutional rights of inmates in DOCS and Coxsackie Correctional Facility which caused the violation of ISMAIL N SMITH's rights.

38[1].[FN4] It was the policy and/or custom of the supervisor defendant Goord, et al., to inadequately supervise and train its police officers [and] corrections officers and civilians including the defendants, thereby failing to adequately discourage further constitutional violations on the part of its staff members (correctional officers, civilians). The Supervisor defendants Goord, et al. did not require appropriate in-service training or re-training of correction officers and civilian staff who were known to have engaged in staff misconduct.

> FN4. In his Second Amended Complaint, Plaintiff numbered two consecutive paragraphs "38." For ease of reference, we have designated them "38[1]" and "38[2]" in order.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

38[2]. It was the policy and/or customs of the Supervisor Defendants Goord, et al., to inadequately and improperly investigate inmates['] complaints of staff misconduct, and acts of misconduct were instead tolerated by the Supervisor Defendants Goord, et al., including but not limited to, the following incidents mentioned [in this Second Amended Complaint].

***4** 39. It was a policy and/or custom of the Supervisor Defendants to hire unqualified[ ] Correction Officer[s] and Civilians.

40. As a result of the above described policies and customs, correction officers and civilian staff of Coxsackie Correctional, including the defendants, believed that their actions would not be properly monitored by supervisory officials and that misconduct would not be investigated or sanctioned, but would be tolerated.

41. The above described policies and customs demonstrate a deliberate indifference on the part of the policymaking Supervisor Defendants Goord, et al., to the constitutional rights of inmates within DOCS and Coxsackie Correctional and were the cause of the violations of plaintiff's rights ....

Second Am. Compl. at ¶¶ 37-41.

Thus, Plaintiff attempts to impute supervisory liability on the moving Defendants owing to their failure to (1) supervise and train subordinates, (2) investigate inmate complaints, and (3) hire qualified correctional officers and staff. *Id.* Plaintiff states that these failures amounted to formal or informal policies and/or customs that directly led to the violation of inmates' constitutional rights, including his own. *Id.*

The moving Defendants contend that the allegations quoted above are conclusory and do not amount to facially plausible supervisory liability claims. We agree. While Plaintiff asserts that the moving Defendants failed to supervise and train their subordinates, he does not allege any facts as to how they failed to do so. *See generally* Second Am. Compl. Similarly, Plaintiff does not explain the circumstances under which any of the moving Defendants failed to adequately investigate constitutional violations, including those alleged in the Second Amended Complaint. *Id.* In that respect, Plaintiff does not allege to have filed any grievance or complaint with or against the moving Defendants, nor that any such Defendant failed to act on or take steps to remedy a wrong after being informed of one. *Id.* Finally, Plaintiff does not explain how the correction officers hired by the moving Defendants were unqualified. *Id.* In sum, these supervisory liability allegations amount to nothing more than a claim based on the theory of *respondeat superior,* which, as discussed above, is insufficient to state a valid claim under § 1983. A defendant cannot be held liable simply because of his supervisory position. *Wright v. Smith,* 21 F.3d at 501; *see also* *Scaccia v. County of Onondaga, New York,* 2009 WL 498563, at *11 (N.D.N.Y. Dec. 15, 2009) (dismissing claims against supervisory defendants where plaintiff's claims "hinge[d] entirely on their roles as supervisors of individuals who (allegedly) violated [his] constitutional rights" and there were "no facts plausibly suggesting how [the supervisory defendants] failed to train and/or supervise their subordinates."); *Paterson v. Goord,* 2008 WL 623123, at *7 (N.D.N.Y. Mar. 4, 2008) (dismissing complaint against supervisory defendants when plaintiff's conclusory allegations failed to implicate their personal involvement).

***5** For all the above reasons, it is recommended that the Motion to Dismiss be **granted in its entirety** and that Defendants Goord, Rivera, and Martuscello be **dismissed** from this action. Moreover, because Plaintiff's only allegations against Defendants John Doe Deputy Commissioner of Facilities and John Doe Deputy of Commissioner of Programs are the same accusations brought against the moving Defendants, *see* Second Am. Compl. at ¶¶ 37-41, they should be **dismissed** from this action for the same reasons stated above and pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). *See, e.g., Zimmerman v. Burge,* 2008 WL 850677, at *7 (N.D.N.Y. Mar. 28, 2008) (citing 28 U.S.C. § 1915(e)(2)(B)(ii) and noting that "even where a defendant has not requested dismissal based on the failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim[.]"). Because Plaintiff has failed to state a valid

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

claim against these John Does, allowing him the opportunity to properly identify and serve these unnamed Defendants would be an exercise in futility.

## II. PLAINTIFF'S THIRD MOTION TO AMEND

### A. Motion to Amend Standard

FED. R. CIV. P. 15(a) states, in pertinent part, that leave to amend a pleading should be "freely given when justice so requires." *Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003). Indeed, leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Kropelnicki v. Siegel,* 290 F.3d 118, 130 (2d Cir.2002) (citing *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 271-72 (2d Cir.1996)). District courts are vested with broad discretion to grant a party leave to amend the pleadings. *See Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel,* 145 F.3d 85, 89 (2d Cir.1998).

In this instance, Defendants assert that Plaintiff's proposed claims against Corrections Officer Mckintyre are futile and, as such, his Third Motion to Amend should be denied as to those proposed claims. Dkt. No. 75, Defs.' Resp. in Opp'n to Pl.'s Third Mot. to Am. The Second Circuit has stated that where futility is raised as an objection to the motion to amend, and

> [w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend. *See, e.g., Foman v. Davis,* 371 U.S. at 182, 83 S .Ct. at 230 (denial not abuse of discretion where amendment would be futile); *Health-Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("where ... there is no merit in the Proposed amendments, leave to amend should be denied"); *Billard v. Rockwell International Corp.,* 683 F.2d 51, 57 (2d Cir.1982) (denial not abuse of discretion where plaintiff had had "access to full discovery" in a related case).

***6** *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

As futility is an appropriate basis for denying leave to amend, such denial should be contemplated within the standards necessary to withstand a motion to dismiss pursuant to FED. R. CIV. P. 12(b) (6). *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002) (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). For a review of that standard, see Part I.B above.

In this case, Defendants assert that Plaintiff's proposed claims against Mckintyre are futile because they fail to state a valid claim under § 1983 and because they are barred by the applicable statute of limitations. Dkt. No. 75, Defs.' Resp. Plaintiff seeks to add the following allegations against Mckintyre: (1) On May 12, 2006 and up to March 26, 2007, Mckintyre consistently harassed him, Proposed Third Am. Compl. at ¶ 27; (2) On May 12, 2006, Mckintyre wrote a false misbehavior report against Plaintiff, prompting Plaintiff to file a grievance against Mckintyre, Proposed Third Am. Compl. at ¶ 28; (3) In March 2007, Plaintiff was transferred to Mckintyre's housing unit and threatened by Mckintyre, Proposed Third Am. Compl. at ¶ 29; (4) On March 26, 2007, after Mckintyre threatened to take adverse actions against him, Plaintiff saw Mckintyre and Stevenson redacting a piece of paper together. When they finished, Mckintyre and Stevenson confronted Plaintiff with a letter of complaint that Plaintiff and another inmate intended to send to the A.C.L.U. regarding ongoing constitutional violations at Coxsackie, which Mckintyre and Stevenson characterized as "gang material," and then proceeded to lock Plaintiff in his cell. At his ensuing disciplinary hearing, Plaintiff saw that in the text of the letter to the A.C.L.U., each letter C was crossed out, a symbol he recognized to be gang-related. Plaintiff asserts that Mckintyre and Stevenson forged the redactions to the letter and filed a fabricated misbehavior report against him. Proposed Third Am. Compl. at ¶¶ 30-31.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept. 2, 2005);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D .N.Y. Aug. 31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Thus, the first and third of the above proposed allegations against Mckintyre are facially inadequate and therefore are futile. With respect to Plaintiff's second claim, that Mckintyre issued a false misbehavior report against him, such claim is also deficient because there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar. 31, 2005). While inmates may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7, Plaintiff does not allege that the alleged May 12, 2006 misbehavior report was motivated by retaliatory animus. In that respect, we note that the Proposed Third Amended Complaint states that Plaintiff filed a grievance against Mckintyre *after* he received the allegedly false misbehavior report. Proposed Third Am. Compl. at ¶ 28.

***7** In contradistinction to his first three proposed allegations against Mckintyre, Plaintiff's fourth allegation, liberally construed, asserts a valid retaliation claim. In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted). Here, Plaintiff alleges that in response to a grievance he filed against Mckintyre after an alleged incident of harassment on May 12, 2006, Mckintyre colluded with Stevenson in March 2007, after Plaintiff was relocated to their housing unit, to forge gang insignia on a legitimate letter intended to be sent to the A.C.L.U., causing Plaintiff to be disciplined and confined in keeplock. Plaintiff also alleges that Mckintyre put Plaintiff on notice that he was going to retaliate against him, stating to Plaintiff upon his arrival at the cell block that "your [sic] in my house now and you better be on point cause I'm out to get you, you're not gonna last up here very long."

Filing grievances is protected conduct under the First Amendment, *see Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988), and Plaintiff has alleged a plausible connection between that conduct and the alleged retaliatory acts taken.[FN5] Therefore, we find that Plaintiff's proposed retaliation claim against Mckintyre is facially valid.

> FN5. Although it is unclear, Plaintiff may have also intended to assert that the drafting of the complaint letter to the A.C.L.U. was protected conduct that caused retaliatory acts to be taken against him.

Defendants also argue that Plaintiff's proposed claims against Mckintyre are futile on statute of limitations grounds. In § 1983 actions, the applicable statute of limitations is a state's "general or residual statute for personal injury actions." *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002). In New York, a three-year statute of limitations applies for personal injury actions, and thus to § 1983 actions as well. *Id.; see also* N.Y.C.P.L.R. § 214(5). Federal constitutional claims accrue when the plaintiff "knows or has reason to know" of the injury that is the basis for his action. *Pauk v. Bd. of Tr. of City Univ. of New York,* 654 F.2d 856, 859 (2d Cir.1981); *see also Connolly v. McCall,* 254 F.3d 36, 40-41(2d Cir.2001). In this case, Plaintiff alleges that Mckintyre retaliated against him on March 26, 2007, the date such claim accrued.[FN6] Proposed Third Am. Compl. at ¶ 30. Plaintiff's Third Motion to Amend, dated March 25, 2010, was filed on March 26, 2010. Dkt. No. 74. Thus, Plaintiff's retaliation claim against Mckintyre, even assuming it does not relate back to the filing of the original Complaint, was timely filed within the three-year statute of limitations.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN6. Because we find Plaintiff's other proposed claims against Mckintyre to be facially invalid, we need not discuss whether or not they fall within the statute of limitations.

Therefore, it is recommended that Plaintiff's Third Motion to Amend be **granted in part** and **denied in part** in accordance with the above opinion. Plaintiff's Motion is **denied** with respect to his proposed claims against Mckintyre, save his retaliation claim. Moreover, the allegations against the supervisory Defendants, which were identical in both his Second Amended Complaint and Proposed Third Amended Complaint, fail to state a valid cause of action under § 1983 and are therefore futile as well. As such, Plaintiff is directed to file a Third Amended Complaint consistent with this Order that does not include the aforementioned futile claims.

### III. CONCLUSION

***8** For the reasons stated herein, it is hereby **RECOMMENDED,** that the Motion to Dismiss the Second Amended Complaint (Dkt. No. 67) brought by Defendants Goord, Rivera, and Martuscello be **GRANTED;** and it is further

**RECOMMENDED,** that Plaintiff's Third Motion to Amend the Second Amended Complaint be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that should the District Court adopt the above recommendations, that Plaintiff be ordered to file a Third Amended Complaint with the Clerk of the Court ***within thirty (30) days of such adoption;*** and it is further

**RECOMMENDED,** that Plaintiff be ordered to omit within any Third Amended Complaint his facially invalid and/or futile claims against Defendant Mckintyre and Defendants Goord, Rivera, Martuscello, John Doe Deputy Commissioner of Facilities, and John Doe Deputy of Commissioner of Programs. Should a Third Amended Complaint be filed, the Clerk shall forward such pleading to this Court for review to ensure compliance with the Court's directives prior to issuing summonses; and it is further

**RECOMMENDED,** that should the District Court adopt this Report-Recommendation, there will still be two John Doe Defendants remaining. Plaintiff should be forewarned that with respect to John Doe, Keeplock C.O., and John Doe, Physical Therapist, the U.S. Marshals cannot effect service on a "John Doe" Defendant. In the event that Plaintiff wishes to pursue his claims against these Defendants, he shall take reasonable steps to ascertain their identity. Plaintiff may then file a motion to amend his complaint and seek leave of the Court to add such individuals, by name, as Defendants to this lawsuit. Plaintiff should be further advised that if these individuals are not timely served, this action will be dismissed as against them; and it is further

**ORDERED,** that the Clerk send a copy of this Order to the parties.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Smith v. Goord
Slip Copy, 2010 WL 3488148 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Ismail N. SMITH, Plaintiff,
v.
Commissioner GOORD; C.O. Matrese, Correctional Officer, Coxsackie Correctional Facility; Ranze, Coxsackie Correctional Facility; Bogardus, Correctional Officer, Coxsackie Correctional Facility; Michaud, Correctional Officer, Coxsackie Correctional Facility; Noeth, Coxsackie Correctional Facility; John Doe, Keeplock C.O., Coxsackie Correctional Facility, from F-2 on 9/12/07; Sperry, Nurse, Coxsackie Correctional Facility; John Doe, Physical Therapist from 8/7/08, Coxsackie Correctional Facility; John Doe, Deputy Commissioner of Programs, Docs; John Doe, Deputy Commissioner of Facilities; Murzda, Correctional Officer, Coxsackie Correctional Facility; McDermot, Lt., Coxsackie Correctional Facility; Rivera, Superintendent, Coxsackie Correctional Facility; Montusello,[FN1] Deputy Superintendent of Security; A. Mtambu, Nurse, Defendants.

> FN1. The correct spelling of Defendant Montusello's name appears to be "Martuscello." *See* Dkt. No. 48, Acknowledgment of Serv., dated Aug. 4, 2009. We shall refer to him using the correct spelling of his name.

No. 9:08-CV-1364.

Aug. 30, 2010.

Ismail N. Smith, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

***1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Randolph E. Treece, duly filed on the 9th day of August 2010. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Smith v. Goord
Slip Copy, 2010 WL 3488139 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Robert del CARPIO, Plaintiff,
v.
Hans WALKER, Superintendent; Edward Dann, Deputy Superintendent; Lt. Battle, Officer of the Adjustment Committee; Officer York; Officer Kimak, Auburn Corr. Facility, Defendants.
**No. Civ.A.95CV1502RSPGJD.**

Oct. 15, 1997.

Robert del Carpio, Federal Medical Center, Lexington, Kentucky, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol, Albany, New York, for defendants, Lisa Renee Harris, Assistant Attorney General, of Counsel.

**ORDER**

POOLER, J.

***1** The above matter comes to me following a Report-Recommendation by Magistrate Judge Gustave J. Di Bianco, duly filed on the 18th day of September, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no party having submitted objections [FN1] thereto, it is

FN1. I note that the magistrate judge's report recommendation was returned to the court undelivered because the plaintiff is no longer at the address listed in the court's file, which is the last address plaintiff instructed the court to use. By Order filed November 22, 1995, Magistrate Judge Gustave Di Bianco ordered that plaintiff "promptly notify the Clerk's Office of any change in his address." Dkt. No. 3 at 4. The same order provided that "failure to keep such office apprised of [plaintiff's] current address will result in the dismissal of the instant action." *Id.* I do not rely on plaintiff's failure to notify the court of his current address as a basis for dismissing the action; I merely note that plaintiff cannot in the future claim, in reliance on his failure to receive a copy of the report-recommendation, that he was deprived of the opportunity to file objections due to any fault of the court.

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. The defendant's motion is granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report.

3. The Clerk serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.
GUSTAVE J. DI BIANCO, Magistrate J.

**REPORT-RECOMMENDATION**

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, United States District Judge pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In the instant civil rights complaint, the plaintiff alleges that while he was incarcerated, defendants York and Battle harassed plaintiff and filed false misbehavior reports against him in retaliation for the exercise of his right to redress grievances and the right to practice his religion in violation of the First and Fourteenth Amendments of the Constitution. Plaintiff also alleges Eighth Amendment violations as a result of defendants' actions.

The complaint seeks both injunctive and monetary relief.

Presently before the court is the defendants' motion for summary judgment pursuant to FED.R.CIV.P. 56. For the following reasons, the undersigned will recommend granting the defendants' motion and dismissing the complaint.

## DISCUSSION

### 1. Summary Judgment

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED.R.CIV.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.*

### 2. Facts

In his complaint, plaintiff alleges a chronology of events, commencing in May of 1995. Plaintiff states that he wrote letters to Superintendent Walker about defendants York and Kimak. Plaintiff alleges that these two defendants constantly harassed plaintiff. Plaintiff then alleges that after he complained of their actions to prison officials, defendants York and Kimak participated in filing false misbehavior reports against plaintiff in retaliation for his complaints. Plaintiff also alleges that defendant York forced plaintiff to continue working when York knew that plaintiff's heart condition would not permit him to do as York asked. Plaintiff also claims that defendant York refused to feed the plaintiff. Plaintiff refers to three misbehavior reports that he alleges were fabricated.

***2** Plaintiff states that he has written to Superintendent Walker many times, but Walker has failed to remedy the situation. Plaintiff states that due to Walker's failure to remedy the problem, York and Kimak believe that they can continue to harass the plaintiff without adverse consequences. Plaintiff claims that Deputy Superintendent Dann failed to properly investigate plaintiff's allegations against York and Kimak. Plaintiff states that Lieutenant Battle was a hearing officer involved in the allegedly retaliatory misbehavior charges.[FN1] Plaintiff claims that defendant Battle did not properly evaluate or credit the plaintiff's testimony or the testimony of plaintiff's witnesses.

> FN1. The court notes that Lieutenant Battle was the hearing officer in only ***one*** of the plaintiff's disciplinary hearings. Lieutenant Perkins presided over the other two disciplinary hearings. Plaintiff did not sue Lieutenant Perkins.

### 3. Respondeat Superior

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

In *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

Defendants Walker and Dann argue that the plaintiff has not alleged sufficient personal responsibility to survive a motion for summary judgment. Clearly, neither Walker nor Dann directly participated in the alleged violations. Plaintiff seeks to establish personal responsibility by claiming that these defendants failed to remedy the violations after learning of them through a report or appeal.

Plaintiff alleges that he began writing to defendant Walker in May of 1995 about harassment by defendant York. It is true that personal responsibility of a supervisory official may be established if the official learns of the violation through a report or appeal and fails to remedy the situation. *Williams, supra*. However, the letter or complaint must alert the supervisory official to the constitutional violation of which the plaintiff complains. *See* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Watson v. McGinnis,* 964 F.Supp. 127, 129-30 (S.D.N.Y.1997).

***3** In the instant case, the plaintiff's complaints to defendant Walker about York and Kimak relate to the alleged harassment that the plaintiff was suffering. There is no evidence that the Superintendent or Deputy Superintendent Dann knew anything about the plaintiff's allegation of retaliatory misbehavior reports. Thus, they could not be held liable for any claims of retaliation. The grievances that the plaintiff submitted were all investigated as shown by the defendants' exhibits. One of the grievances dealt with an allegation of "false keeplock." [FN2] Defendants' Exhibit C. A review of the documents relating to the grievance and all the appeals associated therewith, shows no evidence that defendants Walker or Dann were ever informed of the situation. In fact, the grievance is signed by an individual named Duncan in the space reserved for the Superintendent's signature. Defendants' Exhibit C at p. 6. Attached to the grievance papers are all the memoranda regarding the investigation of the issue.

FN2. This was the June 6, 1995 grievance mentioned in plaintiff's complaint.

Defendants' Exhibit J contains plaintiff's June 11, 1995 letters [FN3] to defendant Walker. The letters stated that defendants York and Kimak were trying to cause the plaintiff to have a heart attack by their harassment. The harassment included not releasing the plaintiff for "chow" and preventing plaintiff from timely visits to the law library. Plaintiff mentioned a false misbehavior charge, but stated that this allegation was being handled in the Cayuga County Court.

FN3. There are two letters in Exhibit J. Both are dated June 11, 1995. One is typed and one is handwritten.

One of plaintiff's June 11 letters was given to Deputy Superintendent Dann, who asked Lieutenant Jackson to investigate the issues raised. Defendants' Exhibit K includes documents relative to Lieutenant Jackson's investigation of the matter, including memoranda of interviews of the officers involved. Although the investigation did not achieve the result desired by the plaintiff, this does not constitute the requisite personal involvement by Walker or Dann in any alleged constitutional violations.

In fact, defendant Dann wrote plaintiff a memorandum stating the results of Lieutenant Jackson's investigation. Defendants' Exhibit K. The memorandum stated that although no merit had been found in plaintiff's claims, Sergeant Lupo was told to speak with the plaintiff to make sure his concerns were addressed. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**4. Due Process**

The complaint in this action focuses upon defendant York and Kimak's retaliatory misbehavior reports, however, in passing, the plaintiff also states that Lieutenant Battle "closed his eyes to the evidence," did not properly evaluate the plaintiff's testimony, and "covered" for the officers. These claims could be interpreted as raising a procedural due process claim in addition to the substantive retaliation claim.

The court would first point out that there were three allegedly retaliatory misbehavior reports. Lieutenant Battle was the hearing officer only at ***one*** of the hearings. Lieutenant Perkins was the hearing officer for the other two hearings. Plaintiff does not mention Perkins in the complaint at all. Thus, the undersigned will consider a procedural due process claim on the one hearing over which defendant Battle presided which took place on July 17, 1995. Defendants' Exhibit S. The formal charge was served on plaintiff on July 13, 1995, and charged plaintiff with refusing a direct order and being out of place. *Id.* at p. 3 (transcript of disciplinary hearing). Officer Kimak was the individual signing the misbehavior report. Defendants' Exhibit R.

***4** In order for a plaintiff to be awarded damages under section 1983 for an alleged violation of procedural due process, the court must find that as a result of conduct performed under color of state law, plaintiff was deprived of life, liberty, or property without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In the instant case, there is no dispute that the defendants acted under color of state law. In *Bedoya,* the Second Circuit indicated that "[w]hat remains is a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined in keeplock ...; and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Id.* at 351-52 (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460-61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

In order to determine whether a liberty interest existed, courts, until recently, were relying on the Supreme Court decision in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). In *Hewitt,* the Supreme Court noted that a state could create a liberty interest through a statute or regulation by utilizing language of unmistakably mandatory character, limiting the discretion of the decision maker. *Id.* After the decision in *Hewitt,* lower courts, as well as the Supreme Court, focused more upon the language of the statute or regulation, rather than upon the character of the deprivation. *See e.g., Kentucky Dep't of Corrections, supra; Hernandez v. Coughlin,* 18 F.3d 133 (2d Cir.1994) (finding no liberty interest after examining regulations associated with the Family Reunion Program), *cert denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.1988) (finding liberty interest in remaining free from administrative segregation based on New York regulations); *Gittens v. LeFevre,* 891 F.2d 38, 41 (2d Cir.1989) (finding a liberty interest in remaining free from keeplock based on language of the regulations).

The Supreme Court has held that the *Hewitt* analysis is not applicable and has led to undesired results in prison cases. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Courts may no longer rely ***solely*** upon the language of the regulations when determining whether a liberty interest exists. *Id.* at 2300. The Court stated in Sandin that "the search for a negative implication from mandatory language in prison regulations has strayed far from the real concerns under-girding the liberty protected by the Due Process Clause." *Id.* The court also stated that it was ***returning*** to the principles established in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Id.* Ultimately, the court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

***5** *Sandin* rejected the notion that any action taken by prison personnel for punitive reasons encroaches on a liberty interest. *Id.* at 2301. The court referred to as "dicta" statements in other cases implying that solitary confinement automatically triggers due process protections. *Sandin,* 115 S.Ct. at 2301 (citing *Wolff,* 418 U.S. at 571 n. 19; *Baxter v. Palmigiano,* 425 U.S. 308, 323, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Applying this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

standard to the facts in *Sandin,* the court determined that Conner's discipline in segregated confinement for 30 days did ***not*** present the type of atypical, significant deprivation in which the state might create a liberty interest. *Id.*

In determining what constituted "atypical and significant" deprivations, the *Sandin* court compared disciplinary segregation with other forms of segregation; compared the plaintiff's confinement with conditions in general population to see whether the inmate had suffered a major disruption in his environment; and examined whether the ***length*** of the inmate's sentence was affected. *Id.*

The Second Circuit has not yet squarely addressed the issue of whether after *Sandin* an inmate facing a disciplinary hearing has a liberty interest, protected by due process. The Second Circuit has *implied* that whether a deprivation is atypical and significant involves fact finding. *See* *Frasier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) ("[t]he extensive fact-finding of the district court permits us to measure Frasier's SHY claim by the standard of *Sandin* ); *Samuels v. Mockry,* 77 F.3d 34, 38 (2d Cir.1996) (assessment as to whether inmate had a protected liberty interest may require fact finding).

Some courts in New York have also read *Sandin* narrowly and have distinguished the holding when applying the *Sandin* factors and distinguishing the situation experienced by inmate Conner to that experienced by New York inmates who face Tier III disciplinary hearings. *See* *Campo v. Keane,* 913 F.Supp. 814, 820-21 (S.D.N.Y.1996); *see Moolenaar v. Finn,* No. 94 Civ. 6778 n. 4 (S.D.N.Y. March 14, 1996) (commenting that the case involved a Tier II hearing with no ***possibility*** of loss of good time and contrasting Tier III hearings where such loss is possible). As noted by the courts in *Campo* and *Moolenaar,* a recognized Second Circuit principle is that due process rights must be determined with respect to the "potential penalty". *Campo,* 913 F.Supp. at 821 (citing *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). Some courts, however, have squarely rejected the potential penalty theory, opting instead to examine the facts and length of each confinement to determine whether the confinement was atypical and significant. *See Marino v.. Klages,* No. 95-CV-1475 (N.D.N.Y. March 27, 1997) (declining to adopt the potential penalty approach); *Delany v. Selsky,* 899 F.Supp. 923, 927-28 (N.D.N.Y.1995) (considering length of confinement together with plaintiff's unusual physical problems).

***6** In the instant case, the plaintiff was subjected only to a ***Tier II*** hearing, in which the maximum possible penalty he could receive was 30 days of segregated housing or keeplock. *See* N.Y.Comp.Codes R. & Reg. Tit. 7 § 254.7(a)(iii) and (vi). There is no possibility in a Tier II hearing of a loss or even a recommended loss of good time. Regardless of the disposition, the length of an inmate's sentence cannot be affected as a result of a Tier II hearing. Even under the potential penalty approach, this plaintiff, who was only sentenced to five days of keeplock for the hearing that he is challenging would not have a liberty interest in being free from that confinement. Thus, any procedural due process claim against Lieutenant Battle, based on the July 17, 1995 disciplinary hearing may be dismissed.

## 5. Verbal Harassment

Plaintiff states that defendants York and Kimak harassed him "to death." Verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997). Thus, any claims of general verbal harassment by either defendant may be dismissed.

## 6. Retaliation

Even after the Sandin decision, a claim that a false misbehavior report was filed in retaliation for the exercise of a constitutional right, is still actionable as a violation of ***substantive due process.*** The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1988). In cases where the defendants' actions are taken for both retaliatory and legitimate reasons, ultimately the defendants must show that they would have taken the same action absent the retaliatory motive. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir .1994). Courts recognize, however, that claims of retaliation may be prone to abuse. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). The court in Flaherty described three situations where retaliation is claimed, each situation requiring a different approach by the court. *Id.* The court stated that a retaliation claim supported by specific and detailed allegations must be pursued with full discovery. *Id.* Whereas, a claim that contains "completely conclusory" allegations may be dismissed on the pleadings alone. *Id.* The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.*

In the instant case, the plaintiff alleges that officers York and Kimak filed the false misbehavior reports in retaliation for plaintiff's complaints and grievances against them. Plaintiff also alleges that defendant York retaliated against plaintiff for the exercise of a First Amendment right to practice his religion. This latter claim is not explained by the plaintiff. He does not allege specifically what First Amendment right he was exercising or how the defendants' actions were in retaliation for the exercise of that right.

***7** Defendants have submitted all the records relating to the disciplinary hearings. With respect to the charges, a review of the transcripts of the disciplinary hearings shows that the plaintiff was given the opportunity to explain his behavior at the disciplinary hearing. *See e.g.* Defendants' Exhibit M at p. 4. Exhibit M is the transcript of the disciplinary hearing that took place on June 11, 1995 for a misbehavior that occurred on June 7, 1995. The misbehavior involved the plaintiff failing to obey an order to continue working. The plaintiff admitted that he did not continue working when defendant York told him to continue. *Id.* Plaintiff stated that his medical condition was preventing him from continuing. *Id.* Essentially, the plaintiff admitted his behavior, but alleged a defense that his medical condition prevented him from following the officer's order.

Thus, the misbehavior report was not ***false.*** Rather, the plaintiff had an explanation for his misbehavior that the hearing officer did not believe. In fact, hearing officer Perkins adjourned the hearing to "check into [[[plaintiff's] medical profile." *Id.* at p. 5. The hearing was reconvened on July 12, 1995, and Lieutenant Perkins had reviewed the plaintiff's medical record. *Id* . at p. 6. Perkins determined that although the plaintiff did have a health problem, there was no indication that he could not work. *Id.* Whether the hearing officer made the correct decision is not the issue. It is clear that at worst, there could have been a dual motivation for defendant York's misbehavior report, and plaintiff did admit failing to obey the officer's order, albeit with reason.

The misbehavior report of July 8, 1995 resulted in a hearing on July 12, 1995. First, the officer fling the misbehavior report was Officer Hoey. The misbehavior report involved unauthorized legal assistance and unauthorized legal exchange. Defendants' Exhibit P (transcript of July 12 hearing). A frisk of the plaintiff's cell resulted in finding 81 pages of legal work that belonged to other inmates. Plaintiff did not dispute that the legal papers were in his cell, but argued that he was using the other individuals' papers to work on his own legal matters. *Id.* at p. 3. The hearing officer simply did not believe the plaintiff's explanation. *Id.* at p. 5.

Neither defendant York nor defendant Kimak was directly involved in the search or the misbehavior report of July 7, 1995. Thus, there is no evidence that this misbehavior report was false and in retaliation for any constitutional right exercised by the plaintiff.

The final misbehavior report was authored by defendant Kimak and involved refusal to obey an order and being out of place. The disciplinary hearing was held on July 17, 1995. Defendants' Exhibit S (transcript of disciplinary hearing). The misbehavior report stated that when plaintiff was returning from his shower, he refused to obey Officer Kimak's order get back into plaintiff's cell. Defendant Kimak stated in the report that plaintiff had stopped at one of the cells and placed his hands inside. *Id.* at p. 3. Plaintiff alleged at the hearing that he was returning from the shower, but he did not stop at anyone's cell and did not disobey any orders. *Id.* at p. 4. Plaintiff also told the hearing officer that defendant Kimak's actions were in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

retaliation for plaintiff's complaints against Kimak. *Id.* at pp. 4-5. Plaintiff called two inmate witnesses to testify at the hearing. *Id.* at p. 7. His first witness was very unclear, but essentially testified that he did not hear the officer give plaintiff an order. *Id.* The second inmate was more articulate and stated that after plaintiff exited the I shower, he always went straight back to his cell. *Id.* at p. 12. Moore testified that he did not hear any order given. *Id.* However, Lieutenant Battle found the witnesses incredible and found plaintiff guilty of the misbehavior. It would appear that the only evidence of retaliation is the plaintiff's allegation of complaints against Kimak and York. A review of the documents I relating to the misbehavior reports shows that even if the plaintiff's statements are credited, the misbehavior reports could have been written for valid reasons as well as invalid reasons. Thus, the plaintiff cannot maintain an action for retaliation in the instant case.

**7. Eighth Amendment**

***8** Plaintiff makes some vague allegations that the defendants forced him to work when he was not capable. Plaintiff admitted at his disciplinary hearing that he wanted to work but needed to take a break. Lieutenant Perkins looked through the plaintiff's medical records and found no limitations with respect to the work he could do. The medical record did note a heart condition.

The Eighth Amendment prohibits the infliction of cruel and unusual punishments, including punishments that involve the unnecessary and wanton infliction of pain. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). In order to state a claim based on inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A plaintiff must allege that his access to physicians for necessary medical care was unreasonably delayed or denied or that prescribed medical treatment was not administered. *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (citing *Todaro v. Ward,* 431 F.Supp. 1129, 1133 (S.D.N.Y.), *aff'd,* 565 F.2d 48 (2d Cir.1977)). Plaintiff's claims, although not specifically involving medical care, do involve allegations that the defendants violated the doctor's orders, and are governed by the same deliberate indifference standard. Deliberate indifference, whether evidenced by medical staff or by officials who allegedly disregard the instructions of the medical staff requires more than negligence, but less than conduct taken for the very purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1978, 128 L.Ed.2d 811 (1994). In order for a prison official to act with deliberate indifference, the official must know of and disregard an excessive risk to inmate health and safety. *Id.* at 1979. The official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* In the instant case, defendant York allegedly told the plaintiff to keep working when plaintiff stated that he needed a break. The defendant could not have been deliberately indifferent since there was no medical limitation on plaintiff's work in his medical file. Thus, York could not have known about and disregarded a serious risk to plaintiff. Additionally, according to the misbehavior report, the plaintiff had already taken a break when defendant York told plaintiff to keep working. Thus, based on the undisputed facts, there is no evidence that defendant York violated the plaintiff's Eighth Amendment rights relating to his medical condition. Plaintiff also indicated in his complaint that defendant York refused to let plaintiff out of his cell to be fed. Plaintiff wrote a grievance on June 29, 1995 regarding being released "for chow." Defendants' Exhibit D. However, it does not appear that Officer York was involved in the incident. In fact, the grievance was resolved informally. Thus, the plaintiff does not state any Eighth Amendment claim for a retaliatory denial of food or for any denial of food.

***9 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the defendants' motion for summary judgment (docket # 15) be **GRANTED,** and the complaint be **DISMISSED.**

Pursuant to 28 1 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)
(Cite as: 1997 WL 642543 (N.D.N.Y.))

Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,1997.
Carpio v. Walker
Not Reported in F.Supp., 1997 WL 642543 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

Feb. 25, 2010.

**REPORT AND RECOMMENDATION**

THEODORE H. KATZ, United States Magistrate Judge.

***1 TO: HON. RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Larry Williams ("Plaintiff"), proceeding *pro se,* brings this action against Defendants the United States of America, the United States Marshal's Service ("USMS"), Detention Officers Luis Figueroa, Donny LaRosa, Thomas Ventiere, A.J. Krause, and unnamed detention officers John Does Nos. 4, 6, 7, and 8 (collectively, "Defendants"), alleging that they violated his rights under the First, Fifth, Sixth, and Eighth Amendments to the United States Constitution. Plaintiff asserts his claims against Defendants Figueroa, LaRosa, Ventiere, Krause, and John Does Nos. 4, 6, 7, and 8 (collectively, the "Individual Defendants") in their official as well as individual capacities.

Defendants have moved to dismiss the action pursuant to Rules 12(b)(1), (5), and (6) of the Federal Rules of Civil Procedure. Defendants contend that the Court lacks subject matter jurisdiction, Plaintiff fails to state a claim upon which relief can be granted, and Plaintiff has failed to serve Defendants within 120 days of the filing of the Amended Complaint. The case was referred to this Court for a Report and Recommendation on Defendants' motion. For the reasons that follow, this Court recommends that Defendants' motion be granted.

**BACKGROUND**

The events at issue in this action took place while Plaintiff was involved in criminal proceedings in the Southern District of New York ("S.D.N.Y."). Plaintiff alleges that the Individual Defendants, employees of the USMS assigned to the S.D.N.Y., violated his constitutional rights by mistreating him when they transported him to and from the S.D.N.Y. courthouse, and while he was in the courthouse's holding cells during the course of his criminal trial. Unless otherwise noted, the following facts are taken from Plaintiff's Amended Complaint, and assumed to be true for purposes of Defendants' motion to dismiss. (*See* Amended Complaint, dated Jan. 7, 2009 ("Am.Compl.").)

**I. The Incidents of 2004 through 2006**

On February 8, 2004, Defendant Figueroa transported Plaintiff and other inmates from the Metropolitan Detention Center ("MDC"), where Plaintiff was incarcerated during his criminal trial, to the S .D.N.Y. courthouse. (*See* Am. Compl. ¶ 4.) During the trip, Defendant Figueroa began to discuss another inmate's case, who was in protective custody with one of Plaintiff's co-defendants in his criminal case. (*See id.* ¶ 5.) Plaintiff told Defendant Figueroa that "such discussions should not take place in the presence of inmates." (*See id.* ¶ 6.) In response, Defendant Figueroa called Plaintiff a "rat," which, according to Plaintiff, put his "life in jeopardy." (*See id.* ¶ 7.) Defendant Figueroa then told Plaintiff that he would be placed in the "Zebra Tank"-a solitary-confinement cell at the courthouse that was typically reserved for inmates who were cooperating with the government. (*See id.* ¶ 8.) Upon arrival at t he courthouse, Plaintiff was placed in the Zebra Tank. (*See id.*)

***2** On March 1, 2004, during another trip to the S.D.N.Y. courthouse, Defendant Figueroa told another inmate on the bus-one of Plaintiff's co-defendants in his criminal proceeding-that Plaintiff would be placed in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

Zebra Tank every time he went to the courthouse. (*See id.* ¶¶ 9-10.) He told Plaintiff, “You don't know who you are messing with. I'm from the street too.” (*Id.* ¶ 11.)

When they arrived at the courthouse, Defendant LaRosa escorted the inmates inside the building and toward the holding cells, while Defendant Figeuroa walked side-by-side with Plaintiff. (*See id.* 12.)

All of the prisoners were restrained with leg shackles, as well as handcuffs connected by chains to waist restraints. (*See id.* ¶ 13.) When the group reached an area of the building outside of the U.S. Marshal's office, Defendant Figueroa encountered Defendant Ventiere, and told him to make sure that Plaintiff was sent to the Zebra Tank. (*See id.* ¶ 14.) Defendant Ventiere instructed Plaintiff to step out of the line and stand by the wall opposite the other inmates. (*See id.* ¶ 15.) Plaintiff complied, but informed Defendant Ventiere that he would like to speak to a supervisor whenever possible. (*See id.* ¶ 16.)

At that point, Defendant Figueroa grabbed Plaintiff and “slammed him back into the wall.” (*Id.* ¶ 17.) Defendant Ventiere joined Defendant Figueroa, and together they began “manhandling, choking, wrestling, and otherwise using excessive force” on Plaintiff as they moved him down the hall and into the Zebra Tank. (*Id.* ¶ 18.) When they arrived, they “smashed” Plaintiff into the metal cell door and the iron cell bars, and finally “slammed” Plaintiff into the metal bench. (*See id.* ¶ 19.) They then punched Plaintiff in the head and back, leaving him in a state of semiconsciousness. (*See id.* ¶¶ 21-22.) Plaintiff remained in restraints during this incident and was unable to physically defend himself. (*See id.* ¶ 20.)

After Defendants Figueroa and Ventiere left, Plaintiff “managed to use the toilet in the Zebra Tank and then fell to the floor.” (*See id.* ¶ 23.) Defendants Krause and John Doe No. 4, who were standing nearby, told Plaintiff to get up, because “it did not look good for the camera.” (*Id.* ¶ 24.) Plaintiff complied, afraid that he would be subjected to further assault. (*See id.*) Plaintiff was later taken to the courtroom by Defendants Ventiere and John Doe No. 4, where his attorney “took note of the effects of the assault.” (*See id.* ¶¶ 25-26.) Plaintiff was not offered medical assistance by any of the Individual Defendants. (*See id.* ¶ 27.)

After Plaintiff's court appearance that day, Defendant Figueroa replaced Plaintiff's restraints for the trip back to the MDC. (*See id.* ¶ 28.) According to Plaintiff, Defendant Figueroa applied the restraints “unduly tight,” inflicting “considerable additional pain.” (*Id.*) When he arrived at the MDC, Plaintiff requested treatment by a physician's assistant for his injuries. (*See id.* ¶ 29.) A physician's assistant refused to examine Plaintiff's injuries, but prescribed “two pills,” and recommended that Plaintiff file a sick-call form. (*See id.* ¶ 30.)

***3** Plaintiff completed and filed the form the following morning, March 2, 2004. (*See id.* ¶ 31.) Several hours later, Plaintiff was taken to the Special Housing Unit (“SHU”), where he informed SHU Lieutenant Wilkens of the events of earlier in the day. (*See id.* ¶ 32.) Wilkens had Plaintiff examined by a physician's assistant, and photographed Plaintiff's bruises and injuries so that Bureau of Prisons officers would not be mistakenly blamed for the assault. (*See id.*)

The following day, March 3, 2004, Plaintiff was “spitting up blood,” and was taken to a local hospital for further examination. (*See id.* ¶ 33.) The hospital prescribed pain medication and scheduled a follow-up examination for the following week. (*See id* .) Plaintiff did not receive medication until March 18, 2004. (*See id.*) MDC staff, “at the behest of the defendants,” kept Plaintiff in SHU confinement until March 30, 2004. (*See id.* ¶ 34.)

As a result of Figueroa's and Ventiere's actions on March 1, 2004, Plaintiff “suffer[ed] from disorientation, and had difficulty swallowing food.” (*Id.* ¶ 35.) Plaintiff had lacerations, bruising, and swelling on parts of his arms, legs and back. (*See id.* ¶ 36.) Plaintiff complained of “[d]izziness, faintness, and breathing problems.” (*Id.*) In addition, Plaintiff claims that he “suffered from emotional anguish and psychological distress,” and requires psychiatric treatment and medication for depression, psychosis, and anxiety. (*See id.* ¶ 37.)

On March 23, 2004, Plaintiff was again taken to the courthouse in order to attend a suppression hearing of one

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

of his codefendants. (*See id.* ¶ 40.) He spent approximately six hours in the Zebra Tank, and was returned to the MDC several hours after his co-defendants, at the end of the day. (*See id.*) During this time, Plaintiff alleges that the Individual Defendants called him a "rat," and "humiliated [him] with jokes and teasing about the complaints made following the assault of March 1." (*See id.*) This treatment left Plaintiff so uncomfortable and mistrustful that he did not want to eat the food that the Individual Defendants gave him. (*See id.*)

Approximately one week later, on March 29, 2004, Plaintiff claims that the Individual Defendants "lost" his legal folder, which contained "valuable legal materials and strategies concerning Plaintiff's suppression hearing." (*Id.* ¶ 41.) Plaintiff does not specify which of the Individual Defendants lost these papers.

On April 23, 2004, Defendant Figueroa "continued his constant habit of taunting and teasing Plaintiff." (*Id.* ¶ 42.) On May 14, 2004, the Individual Defendants again put Plaintiff in the Zebra Tank. (*See id.* ¶ 43.) After Plaintiff complained of the cold temperature, Defendant John Doe No. 6 told Plaintiff "that's your problem." (*Id.*) Plaintiff inquired as to John Doe No. 6's name, but he did not provide it to Plaintiff. (*See id .*) Plaintiff was later placed in a regular holding cell. (*See id.*)

***4** While in the regular holding cell, Defendant Figueroa approached Plaintiff and asked "What's wrong?" while laughing. (*See id.* ¶ 44.) Although Plaintiff had arrived at the courthouse at 8:00 a.m. that morning, Plaintiff was not returned to MDC custody until approximately 8:30 p.m. (*See id.*) Plaintiff alleges that a similar delay occurred several months later, on August 16, 2004. (*See id.* ¶ 45.)

In September and October 2004, during Plaintiff's criminal trial, the Individual Defendants subjected Plaintiff to "constant taunting and harassment" that he alleges "negatively effected [his] due process and right to a fair trial." (*Id.* ¶ 46.) During this time period, Defendant John Doe No. 7 told Plaintiff, "I don't know why you are going to trial, you will never win," and on one occasion, pushed Plaintiff while he was walking from the courtroom. (*Id.* ¶¶ 47, 49.) Defendant John Doe No. 8 called Plaintiff a "crybaby" after he cried at his criminal trial. (*See id.* ¶ 50.) Plaintiff also alleges that one of the Individual Defendants-unspecified by Plaintiff-told Plaintiff that if he "pissed them off[, Plaintiff would] suffer a worse fate than before ." (*Id.* ¶ 48.) At the conclusion of Plaintiff's trial, on October 27, 2004, Defendant John Doe No. 7 told Plaintiff, "You're going to Leavenworth," and "You'll get what you deserve." (*Id.* ¶ 51.) Plaintiff alleges that, in December 2005, at another criminal hearing, he complained about the Individual Defendants' "constant and continued mistreatment of Plaintiff." (*Id.* ¶ 52.)

Finally, on May 5, 2006, Plaintiff claims that Defendant Ventiere "popped from out of a door of a room with a large one-way mirror" as Plaintiff was being escorted to a holding cell by a USMS officer. (*Id.* ¶ 53.) Plaintiff had been telling the officer about the previous incidents with the Individual Defendants when Defendant Ventiere said, "I heard that, and I'll teach you a lesson." (*Id .* ¶ 53.) Plaintiff was returned to a holding cell, where he sat in "utter fear, not knowing if something would happen." (*Id.*) Defendant Ventiere took no further action against Plaintiff, but Plaintiff was kept in the holding cell until the last bus back to the correctional facility. (*See id.*)

**II. The Filing and Service of the Complaint**

Plaintiff filed this action on February 28, 2007.[FN1] In his initial Complaint, he named only "John Does 1-11, sued in their individual capacities" as Defendants. (*See* Complaint, dated Feb. 28, 2007 ("Compl."), at 1.) Plaintiff's Complaint was stamped "received" by the Court's Pro Se Office on March 9, 2007, but was not docketed until April 14, 2007. On August 10, 2007, Plaintiff mailed a service package to the USMS. The paperwork was returned to Plaintiff on August 27, 2007, indicating that the Complaint could not be served without the names and addresses of Defendants. Plaintiff then wrote to the Court on September 5, 2007, requesting additional time to serve Defendants and assistance in obtaining the identity of the then-John Doe Defendants. (*See* Pl .'s Ltr., dated Sept. 5, 2007.) After Plaintiff's request went unanswered, he submitted a second letter to the Court on October 10, 2007. (*See* Pl.'s Ltr., dated Oct. 10, 2007.)

FN1. It is well-settled that, as a *pro se* prisoner, Plaintiff's papers are deemed filed on the date

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

that he hands them over to prison officials to be mailed. *See Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 2382 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (applying *Houston* to constitutional tort suits). Absent evidence to the contrary, the Court assumes that Plaintiff gave his Complaint to prison officials to mail on the date he signed it, February 28, 2007. *See, e.g. Frith v. Hill,* No. 07 Civ. 5899(JSR), 2009 WL 3073716, at *8 n. 4 (S.D.N.Y. Sept. 23, 2009); *Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

***5** On October 30, 2007, District Judge Richard J. Sullivan ordered the United States Attorney's Office ("USAO") to identify the officers described in the Complaint, if possible, and to provide each officer's name and last known address to Plaintiff and the Court within 45 days. (*See* Order, dated Oct. 30, 2007, at 2.) Plaintiff was ordered to file an amended complaint identifying Defendants by their proper names no later than 30 days after receiving the names, and to serve the amended complaint via the Court's Pro Se Office. (*See id.*) Plaintiff was cautioned that *"[f]ailure to comply with this deadline may result in the dismissal of the plaintiff's complaint."* (*Id.* at 3.)

By letter dated December 17, 2007, the USAO identified Defendant Figueroa as John Doe No. 1, and Defendant Ventiere as John Doe No. 3, based on the allegations in the Complaint. (*See* Defs.' Ltr., dated Dec. 17, 2007.) The USAO was unable to identify the remaining John Does. The USAO noted that the Complaint contained no allegations against John Does Nos. 9-11. Finally, the USAO wrote that "no less than forty different officers and/or independent contractors hired by the USMS may have come into contact with Plaintiff while he was being transported from prison to Court, and to the Courthouse cellblock while attending Court conferences, hearings, or his trial," and without more specific information, the USMS was unable to determine which of those officers might have been the John Does described in the Complaint. (*Id.*)

On January 6, 2008, Plaintiff requested that the Court order the USAO to produce the names and pictures of all forty of the officers and independent contractors. (*See* Pl.'s Ltr., dated Jan. 6, 2008.) On January 17, 2008, Judge Sullivan denied this request as premature, ordered Plaintiff to submit additional details about the remaining John Doe Defendants by February 17, 2008, and ordered the USAO to make reasonable efforts to identify the remaining Defendants within 45 days of receiving the new details from Plaintiff. (*See* Order, dated Jan. 17, 2008.) Plaintiff was also ordered to either amend the Complaint within 30 days of receiving the names of the John Doe Defendants, or renew his request for photographs of all forty individuals, should identification by the USAO prove unsuccessful. (*See id.*)

By letter dated February 17, 2008, Plaintiff provided physical descriptions of four of the remaining John Doe Defendants, and an additional factual allegation against a fifth John Doe Defendant.[FN2] (*See* Pl.'s Ltr., dated Feb. 17, 2008.) After 45 days passed and the USAO did not submit a response, Plaintiff wrote to the Court to request a status update. By letter dated June 30, 2008, the USAO indicated that it never received Plaintiff's February 17, 2008 letter.[FN3] (*See* Defs.' Ltr., dated June 30, 2008.) By Order dated July 3, 2008, Judge Sullivan ordered the USAO to respond to Plaintiff's letter within 20 days, and ordered Plaintiff to file an amended complaint within 30 days of receipt, or renew his request for the photographs. (*See* Order, dated July 3, 2008.)

FN2. After the USAO identified John Does Nos. 1 and 3, six John Does remained unidentified, not including John Does Nos. 9-11.

FN3. Plaintiff's February 17, 2008 letter indicated that the USAO was copied on the letter. (*See* Pl.'s Ltr., dated Feb. 17, 2008.)

***6** On August 15, 2008, the USAO informed the Court that they had been unable to conclusively identify any more of the unnamed Defendants based on the information that Plaintiff provided.[FN4] (*See* Defs.' Ltr., dated Aug. 15, 2008.) The USAO indicated that they believed that one of the John Doe Defendants was "most likely" A.J. Krause, but Plaintiff's descriptions were simply too vague to further identify the unnamed Defendants with reasonable certainty. (*See id.*)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

FN4. The Court granted the USAO additional time, beyond the 20 days originally provided, to submit its response.

On September 17, 2008, Plaintiff renewed his request for the names and photographs of all 40 officers, claiming that he needed the information in order to set forth his claims of a "civil conspiracy." [FN5] (*See* Pl.'s Ltr., dated Sept. 17, 2008.) Judge Sullivan denied Plaintiff's request, finding that Plaintiff's "conclusory allegations" did not warrant such an order. (*See* Order, dated Sept. 30, 2008.) Instead, Plaintiff was granted leave to amend the Complaint to add parties as appropriate, and to include any new information that had been developed after the action was commenced. (*See id.*) Judge Sullivan instructed Plaintiff to "add as much identifying detail as possible in order to satisfy the requirements of a valid pleading," and informed him that, to the extent that the amended pleading stated claims against employees of the USMS, he could use the pre-trial discovery process and possibly Court assistance to identify the remaining unnamed Defendants. (*See id.*) Finally, Judge Sullivan reminded Plaintiff of the three-year statute of limitations that governed his claims, and warned him that "[A]n amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." (*See id.* (quoting *Barrow v. Wethersfield,* 66 F.3d 466, 470 (2d Cir.1995)).)

FN5. Neither Plaintiff's Complaint nor his Amended Complaint alleges claims for civil conspiracy.

Plaintiff filed the Amended Complaint on January 2, 2009. He named as Defendants the United States of America, the USMS, Luis Figueroa (formerly John Doe No. 1), Donny LaRosa (whom Plaintiff refers to as "Donny LNU," and was formerly John Doe No. 2),[FN6] Thomas Ventiere (formerly John Doe No. 3), and A.J. Krause (formerly John Doe No. 5). Plaintiff also maintained his action against John Does Nos. 4, 6, 7, and 8, although John Doe No. 8 is not included in the caption of the Amended Complaint. Plaintiff sued the Individual Defendants in their official as well as individual capacities.

FN6. Plaintiff identified John Doe No. 2 as "Donny LNU," (presumably, "last name unknown"), without assistance from Defendants. Defendants have identified this individual as Donny LaRosa.

Judge Sullivan ordered Plaintiff to serve the Amended Complaint by April 1, 2009. (*See* Order, dated Mar. 2, 2009.) Due to a change of address, Plaintiff did not receive this Order, and, on April 9, 2009, Plaintiff requested an extension of time to serve Defendants. Judge Sullivan granted Plaintiff's request, and ordered Plaintiff to serve the Amended Complaint by May 15, 2009, and to submit a status letter to the Court by May 29, 2009, describing his efforts to serve Defendants. (*See* Order, dated Apr. 14, 2009.)

***7** Having received no updates or certificates of service from Plaintiff by June 5, 2009, Judge Sullivan ordered the action dismissed pursuant to Federal Rule of Civil Procedure 41(b). (*See* Order, dated June 5, 2009.)

On June 17, 2009, Plaintiff requested reconsideration of the Order of Dismissal, on the grounds that he had served Defendants, but had been awaiting the process receipts, which he did not receive until June 10, 2009. (*See* Pl.'s Ltr., dated June 17, 2009.) Plaintiff claimed that he had been under the impression that if he served Defendants, he did not need to submit a status letter by May 29, 2009. The Court reopened the case on June 23, 2009. (*See* Order, dated June 23, 2009.) Plaintiff thereafter submitted the process receipts, which indicated that Plaintiff mailed service packages to the USMS on May 12, 2009; the forms were acknowledged as received on May 27, 2009; and process was effectuated on June 2 and 4, 2009.

## DISCUSSION

Defendants contend that (1) the claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity, and should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Federal Rules of Civil Procedure; (2) the claims against the Individual Defendants in their personal capacities are time-barred and/or fail to state claims upon which relief can be granted, and should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (3) Plaintiff failed to effectuate service on the Individual Defendants within 120 days of the filing of the Amended Complaint, and those claims should be dismissed pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. (*See* Defs.' Memorandum of Law, dated Aug. 21, 2009 ("Defs.' Mem."), at 8-19.)

In response, Plaintiff primarily addresses Defendants' argument that the Amended Complaint fails to state a claim upon which relief can be granted, based on Plaintiff's alleged failure to comply with the applicable statute of limitations. Plaintiff argues that the initial Complaint was timely filed, and the Amended Complaint "relates back" to the date of the original filing. (*See* Pl.'s Memorandum of Law, dated Aug. 31, 2009 ("Pl.'s Mem."), at 1-3.) Plaintiff does not address Defendants' arguments regarding sovereign immunity and insufficiency of service of process.

**I. Subject Matter Jurisdiction Under Rule 12(b)(1)**

A. *Legal Standard*

On a Rule 12(b)(1) motion, "the plaintiff bears the burden of proving by a preponderance of the evidence that jurisdiction exists." *Dong v. Ridge,* No. 02 Civ. 7178(HB), 2005 WL 1994090, at *3 (S.D.N.Y. Aug. 18, 2005) (quoting *Chayoon v. Chao,* 355 F.3d 141, 143 (2d Cir.2004)); *see also* *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000); *Marshall v. Nat'l Ass'n of Letter Carriers,* Nos. 00 Civ. 3167(LTS), 01 Civ. 3086(LTS), 2003 WL 223563, at *6 (S.D.N.Y. Feb. 3, 2003).

***8** It is "axiomatic" that, under the principle of sovereign immunity, "the United States may not be sued without its consent, and the existence of consent is a prerequisite for jurisdiction." *Adeleke v. United States,* 355 F.3d 144, 150 (2d Cir.2003). "The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769-70 (1941) (citations omitted); *see also* *Lehman v. Nakshian,* 453 U.S. 156, 160-61, 101 S.Ct. 2698, 2701-02 (1981); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953-54 (1976); *Dotson v. Griesa,* 398 F.3d 156, 177 (2d Cir.2005) ("a finding of sovereign immunity ... deprive[s][a] court of subject matter jurisdiction"). In other words, the United States must unequivocally express its consent to be sued by specifically waiving sovereign immunity in a statutory text. *See* *Lane v. Peña,* 518 U.S. 187, 192, 116 S.Ct. 2092, 2096 (1996); *see also* *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33-44, 112 S.Ct. 1011, 1014-15 (1992); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351 (1980). Further, the "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman,* 453 U.S. at 161, 101 S.Ct. at 2702 (quoting *Soriano v. United States,* 352 U.S. 270, 276, 77 S.Ct. 269, 273 (1957) (quotation marks omitted)); *see also* *Lane,* 518 U.S. at 192, 116 S.Ct. at 2096 ("a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign").

The United States need not be an expressly named defendant for an action to be considered as one against the sovereign. "The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or compel it to act ." *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 723 (2d Cir.1983) (internal quotation marks and citations omitted) (quoting *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, (1963); *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012 (1947); and *Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468 (1949)). It follows that a suit against a federal agency or its officers, acting in their official capacities, constitutes a lawsuit against the federal government. *See* *Dotson,* 398 F.3d at 177 (federal agencies and officers acting in official capacities protected by sovereign immunity); *see also* *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 1000 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit"); *Kemer v. Johnson,* 900 F.Supp. 677, 681 (S.D.N.Y.1995) (citing *B.K. Instrument,* 715 F .2d at 723) (federal officers acting

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

in official capacities protected by sovereign immunity)).

B. *Application*

***9** In the instant case, Plaintiff has named the United States and the USMS as Defendants, and asserted claims against the Individual Defendants in their official capacities, as well as their personal capacities. Because the USMS is a federal agency, and the Individual Defendants, in their official capacities, are officers of that agency, claims asserted against them are in fact asserted against the United States. Thus, absent an "unequivocally expressed" statutory waiver of sovereign immunity for claims of this type, these claims will be barred by sovereign immunity. *See* *Lane,* 518 U.S. at 192, 116 S.Ct. at 2096.

Here, as Plaintiff alleges that Defendants used excessive force and harassed him, in violation of the First, Fifth, Sixth, and Eighth Amendments of the United States Constitution, he is asserting constitutional torts, and there is no waiver of sovereign immunity. *See* *Castro v. United States,* 34 F.3d 106, 110 (2d Cir.1994) ("[T]he United States has not waived its sovereign immunity with respect to claims that its employees have committed constitutional torts."); *see also* *Robinson v. Overseas Military Serv. Corp.,* 21 F.3d 502, 510 (2d Cir.1994); *Doe v. Torres,* No. 05 Civ. 3388(JSR)(GWG), 2006 WL 290480, at *4 (S.D.N.Y. Feb. 8, 2006); *James v. United States.* No. 99 Civ. 4238(BSJ)(HBP), 2003 WL 22149524 at *4 (S.D.N.Y. Sept. 17, 2003). Because sovereign immunity has not been waived, the Court lacks subject matter jurisdiction over Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities. Accordingly, those claims must be dismissed.

Defendants also contend that, to the extent that the Amended Complaint is construed to assert common law tort claims, they are also barred for lack of subject matter jurisdiction. (*See* Defs.' Mem. at 10-11.) As an initial matter, the United States is the only proper Defendant in a claim brought under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 2679(b)(1). And, although the United States has waived sovereign immunity for a limited subset of tort claims via the FTCA, *See id.* § 1346(b), Plaintiff must first exhaust all administrative remedies prior to commencing a federal action. *See id.* § 2675(a). This requirement is jurisdictional, and cannot be waived. *Keene Corp. v. United States,* 700 F.2d 836, 841 (2d Cir.1983). Plaintiff does not dispute that he has not presented his claims to the USMS, and so they remain unexhausted. (*See* Declaration of Gerald M. Auerbach, USMS General Counsel, dated Aug. 20, 2009.) Accordingly, any common law tort claims must also be dismissed for lack of subject matter jurisdiction.

**II. Failure to State a Claim Under Rule 12(b)(6)**

Defendants contend that Plaintiff's claims against the identified Individual Defendants in their individual capacities should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[FN7] (*See* Defs.' Mem. at 11-17.) Defendants' argument is two-fold. First, Defendants argue that Plaintiff's claims arising out of conduct more than three years prior to the filing of the Amended Complaint, where Plaintiff first identified some of the Individual Defendants, are time-barred. (*See id.* at 12-14.) Second, Defendants assert that any remaining claims do not rise to the level of a constitutional violation. (*See id.* at 14-17.)

> FN7. Defendants do not address the claims against the remaining John Doe Defendants. Because those Defendants have not been named, and thus, have not been served, this Court lacks personal jurisdiction over them. Accordingly, those claims should also be dismissed. *See* *Williams v. Winfield,* No. 94 Civ. 6384(TPG), 2002 WL 91619, at *2 (S.D.N.Y. Jan. 24, 2002) (dismissing claims against unidentified correctional officer for lack of personal jurisdiction, after counsel for defendants could not identify him despite good faith efforts to do so).

***10** In response, Plaintiff contends that the claims of the Amended Complaint "relate back" to the date of the original Complaint, February 28, 2007, and are therefore timely.[FN8] (*See* Pl.'s Mem. at 3.) This would include any claims arising out of conduct occurring on or after February 28, 2004.

> FN8. Plaintiff also argues that 28 U.S.C. §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

2401(a) provides for a six-year statute of limitations for *Bivens* claims. (*See* Pl.'s Mem. at 3-4.) The Second Circuit Court of Appeals has made clear that *Bivens* claims are governed by a three-year statute of limitations. *See* *Kronisch v. United States,* 150 F.3d 112, 123 (2d Cir.1998).

After the parties fully briefed the motion to dismiss, the Court requested additional submissions on two questions: (1) which, if any, of Plaintiff's *Bivens* claims would be timely pursuant to Federal Rule of Civil Procedure 15(c)(1)(A), which permits the Court to look to New York State's more forgiving body of statute of limitations law?; and (2) to the extent Plaintiff's claims "relate back" under this framework, do the surviving claims rise to the level of constitutional violations? (*See* Order, dated Dec. 29, 2009.) The Court also requested Plaintiff to provide details regarding his efforts to determine the identities of the John Doe Defendants, both before and after filing the Complaint. (*See id.*)

In response to the Court's inquiry, Defendants contend that Rule 15(c)(1)(A) is wholly inapplicable to *Bivens* claims, but even if it were to apply, Plaintiff's surviving claims do not rise to the level of constitutional violations. (*See* Defendants' Supplemental Memorandum of Law, dated Jan. 15, 2010 ("Defs.' Supp. Mem.").)

Plaintiff, on the other hand, responded to the Court's request by merely stating that he acted diligently and to the best of his abilities at all times given his *pro se* status and limited resources as a prisoner. (*See* Plaintiff's Supplemental Memorandum of Law, dated Jan. 26, 2010 ("Pl.'s Supp. Mem."), at 2.) Plaintiff further contends that New York law permits tolling of the statute of limitations when a plaintiff is unable to identify a defendant, provided he acts diligently in his attempts to do so. (*See id.* at 2-3 (citing *Mabry v. N.Y.C. Dep't of Corr.,* No. 05 Civ. 8133(JSR) (JCF), 2008 WL 6190003 (S.D.N.Y. Mar. 7, 2008)).)

A. *Statute of Limitations*

1. *Legal Standard*

"A *Bivens* action is a judicially-created remedy designed to provide individuals with a cause of action against federal officials who have violated their constitutional rights." *See* *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007); *see also* *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). Federal courts sitting in New York apply a three-year statute of limitations period to *Bivens* claims. *See* *Kronisch,* 150 F.3d at 123; *see also* *Tapia-Ortiz v. Doe,* 171 F.3d 150, 151 (2d Cir.1999). Therefore, a plaintiff filing a constitutional claim against federal officers in their individual capacities must institute his suit no more than three years after the cause of action first accrued. If it is determined that the relevant date for statute of limitations purposes in this case is the date of Plaintiff's original Complaint, the majority of his claims are timely (i.e., those accruing on or after February 28, 2004). On the other hand, if the date of the Amended Complaint (January 2, 2009) is the relevant date, Plaintiff is left with only those claims accruing on or after January 2, 2006.

***11** The Second Circuit has stated that "[i]t is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party [in an amended pleading] in effect constitutes a change in the party sued." *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993). Therefore, "[s]uch an amendment may only be accomplished when all of the specifications of Fed.R.Civ.P. 15(c) are met." *Id.; see also* *Barrow v. Wethersfield,* 66 F.3d 466, 468 (2d Cir.1995). If the requirements of Rule 15(c) are met, an amended pleading will be said to "relate back" to the date of the original complaint. *See* Fed.R.Civ.P. 15(c).

Pursuant to Rule 15(c), an amended pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

... or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if [the amendment arose out of the same conduct in the original pleading] and if ... the party to be brought in by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed.R.Civ.P. 15(c)(1). Because "state law supplies the statute of limitations period" for a *Bivens* claim, *see Kronisch,* 150 F.3d at 122, the Court has the option of applying state law to determine if the amended pleading relates back.

In deciding whether to apply state or federal relation back law, the Court must determine which law "affords a more forgiving principle of relating back." *See Wilson v. The City of N.Y.,* No. 03 Civ. 2495(RLC), 2006 WL 2528468, at *2 (S.D.N.Y. Aug. 31, 2006) (citation omitted). In comparing the two, the Advisory Committee's Notes to Rule 15(c) direct the Court to look at " 'controlling bod[ies] of limitations law,' which in this case includes all the tolling provisions in the New York Civil Practice Law and Rules ("CPLR") and the interpretations of these statutes found in New York case law." *Id.* (citing Fed.R.Civ.P. 15(c) (1) Advisory Committee's Note (1991)); *see also Mabry,* 2008 WL 619003, at *6; *Murphy v. West,* 533 F.Supp.2d 312, 316 (W.D.N.Y.2008); *Laureano v. Goord,* No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at *6 (S.D.N.Y. Aug. 31, 2007) (all applying New York limitations law to claims brought against "John Doe" defendants in federal court).[FN9]

FN9. Defendants' contention that Rule 15(c)(1)(A) is inapplicable to *Bivens* claims is without merit. While such claims are purely federal in nature, the three-year statute of limitations that governs *Bivens* claims is derived from state law. *See Kronisch,* 150 F.3d at 122 (noting that "state law supplies the statute of limitations period" for *Bivens* claims).

Turning first to the federal relation-back rule (Fed.R.Civ.P. 15(c)(1)(C)), it is well-established in this Circuit that "an amended complaint adding new defendants [does not] relate back [to the date of the original complaint] if the newly-added defendants were not named originally because the plaintiff did not know their identities." *Barrow,* 66 F.3d at 470; *see also Tapia-Ortiz,* 171 F.3d at 152. This is because "the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Barrow,* 66 F.3d at 470.

***12** New York law, however, is more forgiving in the case of "John Doe" defendants. *See Laureano,* 2007 WL 2826649, at *6. The controlling body of New York limitations law "creates a special procedure for John Doe cases that focuses on notice to possible defendants rather than whether the failure to name the defendant was an excusable mistake." *Wilson,* 2006 WL 2528468, at *3; *see also* N.Y. CPLR 1024.

CPLR 1024 permits a plaintiff to file an action against an unknown defendant, provided that several conditions are met. *See Bumpus v. N.Y.C. Transit Auth.,* 66 A.D.3d 26, 29-30, 883 N.Y.S.2d 99, 103-04 (2d Dep't 2009). First, a plaintiff must "exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name." *Id.* The failure to act diligently to ascertain the unidentified defendant's name "subjects the complaint to dismissal as to that party." *Id.* If a plaintiff is unable to identify the defendant, he may commence the action against a "John Doe" defendant "describ[ing] [the unknown party] in such form as will fairly apprise the party that she is the intended defendant." [FN10] *Id.* (citation omitted). A plaintiff must then "ascertain the identity of unknown 'Jane Doe' parties, and ... serve process upon them, within 120 days from filing." *Id.* at 31, 883 N.Y.S.2d at 105. The 120-day deadline imposed by CPLR 305-b may be extended "upon good cause shown or in the interest of justice." [FN11] N.Y. CPLR 305-b.

FN10. In New York state cases applying CPLR 1024, plaintiffs commencing actions against unidentified defendants are typically required to "present an affidavit stating that a diligent inquiry has been made to determine the names of such parties." *Luckern v. Lyonsdale Energy Ltd. P'ship,* 229 A.D.2d 249, 253, 654 N.Y.S.2d 543, 546 (4th Dep't 1997) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN11. Rule 4(m) of the Federal Rules provides a similar 120-day requirement with extensions granted upon a showing of "good cause." *See* Fed.R.Civ.P. 4(m).

To identify unknown parties after filing, a plaintiff is advised to serve discovery demands upon any known parties, seek disclosures pursuant to a Freedom of Information Law ("FOIL") request, or otherwise act with diligence. *Bumpus,* 66 A.D.3d at 33-34, 883 N .Y.S.2d at 107. If the unknown parties are identified prior to the deadline for service of process, the statute provides for amendment of the pleadings *nunc pro tunc. See Florence v. Krasucki,* 533 F.Supp. 1047, 1053 n. 3 (W.D.N.Y.1982) (citing N.Y. CP LR 1024). In essence, an amended pleading identifying previously unknown parties does not "relate back" to the date of the original pleading under New York's "unity of interest" test, *see, e.g., Monaardi v. BJ's Wholesale Club.* 45 A.D.3d 1149, 1150-51, 846 N.Y.S.2d 441, 442 (3d Dep't 2007), but rather, the statute of limitations is actually tolled from the date of the original filing until service. *See Wilson,* 2006 WL 2528468, at *3; *see also Luckern,* 229 A.D.2d at 255, 654 N.Y.S.2d at 546 (Under CPLR 1024, "an action commenced against unknown parties is deemed interposed, for Statute of Limitations purposes, when the 'John Doe' summons with notice is filed with the clerk of the court.").

2. *Application*

Here, it is clear that Plaintiff's failure to identify any of the Individual Defendants prior to the running of the three-year statute of limitations is fatal to his *Bivens* claims under the federal relation-back rule, because it was not the result of mistake. *See* Fed.R.Civ.P. 15(c)(1)(C); *see also Tapia-Ortiz,* 171 F.3d at 152; *Barrow,* 66 F.3d at 470. The Court must therefore decide whether Plaintiff may avail himself of New York's more forgiving statute of limitations rules. To succeed in this regard, the Court must conclude that (1) Plaintiff has acted with due diligence in identifying the Individual Defendants both before and after filing his original Complaint; (2) Plaintiff provided sufficient detail in the original Complaint such that the Individual Defendants would be on notice of the claims had they read the pleading; and (3) Plaintiff served the Amended Complaint on the Individual Defendants within 120 days of filing the Complaint.

***13** Plaintiff has provided no information regarding his pre-filing efforts to identify the Individual Defendants. Despite this Court's request that Plaintiff provide additional details in this regard, Plaintiff merely wrote that he has "made his best effort to carry out the case accordingly." (*See* Pl.'s Supp. Mem. at 2.) While the Court recognizes Plaintiff's limitations, given his incarceration and *pro se* status, Plaintiff must show that he exercised some due diligence in an attempt to identify the Individual Defendants prior to filing the Complaint. The incidents in the Complaint are alleged to have occurred as early as February 2004. Yet, Plaintiff appears to have expended no efforts at all to identify the Individual Defendants in the three years that followed. Between February 2004 and February 2007, Plaintiff could have filed FOIL requests or written letters to the USAO or even his criminal defense attorney. *See Laureano,* 2007 WL 2826649, at *6 (plaintiff sent letters, discovery requests, and searched public records to identify defendants); *Wilson,* 2006 WL 2528468, at *3 (plaintiff served "several unanswered discovery requests" and FOIL requests in order to identify defendants). Even if unsuccessful, this would have at least evinced some degree of diligence. And, Plaintiff certainly could have filed the original Complaint much sooner than he did-which happened to be the day before the statute of limitations was to run on his most serious claim regarding the physical assault of March 1, 2004. Had he done so, he could have then sought Court assistance with identifying the Individual Defendants.

Having failed to offer any evidence of diligence prior to filing the Complaint, on this basis alone, Plaintiff does not meet the requirements of CPLR 1024, and the Amended Complaint should be dismissed as time-barred. *See. e.g., Hall v. Rao,* 26 A.D.3d 694, 695, 809 N.Y.S.2d 661, 662 (3d Dep't 2006) (dismissing complaint, purportedly filed under CPLR 1024, when "record is utterly devoid of proof documenting what efforts, if any, plaintiffs undertook to identify [defendant] prior to the expiration of the statute of limitations").

The absence of effort by Plaintiff to identify Defendants prefiling, continued after the Complaint was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

filed. Upon filing the Complaint in February 2007, Plaintiff made no effort to ascertain the Individual Defendants' names until more than six months later, in September 2007. The Court's Pro Se Office sent Plaintiff the initial summons and service package on April 25, 2007, yet, the case otherwise remained dormant through August, when Plaintiff first mailed the service package to the USMS. At that point, however, it was clear that there could be no service, since Plaintiff provided no information as to whom to serve.

It was not until September 5, 2007, after service was unable to be effectuated, that Plaintiff first wrote to the Court to request assistance in identifying the Individual Defendants, and to seek an extension of time to serve them (despite their John Doe status at that time). But by then, the statute of limitations had already run on most of the incidents alleged in the Complaint. Further, more than 120 days had elapsed since the Complaint had been filed and Plaintiff had received the service package. This too was fatal to tolling the statute of limitations under New York law, since, as discussed, a John Doe complaint must be served within 120 days of filing, unless the court has extended that period prior to its expiration.

***14** Nevertheless, the Court breathed life into Plaintiff's claims when it requested that the USAO attempt to identify the Individual Defendants. In December 2007, the USAO identified two of the Individual Defendants, but the vague descriptions in the Complaint prevented identification of the remaining nine John Does. Rather than amend the Complaint at this time to identify and serve the two known Defendants, in February 2008, Plaintiff provided further descriptions of five John Does. However, these were again, too vague, and resulted only in the identification of Defendant Krause, in August 2008.

Failing again to amend the Complaint, Plaintiff renewed his request for the names and photographs of every employee of the USMS that he came into contact with on the dates within the Complaint. This was denied on several occasions. (*See* Order, dated Jan. 17, 2008; Order, dated July 3, 2008; Order, dated Sept. 30, 2008.) In one Order, Judge Sullivan forewarned Plaintiff of the statute of limitations problems inherent in Plaintiff's continued delay in filing the Amended Complaint. (*See* Order, dated Sept. 30, 2008.) Three months later, nearly two years after the statute of limitations had expired, and approximately five years after most of the alleged incidents occurred, Plaintiff filed the Amended Complaint, on January 2, 2009, identifying four of the Individual Defendants. On June 2 and 4, 2009, the Amended Complaint was served on the identified Defendants. While Plaintiff's post-filing efforts were certainly better than those prior to February 2007, more is required under CPLR 1024.

In light of the absence of any pre-filing efforts to identify the Individual Defendants, Plaintiff's failure to identify or serve any Defendants within 120 days of filing the Complaint, the deficiencies in Plaintiff's post-filing efforts to ascertain the Individual Defendants' identities, and Plaintiff's delay in filing and serving the Amended Complaint, Plaintiff may not avail himself of New York's more forgiving law regarding the statute of limitations and John Doe defendants. In those federal cases that have invoked CPLR 1024, the plaintiffs have exercised a degree of diligence not shown by Plaintiff in the instant case. *See, e.g., Mabry,* 2008 WL 619003, at *6 (plaintiff "aggressively sought the identities of defendants" through letters and discovery requests); *Murphy,* 533 F.Supp.2d at 316 (plaintiff sought identities of John Does from identified defendants prior to the expiration of the statute of limitations); *Laureano,* 2007 WL 2826649, at *6 (plaintiff's counsel submitted an affidavit detailing efforts undertaken to identify defendants, which included letters, discovery requests, and a search of public records); *Wilson,* 2006 WL 2528468, at *3 (plaintiff served "several unanswered discovery requests" and FOIL requests). Accordingly, Plaintiff's claims arising out of conduct occurring more than three years prior to January 2, 2009, the date on which some of the Individual Defendants were first identified in the Amended Complaint, are time-barred.

B. *Plaintiff's Remaining Timely Claims*

***15** In the Amended Complaint, Plaintiff asserts a single timely claim against one Defendant. Plaintiff claims that, on May 5, 2006, as he was being escorted to a holding cell after a post-trial hearing, Defendant Ventiere "popped from out of a door of a room with a large

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

one-way mirror and said 'I heard that and I'll teach you a lesson.' " (*See* Am. Compl. ¶ 53.) According to Plaintiff, he had been explaining his problems with the Individual Defend ants to another U.S. Marshal when this occurred. (*See id.*) Afterwards, Plaintiff alleges that he sat in a holding cell "in utter fear, not knowing if something would happen." (*See id.*) There is no allegation that anything did happen.

Liberally construing Plaintiff's *pro se* Complaint, the Court views Plaintiff's claim as one of retaliation under the First Amendment. In the alternative, Plaintiff appears to allege that the verbal threat, in and of itself, constituted a constitutional violation.

1. *Legal Standard on a Motion to Dismiss Under Rule 12(b) (6)*

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *See* *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 1964-65 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *see* *id.* at 570, 127 S.Ct. at 1974, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *See* *id.* at 555, 127 S.Ct. at 1965 (citation omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U .S. at 570, 127 S.Ct. 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *See id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1966) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974.

2. *First Amendment Claim*

To state a retaliation claim under the First Amendment, the Plaintiff must allege that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the plaintiff's speech and the adverse action. *See* *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). In the prison context, the Second Circuit has defined an "adverse action" as conduct "that would deter similarly situated individuals of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). Specifically, the Court of Appeals has found that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001), *overruled on other grounds,* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002). In determining whether a verbal threat constitutes an adverse action, a court must consider the statement's specificity and the context in which it was given. *See* *Mateo v. Fischer,* No. 08 Civ. 7779(RJH)(DCF), 2010 WL 431229, at *8 (S.D.N.Y. Feb. 8, 2010).

***16** Here, the adverse action alleged by Plaintiff is facially insufficient to state a claim for relief. Defendant Ventiere's statement is more akin to a general threat, made in response to Plaintiff's casual conversation with another U.S. Marshal regarding his purported mistreatment.[FN12] *See* *Dawes,* 239 F.3d at 493 (calling plaintiff-prisoner a "rat" or "informant" insufficient to state a First Amendment claim); *Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *4 (S.D.N.Y. May 10, 2006) (dismissing plaintiff's First Amendment claim based on prison official's threat that "we [are] going to get you, you better drop the suit"); *Alicia v. Holwell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's statements that there were "no secrets in prison," and that plaintiff would "have to pay the consequences" for filing a grievance do not state a retaliation claim); *Cruz v. Hillman,* No. 01 Civ. 4169(DAB)(DCF), 2002 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

31045864, at *7 (S.D.N.Y. May 16, 2002) (Report and Recommendation) (dismissing retaliation claim based on defendant's purported "dislike" for inmates who file civil lawsuits, followed by a statement to plaintiff that "Green Haven is an open battlefield, so be careful"); *cf. Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) ("if you don't stop writing grievances I'm going to break your fuckin' neck" was direct and specific enough to state retaliation claim). Accordingly, Plaintiff's First Amendment retaliation claim, arising out of Defendant Ventiere's conduct on May 5, 2006, should be dismissed.

FN12. It is questionable whether Plaintiff's conversation with the U .S Marshal would constitute "protected speech." Plaintiff had not yet filed the instant suit, nor had he filed any grievances at the time. Nor was he making a request for assistance to a supervisory official.

3. *Other Constitutional Claims*

To the extent that Plaintiff claims that Defendant Ventiere's statements, standing alone, give rise to a constitutional violation, the Court recommends dismissal pursuant to Rule 12(b)(6).

It is well-established law that, without more, verbal threats and intimidation do not rise to the level of a constitutional violation. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (name calling insufficient to allege a constitutional violation); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 325 (S.D.N.Y.2006) ("verbal intimidation does not rise to the level of a constitutional violation"); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("[a]llegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983"); *see also Petty v. Goord,* No. 00 Civ. 803(JSR), 2008 WL 2604809, at *5 (S.D.N.Y. June 25, 2008) (verbal harassment related to inmate's HIV-positive status did not state a claim under the Eighth Amendment); *Davidson v. Tesla,* No. 06 Civ. 861, 2008 WL 410584, at *4 (D.Conn. Feb. 13, 2008) (no constitutional violation based on officer acting in an "angry, hostile, aggressive and belligerent manner").

Here, Plaintiff merely alleges that Defendant Ventiere threatened to "teach [him] a lesson." (Am.Compl.¶ 53.) This general threat, detached from the other untimely alleged incidents by more than two years, and not followed by any physical acts, is insufficient to state a constitutional violation. Accordingly, Plaintiff's claim based on Defendant Ventiere's verbal threat on May 5, 2006, should be dismissed.[FN13]

FN13. Because this Court recommends dismissal of all of Plaintiff's claims pursuant to Rules 12(b)(1) and (6), discussion of Defendants' third and final ground for dismissal-insufficient service of process-is unnecessary.

**CONCLUSION**

***17** For the above reasons, I respectfully recommend that Defendants' motion to dismiss be granted, and all claims against Defendants be dismissed. Plaintiff's claims against the United States, the USMS, and the Individual Defendants in their official capacities are barred by sovereign immunity. Plaintiff's claims against the Individual Defendants in their individual capacities are time-barred and/or fail to state a claim upon which relief can be granted.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard J. Sullivan, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. Failure to file objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989).

S.D.N.Y.,2010.

Williams v. U.S.
Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2010 WL 963474 (S.D.N.Y.)

(Cite as: 2010 WL 963474 (S.D.N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.
Larry WILLIAMS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
No. 07 Civ. 3018(RJS)(THK).

March 16, 2010.
*ORDER ADOPTING REPORT AND RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

***1** On February 28, 2007, Plaintiff Larry Williams, who is incarcerated and proceeding *pro se,* initiated this suit by delivering a complaint to prison officials for them to file on his behalf. The complaint was received by the court's Pro Se Office on March 9, 2007 and docketed on April 14, 2007. (Doc. No. 1.) The case was originally assigned to the Honorable Kenneth M. Karas, District Judge, and reassigned to the docket of the undersigned on September 4, 2007. (Doc. No. 3.)

The only Defendants named in the complaint were "John Does 1-11, sued in their individual capacities," whom Plaintiff described as United States Marshals. Accordingly, on October 30, 2007, the Court ordered the United States Attorney's Office for the Southern District of New York ("the USAO") to identify the officers described in the complaint. After an extended investigation period, four Marshals were eventually identified by name: Luis Figueroa, Donny LaRosa, Thomas Ventiere, and A.J. Krause. Plaintiff then filed an amended complaint on January 2, 2009-more than twenty-two months after the original complaint was filed-adding the named defendants, in their individual and official capacities, and other parties. (Doc. No. 19.) The Court ordered Plaintiff to serve the amended complaint by April 1, 2009 (Doc. No. 20), which was later extended until May 15, 2009 at Plaintiff's request (Doc. No. 22). Plaintiff mailed service packages to the Marshals Service on May 12, 2009, and process was effectuated on June 2 and 4, 2009. On August 21, 2009, Defendants moved to dismiss the amended complaint. The motion was fully submitted on September 22, 2009, and was subsequently referred to the Honorable Theodore H. Katz, Magistrate Judge, for a Report and Recommendation.

On February 25, 2010, Judge Katz issued a Report recommending that Defendants' motion be granted in its entirety. Specifically, Judge Katz recommended (1) dismissing claims against the remaining John Doe defendants for lack of personal jurisdiction; (2) dismissing claims against the United States, the United States Marshals Service, and the individual defendants in their official capacities as barred by the doctrine of sovereign immunity; (3) dismissing as time-barred all claims against the individual defendants that are based on events that took place before January 2, 2006; and (4) dismissing the remaining timely claims for failure to state a claim on which relief can be granted. In the Report, Judge Katz advised the parties that failure to file timely objections within fourteen days from service of the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b) (1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After conducting a thorough review of the record, the Court finds that Judge Katz's well-reasoned and persuasive Report and Recommendation is not facially erroneous. Accordingly, the Court adopts the Report and Recommendation in its entirety. For the reasons set forth therein, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is granted. The clerk of the court is respectfully directed to terminate the motion found at Doc.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2010 WL 963465 (S.D.N.Y.)

(Cite as: 2010 WL 963465 (S.D.N.Y.))

No. 35 and to close this case.

***2** SO ORDERED.

S.D.N.Y.,2010.

Williams v. U.S.
Slip Copy, 2010 WL 963465 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Shawn MONCRIEFFE, Plaintiff,
v.
Linda WITBECK, Corrections Officer at Coxsackie Correctional Facility; B. Schwebler; Dominic Mantello, Superintendent; C.O. Weeks; C.O. Jensen; and C.O. McFarlene, Defendants.
**No. 97-CV-253.**

June 29, 2000.

Shawn Moncrieffe, Auburn Correctional Facility, Auburn, New York, Plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General for the State of New York, Steven H. Schwartz, Assistant Attorney General, Department of Law, the Capitol, Albany, New York, for Defendants.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

*INTRODUCTION*

***1** Plaintiff moves and defendants cross-move for summary judgment under Section 56(b) of the Federal Rules of Civil Procedure in this *pro se* action pursuant to 42 U.S.C. § 1983 alleging violations of his rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

Presently before the Court is the Report-Recommendation of the Hon. Magistrate Judge David R. Homer dated December 23, 1998, recommending that plaintiff's motion be denied and defendants' cross-motion be granted in part and denied in part.

Plaintiff filed timely objections to the Report-Recommendation.

*FACTS*

In his complaint, plaintiff alleges that between August and November, 1996, while he was housed in the Special Housing Unit of Coxsackie Correctional Facility, defendant Correctional Officer Linda Witbeck deprived him of a food tray six times; that Witbeck deprived him of things such as recreation and supplies six times; that Witbeck laughed at him four times while he was in the shower; that Witbeck sexually harassed plaintiff once "when she felt [plaintiff's] genitals and rear end during a regular recreation pat frisk;" that Witbeck ransacked his cell; and that in some unspecified manner Witbeck gave him a death threat. Plaintiff further alleges that during the same period defendant Correctional Officer Weeks sexually harassed him during a routine pat frisk when Weeks "felt [plaintiff's] genitals a few times." Plaintiff claims that on two occasions defendant Correctional Officer McFarlene entered his cell and ransacked it while plaintiff was in the shower and once confiscated "a few of [plaintiff's] things." Plaintiff also claims that defendant Correctional Officer Jensen threatened him once and assaulted him once by kicking him in the back. Plaintiff states that the grievance supervisor, defendant Schwebler, did not log and number plaintiff's grievances as required and that Superintendent Dominic J. Mantello disregarded plaintiff's numerous complaints.

Magistrate Judge Homer recommended denial of plaintiff's motion for summary judgment and dismissal of all of plaintiff's claims except his Eighth Amendment claim against Witbeck for denial of food.

*DISCUSSION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Pursuant to 28 USC § 636(b)(1)(C), this Court must make a de novo determination of those portions of the Magistrate Judge's Report-Recommendation to which plaintiff has specifically objected. Here, plaintiff objects to Magistrate Judge Homer's recommendations except with respect to the issues of verbal harassment, threats and denial of recreation. He erroneously states that the Report-Recommendation does not address the claim that Witbeck laughed at him while he was in the shower; however, this allegation amounts to a claim of verbal harassment, which is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Accordingly, the Court will address all other issues de novo.

Summary Judgment is appropriate when the pleadings, affidavits, and any other supporting papers demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Facts, inferences therefrom and ambiguities must be examined in a context which is most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

***2** The movant bears the initial burden of showing that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When the moving party has met this burden the non-moving party “must do more than simply show that there is some metaphysical doubt as to the material facts.” *Matsushita* at 586. The moving party must “set forth specific facts showing that there is a genuine issue for trial.” Fed.R.Civ.P.56(e); *Liberty Lobby* at 250.

Where summary judgment is sought against a *pro se* litigant the Court must afford him special solicitude. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

A. *Defendant Mantello*

Plaintiff alleges that defendant Mantello is liable because, as Superintendent of the Coxsackie Correctional Facility, he “disregarded” numerous complaints made to him by plaintiff. More specifically, plaintiff alleges that (1) Mantello failed to remedy a wrong after having learned of it and (2) that Mantello was negligent in his supervision of subordinate employees.

Magistrate Judge Homer concluded in his Report-Recommendation that plaintiff failed to demonstrate a claim against Mantello. With respect to plaintiff's first allegation that Mantello failed to remedy a wrong, the Magistrate Judge determined that either Mantello or his subordinates investigated plaintiff's grievances. Because plaintiff's complaints were investigated and it was concluded that the grievances were without merit, Mantello satisfied his obligations with respect to plaintiff's grievances.

The Magistrate Judge similarly rejected plaintiff's second claim that Mantello negligently supervised subordinate employees who were allegedly violating his constitutional rights. Magistrate Judge Homer concluded that no claim was stated because, whereas the law requires gross negligence to impose supervisor liability, plaintiff merely alleged negligence. In addition to determining that plaintiff's claim was without merit for failure to plead and prove gross negligence, Magistrate Judge Homer also concluded that plaintiff had failed to establish even ordinary negligence on the part of Mantello.

Plaintiff objects to Magistrate Judge Homer's conclusion that he failed to establish supervisor liability. Plaintiff argues that the record establishes gross negligence in that Mantello was aware that plaintiff's rights were being violated but chose to ignore them by failing to investigate or remedy same.

In order to establish a successful § 1983 claim, a plaintiff must establish that a defendant was personally involved in the alleged rights violation. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). An official is not liable in a section 1983 action under the doctrine of respondeat superior. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981). However, an individual who occupies a supervisory position may be found personally involved by: (1) direct participation; (2) failing to remedy a wrong after learning of the violation through a report or appeal; (3) creating a policy or custom under which unconstitutional practices occurred or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

allowing the policy or custom to continue; or (4) gross negligence in managing subordinates whose conduct caused the unlawful condition or event. *See* *Wright,* 21 F .3d at 501.

***3** With respect to plaintiff's objection arguing that Mantello was grossly negligent, plaintiff simply reiterates his original arguments and relies on evidence already in the record and considered by the Magistrate Judge. Plaintiff merely reiterates in his objections to the Report-Recommendation that he has established a case

which includes gross negligence as evidence [sic] in plaintiff's motion. (See plt. motion for summary judgment, memo. Of law pg. 23 with annexed exibits [sic] and plt. Reply decl. Pg. 11 with attached exibits [sic] ). Moreover, the record is legally sufficient to establish and impose supervisory liability. (See exibits [sic] attached to plt. motion for summary judgment and Reply motion).

As Magistrate Judge Homer correctly stated, the record clearly reveals that Mantello or his subordinate employees investigated plaintiff's grievances and rejected them as being without merit. As such, there is nothing in the record indicating that Mantello either turned a blind eye to plaintiff's complaints. Simply stated, plaintiff's assertion that Mantello ignored his complaints is refuted by the investigations conducted regarding the complaints. Similarly, plaintiff's allegation that Mantello failed to remedy a wrong is without merit because the record reflects that the investigation of the complaints came to the conclusion that no wrongs were being committed.

Aside from reiterating his initial arguments, plaintiff has failed to provide the Court with anything further in his objection which would warrant disturbing the sound conclusion of the Magistrate Judge. Accordingly, this Court accepts Magistrate Judge Homer's determination to dismiss plaintiff's claim with respect to defendant Mantello.

B. *Verbal Threats and Harassment*

Plaintiff alleges that he was subjected to verbal threats and harassment in that corrections officers laughed and insulted him while he showered. Plaintiff also maintains that he was subjected to threats of violence. Magistrate Judge Homer recomended that defendants were entitled to summary judgment because plaintiff failed to establish an actual injury resulting from the alleged threats or harassment.

A claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). As correctly noted by the Magistrate Judge, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Picco* 994 F.Supp. at 474. Similarly, "threats do not amount to violations of constitutional rights." *Malsh,* 901 F.Supp. at 763.

Even assuming that the alleged verbal harassment and threats ocurred, plaintiff has failed to plead or prove that there were any accompanying actual injuries. Furthermore, plaintiff does not object to the findings of the Magistrate Judge with respect to verbal threats and harassment. After a thorough review of the Report-Recommendation the Court adopts the recommendation of the Magistrate Judge.

C. *Excessive Force*

***4** Plaintiff alleges that defendant Jensen kicked him once in the back on November 9, 1996. He states that he suffered pain but does not claim that he sought medical assistance. Plaintiff does not allege that Jensen acted maliciously or sadistically.

Magistrate Judge Homer found that plaintiff had failed to annunciate an actionable claim for excessive force. More particularly, he concluded that the alleged kick, even if true, was of limited duration and that there was no malicious intent on the part of the corrections officer.

It is well settled that "the unnecessary and wanton

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312 (1986))(internal quotation marks omitted). In reviewing a prisoner's claim a Court must consider whether the prison official acted with a sufficiently culpable state of mind and whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation. *Hudson* at 8. In considering whether the prison official possessed a culpable state of mind while engaging in the use of force, the inquiry is whether the prison official applied force maliciously and sadistically to cause harm. *Id.* at 7. The extent of an inmate's injuries is relevant to this inquiry, as is the nature and duration of the act. James v. Coughlin, 13 F.Supp.2d 403, 409 (W.D.N.Y.1998); Reyes v. Koehler, 815 F.Supp. 109, 113-14 (S.D.N.Y.1993). Important in considering the alleged wrongdoing is determining whether the force was applied in a good faith effort to maintain or restore prison discipline or maliciously and sadistically to cause harm. *Hudson* at 7.

With respect to the nature of the wrongdoing, a prisoner must demonstrate that the deprivation alleged is sufficiently serious or harmful enough to reach constitutional dimensions. Romano v. Howarth, 998 F.2d 101, 104-05 (2d Cir.1993). A prisoner is not required to demonstrate that he sustained a serious injury; *de minimis* use of force does not, however, give rise to an Eighth Amendment claim. *Hudson* at 9-10.

Plaintiff's allegations, even if true, do not support a determination that Jensen acted maliciously or sadistically. Interestingly, in his objections to the Report-Recommendation, plaintiff admits that the kick was of limited duration. In the balance of his objection plaintiff merely reiterates his opinion that the evidence submitted supports an inference of malice. The Court concludes that the conduct alleged is not sufficiently serious or harmful to reach constitutional dimensions. Accordingly, defendants are entitled to summary judgment dismissing plaintiff's excessive force claim.

D. *Access to the Courts*

Plaintiff alleges that he was denied access to the courts as a result of cell searches, confiscation of documents and denial of supplies between August and November 1996. Plaintiff alleges that these actions were motivated to frustrate his efforts to litigate.

***5** Magistrate Judge Homer recommended that the defendant's motion to dismiss this claim should be granted. The Magistrate Judge found that plaintiff's claim of denial of access to the courts was unsubstantiated with any evidence which demonstrated that plaintiff had suffered any actual injuries from any alleged wrongful conduct. To the contrary, Magistrate Judge Homer concluded that plaintiff's claims were supported by a thirty-five page memorandum of law containing both case and statutory authority as well as an exhibit related to state court proceedings-all of which demonstrated plaintiff's full and adequate ability to litigate his claims.

It is well established that prisoners have a constitutional right to access to the courts. "To state a claim that his constitutional right to access the court was violated, plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts, and that such conduct materially prejudiced a legal action he sought to pursue." Smith v. O'Connor, 901 F.Supp. 644, 649 (S.D.N.Y.1995); *see* Morello v. James, 810 F.2d 344, 347 (2d Cir.1987). In other words, in order to establish a violation of his right of access to the courts, an inmate must demonstrate that he has suffered or imminently will suffer actual harm in presenting a claim to the court. Lewis v. Casey, 518 U.S. 343 (1996).

In his objections to the Report-Recommendation, plaintiff restates arguments already considered by Magistrate Judge Homer. He states that "[p]laintiff further reiterates that he has incurred irreparable harm and injury as a result of the lack of legal services he received while confined in Coxsackie SHU." Plaintiff goes on to note that his complaints would not have been able to have been brought had he not been transferred to the Elmira Correctional Facility. Implicit in this statement is that plaintiff was in fact allowed to bring his claims. Assuming *arguendo* that plaintiff was not allowed to bring his claims until after transfer, the fact still remains that plaintiff did in fact have the ability to air his grievances. Therefore, at best, plaintiff's hardship was delay in bringing his claims. As plaintiff has not established how such an alleged delay has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

prejudiced his rights or amounted to an injury, he fails to make the requisite showing of actual injury for a successful claim. As such, the Court accepts Magistrate Judge Homer's recommendation and grants defendant's motion as to this claim.

E. *Sexual Harassment*

With respect to plaintiff's sexual harassment claim, Magistrate Judge Homer concluded that plaintiff failed to establish an actionable case. Magistrate Judge Homer found that the conduct involved was *de minimus* and, therefore, did not violate a constitutionally protected right.

Sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim. *Boddie v. Schnieder,* 105 F.3d 857, 859 (2d Cir.1997). When reviewing an Eighth Amendment claim stemming from an allegation of sexual abuse, a Court must consider whether the conduct alleged is sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. *Id* at 861. The Court must further consider whether the prison official involved possessed a sufficiently culpable state of mind. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may be sufficient evidence of a culpable state of mind. *Id.* at 861.

***6** As set forth above, plaintiff claims that defendants Weeks and Witbeck, each on one occasion, conducted pat frisks in an improper manner. Assuming the truth of these allegations for the purposes of these motions, they are not sufficiently serious to violate contemporary standards of decency and cause severe physical and psychological harm. Plaintiff has failed to demonstrate any severe physical or psychological harm that he has suffered as a result of the alleged harassment. Thus, plaintiff's allegations of sexual abuse fail to state a claim cognizable under the Eighth Amendment. Defendants are therefore entitled to summary judgment dismissing this claim.

F. *Cell Searches*

Plaintiff alleges that he was subjected to cell searches which were designed to harass. Plaintiff's initial pleadings merely allege same with no evidence to support the claim. As a result, Magistrate Judge Homer concluded that plaintiff's claim was without merit and recommended that defendant's motion be granted.

“[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell,” *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), even where the search is retaliatory in nature. *Higgins v. Coombe,* 1997 WL 328623, at *7 (S.D.N.Y.1997). Prisoners do, however, enjoy Eighth Amendment protection from searches that lack any legitimate penological interest and are intended solely to harass. *Nilsson v. Coughlin,* 1987 WL 129823, at *4 (S.D.N.Y.1987), see also *Hudson* at 530.

Plaintiff fails to raise anything in his objections to the Magistrate Judge's Report-Recommendation which would warrant disturbing the sound conclusion and recommendation found therein. As Magistrate Judge Homer correctly stated the law with respect to plaintiff's claim, and since plaintiff fails to provide any evidence to support his argument that the alleged searches were improper, the Court concludes that this claim is without merit and grants defendant's motion.

G. *Deprivation of Food and Recreation*

Prison officials have a duty under the Eighth Amendment to provide humane conditions of confinement: adequate food, clothing, shelter and medical care. Denial of a minimal civilized measure of life's necessities violates the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825 (1994). Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment. *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Odom v. Sielaff,* 1995 WL 625786, at *5 (E.D.N.Y.1995); *see also* *Rhodes v. Chapman,* 452 U.S. 337, 348 (1981).

Plaintiff alleges that corrections officer Witbeck denied him food on six occasions and on at least two occasions contaminated his food with spit or perfume. In support of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

their motion to dismiss, defendants rely on an affidavit from Witbeck denying the allegations. Defendants also rely on copies of logbook entries for the SHU in which plaintiff was housed. Because these logbooks do not contain clear entries for some of the dates in issue and would not likely reflect the wrongful denial of meals to an inmate by a corrections officer, they do not establish as a matter of law that defendants never denied plaintiff food. Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion. *Fischl v.. Armitage,* 128 F.3d 50, 55 (2d Cir.1997). Thus, plaintiff's motion and defendants' cross-motion for summary judgment are denied with respect to the issue of whether plaintiff's Eighth Amendment rights were violated by deprivation of food.

***7** Plaintiff further alleges that he was deprived of his Eighth Amendment rights where he was allegedly denied recreation on a single occasion. Magistrate Judge Homer concluded that denial of recreation on a single occasion was not sufficiently serious to support a constitutional claim. Plaintiff does not object to these recommendations.

Although prisoner's have a constitutional right to exercise, a claim alleging deprivation of this right requires a showing of a serious deprivation and deliberate indifference on the part of prison officials. *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996); *Barnham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996). As illustrated by the Report-Recommendation, denial of recreation for eighteen out of nineteen days has been upheld in the Second Circuit and denials of up to seventy-five days have been upheld elsewhere. *Arce v. Walker,* 907 F.Supp. 658 (W.D.N.Y.1995), *aff'd in part, vacated in part* 139 F.3d 329 (2d Cir.1998); *Green v. Ferrell,* 801 F.2d 765 (5th Cir.1986).

Based on the foregoing, the Court concludes that the alleged denial of recreation on a single occasion does not support a claim for deprivation of constitutional rights. Accordingly, defendant's motion is granted with respect to this element of plaintiff's claim.

*CONCLUSION*

After a careful review of the file, party submissions and applicable law, it is hereby

ORDERED that Magistrate Judge Homer's Report-Recommendation dated December 23, 1998 is ACCEPTED IN FULL; and it is further

ORDERED that plaintiff's motion for summary judgment is DENIED in all respects; and it is further

ORDERED that defendant's cross-motion for summary judgment be DENIED with respect to plaintiff's claim against defendant Witbeck regarding the alleged deprivation of food and GRANTED in all other respects.

IT IS SO ORDERED

N.D.N.Y.,2000.
Moncrieffe v. Witbeck
Not Reported in F.Supp.2d, 2000 WL 949457 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

***2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

***3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

***4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

***5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

***6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

***8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

***9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

***10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

***11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could* cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

***12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). FN10

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary **Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310 203**

310 Prisons

310II Prisoners and Inmates

310II(D) Health and Medical Care

310k203 k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1546 k. Medical care and treatment. Most Cited Cases

A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

***1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

**II. BACKGROUND**[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008 WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"* ). Some of the facts recounted here are drawn from the prior opinion.

**A. Facts**

**1. Parties**

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

**2. Bellamy's Surgery**

In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. *See Bellamy I,* 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See *Bellamy I,* 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. *See, e.g.,* Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. ¶¶ 4-5.

FN12. *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants (“Dawkins Decl.”).

FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses. [FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

FN18. *See id.*

FN19. *See id.* ¶ 13.

FN20. *See id.* ¶ 14.

FN21. *See id.*

***2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

FN22. *See id.* ¶ 15.

FN23. *See id.*

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution." [FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See* *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See* *Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

***3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment .[FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." FN50

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See* *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.FN51 Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." FN52 Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." FN53 Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice.FN54 The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." FN55

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also* *Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See* *Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

***4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment.[FN63]

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also* *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

***5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord* *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See* *Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord* *Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See* *Winter,* 129 S.Ct. at 381.

**IV. DISCUSSION**

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

**A. Exhaustion of Administrative Remedies**

***6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5 (citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

**B. Eleventh Amendment Immunity**

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

**C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity**

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved with the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

***7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. [FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See* *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also* *Kshel Realty Corp. v. City of New York,* No. 01 Civ. 9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 1395(6)**

78 Civil Rights

78III Federal Remedies in General

78k1392 Pleading

78k1395 Particular Causes of Action

78k1395(4) Criminal Law Enforcement; Police and Prosecutors

78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 63.4(2)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[6] Arrest 35 63.4(8)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(7) Information from Others

35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

**[7] Constitutional Law 92 1941**

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(P) Public Employees and Officials

92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law 92 1955**

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(P) Public Employees and Officials

92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Municipal Corporations 268 185(1)**

268 Municipal Corporations

268V Officers, Agents, and Employees

268V(B) Municipal Departments and Officers Thereof

268k179 Police

268k185 Suspension and Removal of Policemen

268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 28**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 28**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

***342** James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 ***343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When ***344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this “*Miranda* sheet.” *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC ***345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528, 534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of ***346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the ***347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/* ***348** *pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is ***349** committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See* *Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also* *United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases, *United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus ***350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf.* *J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous ***351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and “zone out”; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform “ill-conceived” and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, “Bang bang, you're dead.” *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. ***352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶ ¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶ ¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation ***353** mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

> [U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment," and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals ***354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen." [FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see* *Sousa,* 578 F.3d at 170, and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see* *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001).

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be ***355** cured by repleading. *Cf.* *Oliver Schs., Inc. v. Foley,* 930 F.2d 248, 252-53 (2d Cir.1991). The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12, 2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir.2002). Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g.,* *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963). The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Even accepting as true Crisafi's non-conclusory factual allegations, including ***356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here, the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close ***357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

**Constitutional Law 92 4825**

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)11 Imprisonment and Incidents Thereof

92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Prisons 310 234**

310 Prisons

310II Prisoners and Inmates

310II(E) Place or Mode of Confinement

310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H 1537**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

[2] **Civil Rights 78 1335**

78 Civil Rights

78III Federal Remedies in General

78k1334 Persons Liable in General

78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[3] **Civil Rights 78 1355**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

[4] **Sentencing and Punishment 350H 1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H 1533**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 1376(7)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 1376(2)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

***1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

**I. BACKGROUND**

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27). Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

***2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

### A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

B. *Supervisory Liability Post-Iqbal*

***3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

> (1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at *5, 2009 U.S. Dist. LEXIS 7709, at *17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at *4-6, 2010 U.S. Dist. LEXIS 59563, at *14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *1-2, 2009 U.S. Dist. LEXIS 54141, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *15, 2009 U.S. Dist. LEXIS 96952, at *42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

***4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

***5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

## III. CONCLUSION

***6** Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Millicient FREEMAN, Plaintiff,
v.
Kevin LUNDRIGAN, C.O., Defendant.
No. 96-CV-1190 (RSP/RWS).

Aug. 22, 1996.

Millicient Freeman, Oriskany, NY, Pro se.

McLane and Smith, L.L.P., Utica, NY (Steven A. Smith, of counsel), for Defendant.

ORDER

POOLER, District Judge.

***1** By Order dated February 5, 1996 ("Order"), I approved the Order and Report-Recommendation of Magistrate Judge Ralph W. Smith, Jr., dated October 5, 1995, and dismissed this action as against Daniel Middaugh, Michael Durant, Todd Egger, Robert Stanton and Daryl Bourant. *See* Dkt. No. 11.

A copy of the Order was served on Freeman at her last known address by regular mail on February 6, 1996. On February 12, 1996, the Order was returned to the Court marked "No Longer at This Facility-Please Return to Sender." *See* Dkt. No. 12.

On June 19, 1996, Steven A. Smith, Esq., attorney for the defendant, filed an affidavit with the Court stating that he had attempted to serve a first set of interrogatories on Freeman at the address listed on the summons, and that it was returned to him by the Post Office marked "RTS" or return to sender. *See* Dkt. No. 14.

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute an action or comply with any order of the court. *Link v. Wabash Railroad County Independent School District,* 370 U.S. 626 (1962). This power to dismiss an action may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Rodriguez v. Walsh,* No. 92-Civ-3398, 1994 WL 9688, *1 (S.D.N.Y. Jan. 14, 1994) (citations omitted).

Additionally, this Court specifically cautioned Freeman that her failure "to promptly notify the Clerk's Office of any change in her address ... [would] result in the dismissal of the instant action." *See* Dkt. No. 3 at 7.

Moreover, a plaintiff has the duty to inform the Court of any address changes. As I have stated:

> It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany Cty Corr. Facility,* No. 95-CV-1525, 1996 WL 172699, *1 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.) (quoting *Perkins v. King,* No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see generally* Rule 41.2(b) of the Local Rules of Practice for the Northern District of New York.

This matter cannot proceed without notification to the Court by Freeman of her current address. Therefore, it is hereby:

ORDERED, that this action is dismissed, *See* Rule 41.2(b) of the Local Rules of Practice for the Northern District of New York, and it is further;

ORDERED, that the Clerk serve a copy of this Order on Freeman by regular mail at her last known address and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp., 1996 WL 481534 (N.D.N.Y.)

(Cite as: 1996 WL 481534 (N.D.N.Y.))

on Steven A. Smith, Esq., attorney for the defendant.

***2** IT IS SO ORDERED.

N.D.N.Y.,1996.

Freeman v. Lundrigan
Not Reported in F.Supp., 1996 WL 481534 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1994 WL 9688 (S.D.N.Y.)

(Cite as: 1994 WL 9688 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

George RODRIGUEZ, Plaintiff,
v.
Captain WALSH, # 855, Defendant.
No. 92 CIV. 3398 (PKL).

Jan. 14, 1994.

George Rodriguez, pro se.

Antonia Kousoulas, Asst. Corp. Counsel, New York City Law Dept., New York City, for defendant.

MEMORANDUM ORDER

LEISURE, District Judge.

***1** Plaintiff George Rodriguez, proceeding *pro se,* filed this action on May 11, 1992 pursuant to 42 U.S.C. § 1983. On May 15, 1992 this action was referred to the Honorable Theodore H. Katz, United States Magistrate Judge, Southern District of New York, for all purposes including dispositive motions. On July 20, 1993 defendant moved for an order dismissing the complaint for failure to prosecute pursuant to Fed.R.Civ.P. 41(b). On October 27, 1993 Magistrate Judge Katz filed a Report and Recommendation (the "Report") in this matter finding that, even exercising the additional patience which the United States Court of Appeals for the Second Circuit ("Second Circuit") requires when cases involve *pro se* litigants, the defendant's motion to dismiss should be granted, and that the action should be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days, after being served with a copy of the Report, to file written objections to Magistrate Judge Katz's Report and Recommendation.[FN1] Although the time to object has expired, no objections have been received by the Court or by Magistrate Judge Katz. Nevertheless, the Court has undertaken a *de novo* review of the record. Based upon that review, the Court, as discussed below, adopts the Report and Recommendation in its entirety.

The Court's historical power to dismiss an action for failure to prosecute a case is codified in Rule 41(b) of the Federal Rules of Civil Procedure. Rule 41(b) provides, in pertinent part:

(b) Involuntary Dismissal: Effect Thereof. For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant.... Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision ... operates as an adjudication upon the merits.

*See also* *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630-31 (1962) ("The authority of a court to dismiss *sua sponte* for lack of prosecution has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."); *Minnette v. Time Warner,* No. 92-7951, slip op. at 4431, 4437, 1993 WL 233525, at *3 (2d Cir. June 30, 1993) ("[a] district court may, *sua sponte,* dismiss an action for lack of prosecution pursuant to Fed.R.Civ.P. 41(b)." (citing *Lyell Theatre Corp. v. Loews Corp.,* 682 F.2d 37, 42-43 (2d Cir.1982))).

While dismissal of an action for failure to prosecute is " 'a harsh remedy to be utilized only in extreme situations,' " *Romandette v. Weetabix Co.,* 807 F.2d 309, 312 (2d Cir.1986) (quoting *Theilmann v. Rutland Hosp., Inc.,* 455 F.2d 853, 855 (2d Cir.1972) (per curiam)), this sanction is necessary to allow courts "to clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link,* 370 U.S. at 630. *See, e.g., Peart v. City of New York,* 992 F.2d 458, 461 (2d Cir.1993) (affirming dismissal with prejudice where plaintiff's counsel failed to comply with two Court orders and otherwise demonstrated a lack of respect for the Court); *Ali v. A & G Co.,* 542 F.2d 595, 596 (2d Cir.1976) (affirming dismissal with prejudice

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

where counsel failed to appear for trial despite no showing of delay).

***2** In the instant case, plaintiff failed to perform any pre-trial discover or failed to take any steps to prosecute the action, since filing the Complaint over twenty months ago. Plaintiff failed to submit a pre-trial activity report as instructed by the Court, and failed to respond to Magistrate Judge Katz's repeated requests to schedule pre-trial discovery. Moreover, plaintiff failed to respond to any of defendant's discovery requests and failed comply with the Court's order to attend a pre-trial conference scheduled for June 9, 1993. Plaintiff's failure to appear occurred despite the Court's express warning that failure to attend could result in dismissal of the action. At the June 9, 1993 conference, defendant discussed with Magistrate Judge Katz the instant motion to dismiss for failure to prosecute. The motion was filed on July 20, 1993. Plaintiff submitted no opposition to the motion, and has not objected to Magistrate Judge Katz's Report.

Before dismissal is ordered, a court in this Circuit should give *pro se* litigants some notice of the consequences of their actions. *Bobal v. Rensselaer Polytechnical Institute,* 916 F.2d 759, 764 (2d Cir.1990). Here, plaintiff was given numerous warnings of the possibility of dismissal. First, Magistrate Judge Katz expressly informed plaintiff of the possibility of dismissal. Second, defendant's motion papers made it abundantly clear that dismissal could result from plaintiff's failure to respond to defendant's discovery requests. Third, plaintiff had an opportunity to object to Magistrate Judge Katz's Report. Accordingly, plaintiff was properly notified of the possibility of dismissal.

There is no explanation for plaintiff's failure to pursue the action, or his failure to appear at the pretrial conference.[FN2] Under these circumstances, it is appropriate for the Court to conclude that plaintiff has abandoned the action and to dismiss the action with prejudice.

CONCLUSION

The Court has reviewed the Report and finds it legally correct and proper. For the foregoing reasons, IT IS HEREBY ORDERED that the Report and Recommendation of Magistrate Judge Katz, dated October 27, 1993, is affirmed and adopted in its entirety. Accordingly, defendant's motion is hereby granted, and the action is dismissed with prejudice for failure to prosecute pursuant to Fed.R.Civ.P. 41(b).

SO ORDERED.

FN1. Fed.R.Civ.P. 6(a) provides that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded from the computation." *See also* Fed.R.Civ.P. 6(e) (additional three days for mail).

FN2. It may be of some moment that plaintiff was paroled on February 26, 1993.

S.D.N.Y.,1994.

Rodriguez v. Walsh
Not Reported in F.Supp., 1994 WL 9688 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin DANSBY, Plaintiff,
v.
ALBANY COUNTY CORRECTIONAL FACILITY STAFF, Defendant.
No. 95-CV-1525 (RSP/RWS).

April 10, 1996.
Kevin Dansby pro se.

*ORDER*

POOLER, District Judge.

***1** In an order and report-recommendation dated December 8, 1995, Magistrate Judge Smith noted that Dansby had not signed the complaint he filed to commence this action. Magistrate Judge Smith directed Dansby to submit an affidavit which contained all of the representations delineated in Fed.R.Civ.P. 11(b) with respect to his complaint. The magistrate judge recommended dismissal of Dansby's action if Dansby failed to comply with the terms of the report-recommendation within forty-five (45) days from the date of the service.

On December 12, 1995, a copy of the report-recommendation was served on Dansby by regular mail to his last known address, the Albany County Jail. On December 22, 1995, the jail returned the report-recommendation marked "Return to Sender -- No Forwarding Order on File."

Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute an action or comply with any order of the court. *Link v. Wabash R.R. Co.,* 370 U.S. 626, 629 (1962). The district court may exercise its discretion to dismiss when necessary to achieve orderly and expeditious disposition of cases. *See Rodriguez v. Walsh,* 1994 W.L. 9688, at *1 (S.D.N.Y. 1994).

Moreover, a plaintiff has the duty to inform the Court of any address changes. As the Fifth Circuit has stated:

It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Perkins v. King,* No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (citing *Williams v. New Orleans Public Service, Inc.,* 728 F.2d 730 (5th Cir. 1984); *Wilson v. Atwood Group,* 725 F.2d 255 (5th Cir. 1984) (en banc)); *see Wehlen v. Foti et al.,* 1987 W.L. 8039, at *1-2 (E.D.La. 1987); *see generally* Rule 41.2(b) of the Local Rules of Practice for the Northern District of New York.

This matter cannot proceed without Dansby filing the affidavit described above or notifying the court of his current address. Therefore, it is hereby

ORDERED, that this action is dismissed. *See* Rules 5.4(b)(4) and 41.2(b) of the Local Rules of Practice for the Northern District of New York, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail at his last known address.

IT IS SO ORDERED.

N.D.N.Y.,1996.

Dansby v. Albany County Correctional Facility Staff
Not Reported in F.Supp., 1996 WL 172699 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.